**FOR   PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| INTERFAITH COMMUNITY ORGANIZATION, *et al.*, | : | |
| | : | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | | |
| | : | |
| v. | | |
| | : | **OPINION** |
| HONEYWELL INTERNATIONAL, INC.,), *et al.*, | : | |
| Defendants. | | |
| | : | Civil Action No.  95-2097   (DMC) |

<u>**DENNIS M. CAVANAUGH, U.S.D.J.**</u>:

The most recent incarnation of this protracted and complicated case feels to the Court like deja vu all over again. (See 95-2097, Dock. 617, Court's Opinion June 14, 2005.) There are several motions and applications before the Court which will be addressed in turn. Interfaith Community Organization *et al* ("Plaintiff")  has filed applications asking the Court to award disputed fees and expenses for post-judgment and post-decree monitoring work in the companion cases of *Interfaith Community Organization v. Honeywell*, D.N.J., Civ. No. 95-2097, *Hackensack Riverkeeper v. Honeywell, Inc.*, D.N.J., Civ. No. 06-22, *Jersey City Municipal Utilities Authorities v. Honeywell, Inc*., Civ. No. 05-5955, and *Jersey City Incinerator Authority v. Honeywell International Inc*., D.N.J., Civ. No.05-5993, all of which are opposed by

Defendant.[1] In addition, Plaintiff has filed a motion to consolidate four cases involving various study areas which Defendant opposes. There is also a pending motion by Plaintiff requesting a declaratory judgment that Defendant's offers of judgment pursuant to Fed. R. Civ. P. 68 are null and void. In addition, Defendant has recently filed a motion to strike new evidence and argument in Plaintiff's reply brief, much of which the Court finds to be moot,  which led Plaintiff to file a motion requesting permission to file a sur-sur-reply brief.

**I.**     **BACKGROUND**

For purposes of this Opinion, the Court will summarize only so much of the history of this litigation as it deems necessary to understanding the Court's decision.

On May 21, 2003, this Court entered an Amended Opinion granting judgment in favor of Plaintiff with regard to Plaintiff's 42 U.S.C. §7002(a)(1)(B) claims against Honeywell.  *See Interfaith Community Organization v. Honeywell Int'l Inc.*, 263 F.Supp. 2d 796 (D.N.J. 2003). The Amended Opinion awarded Plaintiff fees and costs that were "incurred in furtherance of its RCRA claim against Honeywell in this action." Id. at 850.  Defendants subsequently appealed, and the Third Circuit affirmed in part and vacated in part (426 F. 3d 694(3dCir. 2005)). Following the appeal and denial of certiorari, the companion cases were filed. Collectively, these cases involve several Study Areas 6 North and South and 5. All of them were brought with the intention of imposing a comprehensive clean up of chromium contamination resulting from the operations of Honeywell's predecessor in interest, Mutual Chemical Company.

Over the course of this litigation, the parties have entered into a number of consent

---

[1]Although the Court had originally thought to entertain oral argument on this and other matters, it became clear that the excellent briefing by both parties would give the Court more than sufficient basis upon which to rule on the papers on all the pending motions.

decrees and consent orders that gave rise to the fees and expenses sought in Plaintiff's three applications for work in 2009, 2010, and outstanding fees and expenses as defined by the NJCU consent decree. Each of the consent decrees includes a provision regarding the payment of past fees and expenses, as well as a provision regarding future fees and expenses. Until 2009, the parties were able to negotiate the amount of future fees without intervention of the Court, but have not been able to do so more recently. At issue are both the reasonableness of the hours and expenses as well as the correct rate to be applied to determine the appropriate fees. Although this issue was previously litigated and decided by the Court in the Study Area 7 case, Defendants feel the time is ripe to raise the issue for the post-decree and post-judgment work for 2009 and the first half of 2010, as well as the outstanding fees and expenses as defined by the NJCU consent decree.

## II.    **LEGAL STANDARD**

Section 7002(e) of the Resources Conservation and Recovery Act ("RCRA") 42 U.S.C. 6972(e) provides that the Court "may award costs of litigation (including reasonable attorneys' and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate.[2]"

_____

[2]This Court previously determined that Plaintiffs in the underlying Study Area 7 litigation were prevailing parties, and the Court finds that the same holds true for the Study Area 5/6 Plaintiffs, despite Defendants objection that the litigation objectives were not fully vindicated. As the Supreme Court noted in *Hensley v. Eckerhart* 461 U.S. 424, 431, 103 S.Ct. 1933, 1938 (U.S.S.C., 1983) quoting *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444 (CD Cal.1974), "it also is not legally relevant that plaintiffs' counsel expended a certain limited amount of time pursuing certain issues of fact and law that ultimately did not become litigated issues in the case or upon which plaintiffs ultimately did not prevail." Moreover, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Nadeau v. Helgemoe,* 581 F.2d 275, 278-279 (CA1 1978). The Court previously stated in an Order dated

3

The Third Circuit has explained that, as part of the assessment of the reasonableness of fee petitions, district courts "should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" *PIRG of N.J. v. Widnall*, 1995 WL 836144. When a defendant challenges the number of hours as being excessive, courts frequently look at two factors to guide the assessment of reasonableness-whether such charges would be billed to a fee-paying client, and what the opposing party did in the same case. *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 587 (3d Cir.1984); *Lenard v. Argento,* 808 F.2d 1242, 1245 (7th Cir.1987); *Jordan v. CCH, Inc.,* 230 F.Supp.2d 603, 611 (E.D.Pa.2002); *Coalition to Save Our Children v. State Bd. of Educ.,* 143 F.R.D. 61, 63-65 (D.Del.1992).In *Bell v. United Princeton Properties, Inc.,* 884 F.2d 713, 720 (1989), the Third Circuit held that the opposing party bears the burden of challenging the reasonableness of a fee application with sufficient specificity as to give the applicant notice and an opportunity to respond. Specifically, the Third Circuit stated that "[a] court may not sua sponte reduce the amount of the award when the defendant has not specifically taken issue with the amount of time spent or the billing rate, either by filing affidavits, or in most cases, by raising arguments with specificity and clarity in briefs (or answering motion papers).... It bears noting that the district court retains a great deal of discretion

_____

May 16, 2003:

> Having prevailed on their RCRA claims, [Plaintiffs] are entitled to
> an award of attorneys' fees, costs and expenses they have incurred
> in furtherance of their RCRA claims in this action.

4

in deciding what a reasonable fee award is, so long as any reduction is based on objections raised by the adverse party." (Internal citations omitted). The court went on to state that "[t]he adverse party's submissions cannot merely allege in general terms that the time spent was excessive. In order to be sufficient, the briefs or answers challenging the fee request must be clear in two respects. First, they must generally identify the type of work being challenged, and second, they must specifically state the adverse party's grounds for contending that the hours claimed in that area are unreasonable. The briefs must be specific and clear enough that the fee applicants have a fair chance to respond and defend their request." [footnote omitted].*Id.* at 720.In *Rode v. Dellarciprete,* 892 F.2d 1177, 1187 (1990), the Third Circuit explained that based on the challenges raised by the adverse party, the district court must "explain why it concludes hours expended on a task are excessive" and must "specify the number of hours that would be reasonable and why those hours would be reasonable." It also reiterated that "[t]he district court cannot 'decrease a fee award based on factors not raised by the adverse party." ' 892 F.2d at 1183 ( *quoting Bell v. Union Princeton Properties, supra* ). "The first inquiry of the court should be into the hours spent by the attorneys-how many hours were spent in what manner by which attorneys. It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought." *Lindy Bros. Builders, Inc.,* 487 F.2d at 167.

In 1985, the Third Circuit established a Task Force on Court Awarded Attorney Fees to

address the issue of fee awards in this circuit.  The Task Force recommended the adoption of the "forum rate" rule.  Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 260 (1985).

Most Courts in this Circuit have held that, absent special expertise or inability to obtain local counsel, the forum rates should apply.  The Task Force has indicated that the forum rate rule should be applied except "when the need for 'special expertise of counsel from a distant district is shown' or when local counsel are unwilling to handle the case."  108 F.R.D. at 261.

III.   **<u>DISCUSSION</u>**

The Court notes that the amount of litigation engendered by the present fee dispute has probably cost  as much as the contested amount. It is notable that between 2005 and 2009, with guidance from the Court, but absent substantive litigation, disputes such as the one at hand were avoided by consent agreements that represented the ability of both parties to compromise. It is unfortunate that litigation to resolve fee disputes has once again taken on a life of its own, in contravention of the admonition of the Supreme Court that "a request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941 (U.S.S.C., 1983).

 Nonetheless, there are two distinct issues that are raised by the instant fee applications and the opposition thereto. One is the proper method of calculating the rate at which fees are to be awarded, and whether deviation from the forum rate rule as previously determined by the Court still applies, and the other is whether the hours and expenses documented by Plaintiffs are, in fact, reasonable. The Court will not conduct a hearing to determine the proper  rate since the

Court is persuaded that Plaintiff has, in its initial moving papers,[3] (05-5955,  Docket No. 331,) established that at least one, if not both, of the exceptions to the forum rate rule still apply. The Court is  persuaded that, whether because of the "law of the case" doctrine, or a simple exercise of common sense, it would have been unreasonable to expect Plaintiffs to change horses in mid-stream, and suddenly find, or need to document the inability to find, competent local counsel to continue the litigation in Study Areas 5 and 6. The ultimate goal of the litigation was a comprehensive solution, and that goal was best met with continuity of counsel at the rate which had previously been decided, and approved, albeit reluctantly, by the Third Circuit. Thus, the Court rejects from the outset Defendant's contention that we must review the forum market rate, and the exceptions thereto, as if they had never been discussed or litigated in the first place. Whether or not the inability to find local counsel still obtains, there is no question that Plaintiff is correct that the goal of all the litigation at issue was to "effectuate a comprehensive remediation of the hexavalent chromium contamination emanating from the former Mutual Chemical Company site on Route 440 in Jersey City, New Jersey." (05-5955, Dock. 331-5, Millian Affidavit,¶12). Although the litigation may have been conducted piecemeal or in stages, the ultimate purpose of the cases involving all three study areas was identical. There is no question, then, as the Terris firm points out, that  "our representation of the plaintiffs in the Study Area 7 case gave us significant expertise and knowledge with regard to the facts and the law needed to prove the imminent and substantial endangerments created by the chromium contamination at Study Areas 5 and 6." (*Id.* ¶29). It would be perverse to expect either that the Terris firm's

---

[3] It is for this reason that Defendant's most recent motion (05-5955, Motion to Strike, Docket 408) is rendered moot as to new evidence and argument concerning deviation from the forum market rule, and the exceptions to that rule.

expertise was vital to one phase of the litigation, but not to all phases, or that such expertise was not important to Plaintiffs as they proceeded. As Plaintiff's point out, "only the Terris firm could have brought the special expertise acquired from the Study Area 7 case to the Study Area 5 and 6 case."(Plaintiff's Application for and Brief in Support of Disputed Fees, 95-2097, Docket 331-1, page 17). The Court takes seriously Defendant's contention that "this argument is circular; it cannot be the case that once a law firm litigates a particular type of matter in a foreign jurisdiction, it is forever deemed to have special expertise such that no local firm is capable of handling similar or related matters." (05-5955, Dock. 370, Defendants Opposition brief, page 13-14. ) Nonetheless, this case is the exception that proves the rule. The Court is not conferring a monopoly on the Terris firm to conduct unfettered litigation in New Jersey at Washington, D.C. rates. Rather, the Court is making the logical inference, supported by the geographical and legal facts of the case, that all this litigation is of a piece, should be subject to the same fee rates, and that the Terris firm has actual expertise that makes them unique to the prosecution of all the Plaintiff's interests, and not just the interests of the Study Area 7 Plaintiffs.

As to the second factor that justifies an exception to the forum rate rule, the Court once again relies on the affidavit of Edward Lloyd submitted by Plaintiff in their initial moving papers filed with the Court on December 16, 2010, as well as the affidavit of William Sheehan filed on the same date, and not the subsequent affidavits filed with the Court in June to which Defendants have taken exception. Although Mr. Lloyd did not make an individualized assessment for the purposes of the Study Area 5 and 6 litigation of whether there might have been some New Jersey firm out there willing to litigate on speculation that their fees and expenses would ultimately be paid, the Court does not believe that either he or Plaintiffs was obligated to do so. The Court is

satisfied that nothing has occurred in the interim which alters the futility analysis the Court previously engaged in, and which Mr. Sheehan's affidavit seconds. *(See ICO v. Honeywell,* 336 F. Supp. 2d 370 (2004), affirmed in part and remanded in part.)  Defendant's declaration from Mr. Kurzweil did not address the one crucial question, whether any firm in New Jersey was both capable of and willing to assume the responsibility and attendant liabilities and expenses of either the original case or its progeny. The inclusion of billing data from the Special Master and the law firm and experts hired by him to assist in the process are equally unhelpful, since the lawyers engaged by the Special Master were already assured of payment. The Court also finds that they do not bear on the fee to be applied for Mr. Lloyd's work, which the Court concludes should be $715.00 per hour for an attorney with his unique skill set and experience in this precise and highly specialized corner of complex Federal environmental litigation. As to the question of whether a local firm was competent, available and willing, Mr. Kurzweil's study only demonstrates that had there been such a firm, it would have saved Defendants money. The Court finds the flurry of motions relating to discovery and subpoenas issued by Plaintiffs to extract information from law firms who participated in the Kurzweil study to be a distraction, indicative of the Terris firm's occasional and unfortunate resort to severe litigation tactics. Since all those motions, and the prolific opposition they engendered, are rendered moot by the Court's Opinion, nothing further need be said on the matter.

The second related issue of the Laffey Matrix is somewhat more complex, only because different courts have chosen such different approaches. Both parties have directed the Court to Opinions from the District of Columbia Circuit in support of their positions concerning the proper method of updating the Laffey Matrix, using either the Defendant's preferred method, the

9

U.S. Attorney Matrix data which  monitors the cost of living index in Washington, D.C., or Plaintiff's preferred method, the Legal Services Index ("LSI") method of accounting for shifts in the consumer price index for legal services nationwide. Although our Circuit has yet to specifically approve either version of updating the Laffey Matrix, the Court will rely on the holding in the previous *ICO v. Honeywell* 426 F. 3d. 94 (3rd Circuit 2005) case  which concluded that reliance on Plaintiff's preferred method ,based on *Salazar v. District of Coumbia,* 123 F. Supp. 2d 8 (D.D.C. 2000), "was not clearly erroneous." While this may seem less than the strongest footing, the Court concludes that it is preferable to choosing between two diametrically opposed approaches favored by different District Court Judges in another Circuit. Even if the Court were going to decide on the basis of favoring one foreign case over another, the Court is persuaded that the methodology of *Salazar* is preferable to *M.R.S. Enterprises, Inc. V. Sheet Metal Worker's International Association*, 2007 WL 950071 (D.D.C. Mar. 29, 2007), the case Defendant would have the Court rely on.[4]

The Court now turns to the fact intensive and laborious task of determining whether the hours expended by Plaintiff in these matters was reasonable. The Court begins with the well-established proposition that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941 (U.S.S.C., 1983). Plaintiff has met this burden with

---

[4]The Court notes a recent Opinion in our district in which Judge Walls chose not to apply the Laffey matrix. (See *Port Drivers Federation 18, Inc. V. All Saints Express*, 09-civ-868) in a case that is clearly distinguishable from the case at bar. The legal issues were not complex, and no special expertise was required. Plaintiff's attorney submitted "nothing more than a generalized statement that lawyers prefer certainty in billing." (Opinion, Docket No.86, page 6.) As Judge Walls held, *Port Drivers* is a classic case where the forum rate rule applies. The instant case is a classic example of where it does not.

records that are both detailed and voluminous.[5] The Court will attempt to address the specific objections raised by Defendant in reverse order, beginning with Defendant's objections to the first half of 2010 post-judgment and post-decree work.

Defendant complains (95-2097, Dock. No. 1063) that Plaintiff's fee application for the interim remediation of a residential property known as the "Fisk Street Homes" was excessive because the entire cost of the remediation was less than the hours billed by Plaintiff for legal work in connection to the project. Defendant's protest that this was "a minor remedial issue" and that Plaintiff's aggressive litigation caused Defendant to make "an economically rational decision to conduct the unnecessary remedial work." (See 95-2097, Docket 1063, page 22). Defendant fails to acknowledge that over-litigation has been a strategic tool employed by both parties since the onset of this case in 1995. The parties have taken the attitude that anything worth doing is worth over-doing, and therefore neither side ever fires a bullet when a cannon will do. While this may be distasteful, it is not unreasonable in light of Plaintiff's objective. The result of Plaintiff's aggressive tactics was to achieve the remediation they sought, even if it was through a form of economic intimidation. The Court is not in a position to second guess this strategic decision. This is one of the reasons that the Court finds Defendant's arguments that Study Areas 5 and 6 are substantially unrelated to the initial study area 7 and did not even require litigation to be disingenuous. Defendant maintains that Plaintiff is not entitled to the same level of remuneration

---

[5]Although both Plaintiff's and Defendant's exhibits are voluminous, they are confusing. The Court has made general findings as to the categories of fees which it deems to have been excessive, but has not arrived at a precise dollar amount for every item. The Court awaits proposed orders from the parties to calculate the amount owed by Defendant to the Terris firm in order to comply with this Opinion, and hopes that this simple request for a calculation will not result in yet another round of contentious litigation.

where litigation *per se* was not required, but this ignores how litigation came to be avoided in the second round of cases. Although Defendant disputes that Plaintiffs prevailed in the secondary cases because "no party vindicated its litigation demands," this belies the truth of the remedy that Plaintiffs did achieve and continue to monitor and enforce, "Honeywell agreeing to undertake environmentally sound remedies centered around the principle of excavation of future residential areas and capping of commercial and open space areas." (05-5955, Dock. 370, page 37.) It is further evidence of how the expertise gained by Plaintiff's attorneys in litigating the area 7 case bore directly on their ability to achieve consent decrees and remediation plans with Defendant for subsequent work. What Defendant labels "churning" the Court sees as Plaintiff's zealous "take no prisoners" attitude. While Defendant is correct that "there must be a correlation between the 'hours worked' and the 'total recovery,'" (see *Ursic v. Bethlehem Mines*, 719 F. 2d 670(3d Cir. 1983), it is not clear if the total recovery is merely the small remediation of the Rosario property, or Plaintiff's larger concern that in the future, Defendant will remediate sooner and save itself litigation costs that it has reason to believe will be forthcoming if they do not. The fact that even after having undertaken the remedial work, Defendant still regards it was "unnecessary"(95-2097, Docket 1063, page 22) only serves to demonstrate to the Court that had Plaintiff taken a less contentious approach, they would likely not have prevailed, although the Court expresses no opinion as to the merits of this particular remediation project. The Court will not reduce the hours spent or the fees for this item.

The next issue raised by Defendant is the amount of time Plaintiff's attorney spent creating a "Master Calendar for all Consent Decrees," an effort that took 97 hours and resulted in a fee of $16,674.05. The Court agrees that this is excessive, especially because it is tangential to

12

the litigation, and as Defendant points out, is more for the efficiency and convenience of Plaintiff's attorneys than for any bona fide litigation purpose. The Court cautions, however, that denying Plaintiff's attorneys the ability to create such calendars and time-saving efficiencies in the future may perversely result in higher fees going forward. Nonetheless, the Court will reduce the amount of the requested fee for this item by 25% to $12,505.54.

Defendant next complains that Plaintiff's hours for the 2008 fee mediation, settlement and briefing are excessive. Once again, the Court is in a difficult position to second guess these expenses, and suspects that much the same kind of posturing and strategy as the Court discussed in the Fisk Street Properties example was at play here as well. The fact that the original fee application prepared by Plaintiff's attorney in 2008 was never filed does not suggest to the Court that the work was unnecessary or unsuccessful, but rather, the opposite. It seems that the tactic of preemptive and aggressive litigation employed by Plaintiff's attorneys extended to the fee dispute arguments as well, although as the current motions before the Court demonstrate, not always successfully. The Court sees no imperative in reducing the hours for the 2008 fee application.

Defendant next asks the Court to reduce the hours spent by Plaintiff's attorneys to secure financial assurances from Defendant. Defendant avers that this was unnecessary because "Honeywell has shown its commitment to meet its financial obligations with regard to the environmental cleanups since 2003" (95-2097, Docket 1063, page 30), and further argues that this represents how the "Terris firm has used fees to back Honeywell into a corner." Once again, what Defendant decries as abuse, the Court interprets as Plaintiff's crude way of evening the playing field between a powerful corporate Defendant with deep pockets, and a group of citizens

13

attempting to rectify an environmental disaster. While the approach may be unsavory, it is

outside the scope of the Court's review. The Court reviews the reasonableness of the hours, and

the results achieved, not the strategic choices that Plaintiff's attorneys were entitled to make

unless they are clearly over zealous or unreasonable. The Court is not unmindful of what

Defendant's call "a classic Catch-22" (Id.), but it is unclear how the Court's intervention might

change the long standing and unfortunate dynamic of the parties' relationship, or the strategic

decisions of both parties.

    Defendant's arguments with regard to the 100% Design Document Review that produced

only two pages of legal comments based on billing  $26, 960.03 in fees seems excessive, as do

the fees for case management and document storage.  The case management fees in particular are

susceptible to the same analysis as the Court's finding as to the production of the "Master

Calendar for all Consent Decrees," but the Court finds that  case management oversight is critical

to the efficiency of litigation. The Court will reduce these items by 10% each. The amount for the

100% Design Document Review will accordingly be reduced to $24,264.03.

    Defendant next asks the Court to reduce what it labels "an excessive amount of hours on

tasks at issue in Plaintiffs' prior fee applications," including "Special Master Meeting

Preparation and Follow-up" and "Bruce Terris oversight." The Court finds neither of these

requests availing. The Special Master proceedings are at the heart of the successful resolution of

this extensive clean-up process. As Plaintiff points out, the Special Master does not represent the

Plaintiff's interests. Those interests can only be properly vindicated if Plaintiff vigorously

defends them in the on-going monitoring process. The Court can not gainsay what amount of

preparation is required, other than to note that since this is the crux of Plaintiff's attorneys'

responsibility to the zealous representation of their clients,  the Court will not easily trifle with nor disturb Plaintiff's representations as to reasonableness. However, while the Court declines to reduce the number of hours Mr. Terris expended on oversight, the Court does find that the amount of intra-office conferencing is excessive, and will reduce that amount by 10%.

The Court takes exception to the extensive billing for activities related to legislative initiatives that Defendant enumerates. (See 95-2097, Docket No. 1036; 05-5995 Docket No. 370). As Defendant points out, "passage of new laws and regulations could well aid any plaintiff's case-not just this part of litigation." (Id., page 57). While it is clear that Plaintiff's attorneys had extensive expertise which was useful in the rule making and legislative process, it is not clear how that process directly benefitted Plaintiffs in any other than a speculative or redundant way. While Plaintiff correctly directs the Court to *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546 (1986), the Court is not convinced that *Delaware Valley* is as factually apt as Plaintiff suggests. While the environmental covenant that Plaintiff's attorneys worked on may "add to the layers of protection of the consent decrees" (Plaintiff's Application and Brief, 05-5955, Dock. 331-1, page 39), it was likely not, as was the case in Delaware Valley, work that was "crucial to safeguard the interests asserted," (Id. At 3095) and therefore the entire amount should not be compensable. It is difficult for the Court to gauge what part was crucial to Plaintiffs in the instant cases.  The Court is certain that, to a large extent, these activities did, and will continue to,  accrue to the benefit of the named Plaintiffs. Therefore, the Court will reduce the amount of Plaintiff's fee applications in regard to rule making, lobbying and associated activities by 25%.

Defendant has raised the issue of Plaintiff's work with regard to Regnal Realty, a party

joined and later voluntarily dismissed without prejudice, on the basis that Regnal Realty was not part of the Study Area 5/6 litigation, and that Plaintiff's claims were dismissed "without obtaining any actual relief."(05-5955, Docket No. 370, page 49). Plaintiff points out that it never had claims against this party. Regnal was joined as an indispensable party as part of Plaintiff's action against Defendant, which was successful. Moreover, the dismissal to which Defendant directs the Court specifically mentions shallow groundwater in Study Area 5, and reserves the right to rejoin them if necessary for the purpose of enforcing Honeywell's compliance. Thus, it appears that the Regnal Realty work was not separate and apart from the overall litigation, and should not be treated as an independent or  unsuccessful action. The Court will not reduce the amount Plaintiff has billed for this item.

The Court finds that Plaintiff's review of confirmation sampling was justified, as was its storm water management, despite Defendant's argument that these should not properly be under the legal rubric. The Court finds it appropriate for there to be legal oversight over anything that effects Defendant's compliance. The efforts of Plaintiffs to monitor the disposal of excavated material in Idaho is, however, outside the scope of appropriate oversight, and the Court will deduct $2,053.93 accordingly.

Defendant opposes Plaintiff's fee applications for the 2009 post-judgment and post-decree work, as well as outstanding fees and expenses as defined by the NJCU consent decree, and argues that Plaintiffs completely lacked billing judgment, and that the "Terris firm over-staffed and over-lawyered the Study Areas 5/6 litigation." (05-5955, Docket 370, page 39.) Specifically Defendant avers that Plaintiff's fees for filing and service of the complaint, expert work, Rule 30(b)(6) depositions, review of Honeywell documents, pre-trial work, document

16

management and expert fees and expenses are all unreasonable. The Court credits Plaintiff's

arguments in reply as to the reasonableness of the legal and expert fees, expenses and hours

charged. Moreover, the Court finds that Plaintiffs were correct to supplement their initial fee

application with evidence once the hours and fees had been challenged by Defendant. As

previously noted, the evidence contained in Plaintiff's reply brief dealing with the forum rate rule

and Laffey Matrix were superfluous because the initial briefing did not require further

elucidation, and the Court found them to be sufficient from an evidentiary point of view. To the

extent that Plaintiff's reply contained new legal argument, the Court has discounted it, but the

explanations offered by counsel as to the hours and fees, and the reasonableness of both, were

entirely appropriate. The Court will not second guess the staffing decisions of either the Terris

firms or its experts, nor will the Court parse the skill required to produce fee applications as

opposed to other legal documents. The Court is mindful that other courts have taken a more

aggressive approach to fee reduction, but adopts the philosophy recently expressed by the

Supreme Court, that ["t]rial courts need not, indeed should not, become green-eyeshade

accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to

achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and

may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 131 U.S. 2205,

2011 WL 2175211(2011). Having presided over this case for years, this Court finds that advice

to be both apt and insightful.

The Court next turns to the issue of consolidation, raised by Plaintiffs in a motion filed

with the Court February 3, 2011 (see 95-2097, Docket No. 1013). Defendants are joined in their

opposition by Consol Cross Defendant New Jersey City University. Defendants first maintain

17

that consolidation will be confusing and judicially inefficient. While there is some cause for concern, the issue of confusion and efficiency are equally problematic with the separate dockets as they currently exist. In fact, the wisdom behind consolidation became evident to the Court in the course of preparing this Opinion. Defendant's argument that it will complicate the eventual purchase of some of the property involved in the various clean-ups is unavailing. Presumably any purchaser of property, especially property that has been the subject of environmental litigation, would take the time to examine all available evidence with a fine tooth comb before proceeding with purchase. Combing through one long, extended docket, rather than three piecemeal ones, does not seem overly burdensome to potential purchasers. While the Court agrees that the length of the unified docket will be unwieldy, it is less so than three dockets which are largely duplicative of one another. Unifying the docket will reduce the need for duplicative and wasteful multiple filings which have certainly added to the fee disputes at issue, but it need not confuse the discrete issues applicable to the individual study areas if the litigants are meticulous in their filing and record-keeping, as the Court notes they have been. The Court notes that ultimately, the way to control the length of the docket is not to divide it into equally unwieldy pieces, but rather to undertake extensive litigation only with circumspection and restraint, and to return to a more cooperative and productive relationship between the parties. The Court finds that Plaintiff's motion to consolidate the cases under one docket is not an attempt to make an end-run around the fee dispute, which the Court has already opined on, but is, in fact, a legitimate exercise of judicial efficiency.

The final motion is Plaintiff's request for declaratory judgment that Defendant's offers of settlement pursuant to Fed. R. Civ. P. 68 are null and void.

The Court finds the well-reasoned and thoughtful approach taken by Judge Brotman from our District in *Public Interest Research Group of New Jersey, Inc. V. Struthers-Dunn, Inc.*, 1988 WL 147639(D.N.J.) to be persuasive. Defendant argues that *Struthers-Dunn* is factually inapposite because "this contrasts sharply with an offer of judgment made in the attorneys fees context where (a) no underlying environmental rights or remedies are at issue, and (b) the Terris firm stands to benefit directly from remuneration received, and from continued litigation of attorneys' fees issues." (95-2097,   , page 15). The Court disagrees for several reasons. First of all, Defendant mischaracterizes  the on-going monitoring work that Plaintiffs have undertaken, and will continue to engage in as somehow being independent of the underlying environmental rights and remedies. That is simply not the case. The enforcement of the judgment, and the careful adherence to the terms of the consent decrees are just as fundamental to the environmental rights and remedies as the original law suit. Second, the Court finds Defendant's characterization of the Terris firm's fee application as a "benefit" to be misleading. As the Supreme Court has said, "fee shifting statutes were not designed as a form of economic relief to improve the financial lot of attorneys."*Pennsylvania v. Delaware Valley Citizens Council,* 478 U. S. 546, 565 (1985), and that is not what the Terris firm, as the Court understands it, seeks in the instant applications. The Court does not construe the legitimate fees, reduced in part as previously enumerated by the Court's Opinion, to be a windfall or a benefit as the term is implied by Defendant. Attorneys, just like other members of the workforce, are entitled to payment for the work they perform. Attorneys fees, whether paid by Plaintiff or Defendant, imply a contractual relationship, not a benefit or a gratuity. The work that the Terris firm performed should be compensated, not as a benefit, but because it was earned especially in light of the fact

19

that, as Plaintiffs point out, in this suit, "counsel are only paid if they prevail." (05-5955, Docket No. 399, page 9). The Court would expect no less of Defendant in compensating their attorneys for work that has been performed. Defendant's contention that "the Terris firm has already collected a windfall of millions of dollars in fees for the 'litigation' of Study Areas 5 and 6 when that case involved very little litigation" is offensive, and the Court takes exception to Defendant's narrow construction of the word "litigation," and the implication that anything short of a full-blown trial is somehow unworthy of compensation. The lengthy and unwieldy docket of which Defendant complained in opposing Plaintiff's motion to consolidate is certainly evidence of the on-going litigation, despite the fact that the judgment of the Court in the underlying case was entered in 2003. The fact that the Terris firm  has earned millions of dollars in prosecuting the interests of the citizen Plaintiffs does not indicate that it has been the beneficiary of  a windfall.

The *Struthers-Dunn* Court was persuaded, as is this Court, that Rule 68 offers of judgment in the context of citizen's suits that seek only injunctive and remedial relief, but offer no potential for Plaintiffs to receive monetary recovery, are "simply incompatible with the purposes Congress sought to serve in enacting § 1365." The Court further stated that "such an impingement on a Congressional statute through the application of a federal rule of civil procedure is barred by the Rules Enabling Act, 28 U.S.C. § 2072. The effectiveness of § 1365 as 'a very useful additional tool in enforcing environmental protection laws,' 118 Cong.Rec. 33717 (1972), 1 Leg.Hist. 221 (Sen. Bayh), *cited in Gwaltney of Smithfield v. Chesapeake Bay Found.,* 108 S.Ct. 376, 383 (1987), is certainly diluted, if not decimated, by the disincentives created when Rule 68 is applied to citizen suits." The Catch-22 of allowing Rule 68 offers of judgment, even in the context of attorney fee disputes in citizen suits, is simply inimical to the goal of

20

encouraging law firms to represent Plaintiffs in such actions. Ironically, as the difficulty of litigating fee applications in these cases is lessened, more local firms such as those represented in the Kurzweil affidavit might be encouraged  to incur the out of pocket expenses of complex environmental litigation without the potentially crippling risk of non-payment of fees and expenses. In the end, this decision may lead to the availability and willingness of local counsel to represent citizen plaintiffs, which would allow the Court to apply the forum rate rule without resort to its exceptions in future cases. This is in keeping with Congressional intent, as expressed in U.S.Code Cong. & Admin.News 1976, p. 5913 of the Senate Report that "Congress provided fee shifting to enhance enforcement of important civil rights, consumer-protection, and environmental policies. By providing competitive rates we assure that attorneys will take such cases, and hence increase the likelihood that the congressional policy of redressing public interest claims will be vindicated."

Defendant would have the Court rely on *PIRG of N.J. v. Widnall*, 1995 WL 836144, stating incorrectly that "the *Widnall* decision is on all fours with the current case."( p. 12).The *Widnall* Court did not actually consider the propriety of Rule 68 offers of judgment in suits of this kind, and it does not appear that either party briefed the issue for the Circuit Court. In fact, Defendant's brief to the Third Circuit in *Widnall* specifically states "at the outset we note that we are not invoking Rule 68 in the instant case. ..Nor did we seek application of Rule 68 in the district court." Moreover, Defendant's brief further states "the question before this Court is not whether Rule 68 applies but whether the district court abused its discretion in denying the 'fees on fees' application." (See Brief of Appellee/Cross-Appellant Sheila E. Widnall, 1994 WL 16014839). To use *Widnall* for the proposition that it approves Rule 68 offers of judgment when

21

in fact the Court never considered that legal question is disingenuous. In contrast, *Struthers-Dunn* is actually on all fours with the instant case, and the Court adopts and endorses its holding.

**IV.**   **CONCLUSION**

      For the reasons stated herein, Plaintiff's motion to consolidate Docket Numbers 95-2907, 05-5955 and 06-22 is **granted.** Plaintiffs applications for attorneys fees and expenses will be **granted** in part and **denied** in part. Plaintiff's motion for a declaratory judgment stating that Defendant's offers of settlement pursuant to Fed. R. Civ. P. 68 are null and void is **granted**. Defendant's motion to strike evidence and argument in Plaintiff's reply brief is **denied.** An appropriate Order accompanies this Opinion.

                     S/ Dennis M. Cavanaugh
                     DENNIS M. CAVANAUGH, U.S.D.J.

Date:   September ___8___, 2011

cc: All Counsel of Record
     Hon. Joseph A. Dickson, U.S.M.J.
     File