Plaintiffs'
Exhibit 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| INTERFAITH COMMUNITY ORGANIZATION, *et al.* | ) ) | **FILED ELECTRONICALLY** |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Civ. No. 95-2097 (JLL) |
| HONEYWELL INTERNATIONAL, INC., *et al.* | ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| HACKENSACK RIVERKEEPER, INC., *et al.* | ) ) | |
| Plaintiffs, | ) | Civil Action No. 06-22 |
| v. | ) | **Consolidated with** |
| | ) | **Docket No. 05-05955** |
| HONEYWELL INTERNATIONAL INC., *et al.* | ) ) | **under Docket No. 95-2097** |
| Defendants.) | | |

## AFFIDAVIT OF KATHLEEN L. MILLIAN

I, Kathleen L. Millian, do hereby affirm and state:

1. I am a partner in the law firm of Terris, Pravlik & Millian, LLP (hereafter "the Firm"). During the 2012-2013 time frame, I was responsible for representing plaintiffs before Special Master Torricelli in *Interfaith Community Organization v. Honeywell International, Inc.*, D.N.J., Civ. No. 95-2097 (hereafter "*ICO v. Honeywell*" or the "Study Area 7 case"), and its companion case, *Hackensack Riverkeeper v. Honeywell International Inc.*, D.N.J., Civ. No. 06-22 (hereafter "*Riverkeeper v. Honeywell*" or the "Study Areas 5 and 6 case")(referred to collectively

as "Study Areas 5-7 cases").  The Study Areas 5 and 6 case was consolidated with

Civil No. 05-5955, and was subsequently consolidated under Docket No. 95-2097.[1]

As explained in detail below, I offer this affidavit in support of plaintiffs' fee

application for the fees incurred in 2012-2013 for the work related to post-judgment

and post-decree monitoring work in the above-captioned actions.[2]

2. The Firm, which has generally had 11 attorneys since the Study Area 7 case

began in 1995, engages almost exclusively in litigation in areas that have come to be

identified with public interest law, particularly in the areas of environmental,

employment, civil rights, and consumer law.  Since 1970, when the Firm was

established, environmental cases, involving such environmental statutes as the

Resource Conservation and Recovery Act (hereafter "RCRA"), 42 U.S.C. 6901, *et

seq.*, the Federal Water Pollution Control Act, 33 U.S.C. 1251, *et seq.*, the National

Environmental Policy Act, 42 U.S.C. 4321, *et seq.*, the Clean Air Act, 42 U.S.C. 7401,

*et seq.*, the Endangered Species Act, 16 U.S.C. 1531, *et seq.*, and the Outer

Continental Shelf Lands Act, 43 U.S.C. 1331, *et seq.*, have averaged about 60% of our

---

[1]On September 8, 2011, this Court consolidated the Study Areas 5 and 6 case under *Interfaith Community Organization v. Honeywell International Inc.*, D.N.J., Civ. No. 95-2097. Sept. 8, 2011, Order ECF No. 1090.  The Study Areas 5 and 6 case had been previously consolidated with *JCMUA v. Honeywell International Inc.*, and *JCIA v. Honeywell International Inc.*, D.N.J., Civ. No. under Docket No. 05-5955.  July 26, 2006 Order, ECF No. 34 in Docket No 05-5955.  Whenever possible, citations herein to the docket are to the consolidated Docket No. 95-2097.  However,  since Docket No. 05-5955 is not completely duplicated in Docket No. 95-2097, when necessary, citations will be made to Docket No. 05-5955 and noted as such in the citation.

[2]Throughout this affidavit, the term "fees" shall mean "fees and expenses."

2

work.  The Firm has over 40 years of experience in federal environmental litigation on behalf of citizen plaintiffs.  We have litigated over 100 citizen suits in Alabama, Alaska, Florida, Kentucky, New Jersey, New York, North Carolina, South Carolina, Tennessee, Texas, Virginia, Washington, D.C., and West Virginia.  Many of these cases are described in the Firm's environmental resume, which is attached as Plaintiffs' Exhibit 2.

## PROCEDURAL BACKGROUND

3.  The Firm represents the plaintiffs in *ICO v. Honeywell*, which is a RCRA citizen suit brought to address the chromium contamination in the soils, groundwater, surface water, and sediments in a portion of the area designated by the New Jersey Department of Environmental Protection as Study Area 7.  The Firm also represents the plaintiffs in *Riverkeeper v. Honeywell*, a companion case to the Study Area 7 case that addresses chromium contamination in the soils, groundwater, surface water, and sediments in Study Area 6, which is adjacent to Study Area 7 to the north and the south, and Study Area 5, which is across Route 440 from Study Area 7.

4.  The 2003 Final Judgment in the Study Area 7 case provided for a comprehensive remedy at Study Area 7, under the supervision of the federal court, requiring, *inter alia*, the excavation of 1.5 million tons of hexavalent chromium-contaminated waste, a remedy for the contaminated deep groundwater, and a remedy for the contaminated sediments of the Hackensack River.  June 30, 2003, Final Judgment, ECF No. 356.  Following the appeal and denial of certiorari in the Study

Area 7 case, some of the plaintiffs from that case brought the second, companion case involving the adjacent areas, called Study Areas 5 and 6, in order to ensure a comprehensive clean up of the chromium contamination resulting from the operations of Mutual Chemical Company, Honeywell's predecessor in interest.

5. Over time, the Study Area 7 and Study Areas 5 and 6 cases became more closely related, particularly as many aspects of the Study Areas 5 and 6 case were assigned, pursuant to consent decrees, to the same Special Master, former Senator Robert Torricelli, who had been appointed to oversee the relief in the Study Area 7 case. The complexity and vast nature of these cases means that over time different attorneys had to work on different aspects of the cases and thereby gained a particular knowledge or background concerning those aspects. For example, I was the partner who oversaw the litigation in the Study Area 7 case and I am the partner who has overseen the work of monitoring the implementation of the relief ordered in the 2003 Final Judgment. However, Carolyn Smith Pravlik is the partner who oversaw the litigation in the Study Areas 5 and 6 case. In addition, Alicia Alcorn worked on many aspects of the litigation of the Study Areas 5 and 6 case. She therefore had the best knowledge of the case as the associate responsible for the work related to monitoring compliance with the requirements of the various Consent Decrees entered in the Study Areas 5 and 6 case.

6. Each of the Study Areas is governed by one or more judgments and Consent Decrees, and, based on the respective judgment or Consent Decree, has different

4

remedies.  For example, Study Area 6 North is governed by one Consent Decree, while Study Area 6 South is governed by a different Consent Decree.  Each of the Study Area 6 Consent Decrees, while similar, require slightly different remedies and procedures.  Likewise, Study Area 5, which is across Route 440 from Study Areas 6 and 7, is governed by three Consent Decrees and has at least six different remedial areas and remedies.  Similarly, Study Area 7 is governed by the June 2003 Final Judgment of this Court and two additional Consent Orders, and has distinct remedies and long-term protections related to soils, sediments, and deep groundwater.

7. The names of the Consent Decrees and the cases to which they apply are as follows:

**Both Cases**:

(1) the Consent Order on Sediment Remediation and Financial Assurances, ECF No. 882, amended at ECF No. 1189 (hereafter "Sediment Consent Order");

(2) the Deep Overburden and Bedrock Groundwater Remedies Consent Order ECF No. 898 (hereafter "Deep Groundwater Consent Order");

**Study Areas 5 and 6 Case**:

(3) the Consent Decree Regarding Remediation and Redevelopment of Study Area 6 North, ECF No. 202 in docket 05-5955, amended at ECF No. 1141 (hereafter "Study Area 6 North Consent Decree");

(4) the Consent Decree Regarding Remediation and Redevelopment of

Study Area 6 South, ECF No. 234 in Docket No. 05-5955, amended at ECF No. 1140 (hereafter "Study Area 6 South Consent Decree");

(5) the Consent Decree Regarding Sites 79 and 153 South, ECF No. 301 in Docket No. 05-5955 (hereafter "Site 79 Consent Decree")

(6) the Consent Decree Regarding Remediation of the New Jersey City University Redevelopment Area, ECF No. 302 in Docket No. 05-5955 (hereafter "NJCU Consent Decree"); and

(7) the Consent Decree Regarding Remediation of the Study Area 5 Shallow Groundwater and the Site 79 Residential Properties, ECF No. 303 in Docket No. 05-5955 (hereafter "Study Area 5 Groundwater Consent Decree").

8. Although the merits of the Study Areas 5-7 cases were resolved by a judgment of this Court and numerous Consent Decrees, the substantial work of carrying out the terms of the 2003 Final Judgment and the Consent Decrees will continue for many years. Monitoring of the remedies under the decrees will continue in perpetuity. The entitlement of plaintiffs' counsel to future fees and expenses for their work following entry of the decrees is covered by specific provisions in each of the various Consent Decrees.[3] The fees included in this application have not been included in any previous applications.

---

[3]Sediment Consent Order, para. 88; Deep Groundwater Consent Order, para. 30; Study Area 6 North Consent Decree, para. 110; Study Area 6 South Consent Decree, para. 120; Site 79 Consent Decree, para. 96; NJCU Consent Decree, para. 150; Study Area 5 Groundwater Consent Decree, para. 110.

**ATTORNEYS**

9. In the next few paragraphs, I identify the attorneys from the Firm who worked on these cases in the 2012-2013 time frame and their role in the cases. The resumes of these attorneys are included in Plaintiffs' Exhibit 3.

10. I graduated from Stanford Law School in 1985. Before beginning employment with the Firm, I was a judicial clerk to the Honorable James K. Singleton of the Alaska Court of Appeals from 1985 to 1986. I began employment with the Firm in 1987 and became a partner in 1992. Since joining the Firm, I have litigated complex cases in the federal courts, namely, cases brought under federal environmental laws and civil rights class actions. Since February 2001, I have supervised the day-to-day activities in the Study Area 7 case. From the time it was being investigated until the spring of 2007, I also supervised the day-to-day activities in the Study Areas 5 and 6 case. Since 2009, as portions of the Study Areas 5 and 6 case were settled and, pursuant to Consent Decrees, were assigned to the same Special Master as the Study Area 7 case, I have supervised the work pursuant to the Consent Decrees.

11. Carolyn Smith Pravlik is a 1980 graduate of Catholic University Law School and was admitted to the District of Columbia Bar in 1980. After law school, she was a participant in the Solicitor's Honors Program at the United States Department of the Interior where she did work relating to environmental statutes, such

7

as the Clean Water Act, the Surface Mining Control and Reclamation Act, and the Endangered Species Act. Ms. Pravlik joined the Terris firm as an associate in May 1981 after a reduction-in-force eliminated the Solicitor's Honors Program. She became a partner in July 1987. Since 1982, Ms. Pravlik has spent approximately 95% of her time in citizen suit environmental litigation in the federal courts. From 2007 through 2010, Ms. Pravlik supervised the day-to-day activities in Study Areas 5 and 6 litigation. Since 2010, Ms. Pravlik has continued to engage in work related to the Study Areas 5-7 cases when her previous knowledge on a particular topic warranted the work and/or oversight, such as institutional control issues like the Open Space Design Standards. From its inception until approximately February 2001, Ms. Pravlik supervised the day-to-day activities in the Study Area 7 case. Those responsibilities were then shifted to me due to the demands of another case for which Ms. Pravlik was responsible. When the Study Area 7 case reached the fees litigation stage, Ms. Pravlik resumed work in that case to deal with those issues. She continues to oversee the fees issues in both cases.

12. Bruce J. Terris is a 1957 graduate of Harvard Law School. He was admitted to the District of Columbia Bar in 1957 and to the Supreme Court Bar in 1960. He has practiced law for over 50 years, including 7 years in the Office of the Solicitor General where he supervised approximately 70 briefs on the merits for the Supreme Court. He has presented 20 oral arguments to the Supreme Court, most

recently in *Friends of the Earth v. Laidlaw Envtl. Services, Inc. (TOC)*, 528 U.S. 167 (2000). He was one of the founders of both the Legal Services Program in the original Office of Economic Opportunity and the Center for Law and Social Policy, one of the country's first major public interest law firms. In 1981, the National Wildlife Federation awarded Mr. Terris its Conservation Law Award. In 2005, Mr. Terris was awarded a Lifetime Achievement Award by the Hackensack Riverkeeper for his contributions to the field of environmental law. Mr. Terris tried the Study Area 7 case along with me and an associate attorney. Throughout the Study Areas 5-7 cases, he served as a supervisory attorney and reviewed all of the written material.

13. As is the case in all of the citizen suits the Firm litigates, Mr. Terris reviews all of the written work and generally supervises the other attorneys working on the case. He does this to ensure that the Firm's written material is of the highest quality. Mr. Terris' work throughout his career has largely been editing briefs and other legal materials, starting when he was 25 years old with the Solicitor General's Office. Mr. Terris also reviews the Firm's written work to ensure that positions and arguments are consistent from case to case.[4] In large, complex cases such as these, another of the Firm's senior partners acts as the more direct supervisor in the cases. Here, Mr. Terris or that partner is responsible for representing plaintiffs before the Court and Special

---

[4]This is particularly important since we frequently represent the same client in more than one case.

Master Torricelli, as well as providing guidance to the less experienced attorney who has the direct day-to-day responsibility for the cases.

14.  In the time frame at issue, 2012-2013, two associate attorneys have had responsibilities in these cases.  The roles and backgrounds of these attorneys are described below.  The resumes of these attorneys are included in Plaintiffs' Exhibit 3.

15.    Alicia Clark Alcorn earned her B.A. from Hobart and William Smith Colleges in 1997 and her J.D. from George Mason University School of Law in 2004.  Ms. Alcorn has been with the Firm since 1998.  She worked as a legal assistant from 1998 to 2001 and as a law clerk from 2002 to 2004.  In 2004, she was hired as an associate.  Since that time, Ms. Alcorn has concentrated on Clean Water Act and RCRA litigation in the federal courts.  Ms. Alcorn has worked on the Study Areas 5 and 6 case as an associate responsible for the day-to-day work since 2007.  In 2010, after all of the merits of the Study Areas 5 and 6 litigation had been settled and the Consent Decrees were entered by the Court, Ms. Alcorn was assigned as the attorney primarily responsible for the day-to-day work of monitoring the implementation and protection of the remedies in the Study Areas 5 and 6 case, based on her knowledge of the case, the issues and the Consent Decrees.  Ms. Alcorn has maintained those day-to-day responsibilities since 2010.

16.  In addition to Ms. Alcorn's work on individual issues related to the implementation and protection of the remedies, in the 2012-2013 time frame, she

assisted me in representing plaintiffs in the Special Master process and meetings. In this role, Ms. Alcorn acted as the clearinghouse for all legal and technical issues related to Study Areas 5-7, and she kept all other individuals representing plaintiffs informed as to these issues and their status during preparation for the monthly Special Master meetings. She coordinated the legal and technical work and ensured that the proper attorneys and experts were involved in the resolution of any issue. She also coordinated and oversaw the work of the experts to ensure that each was aware of the issues related to the various sites or other experts that might affect his or her work.

17. In August 2012, Ms. Alcorn was promoted to partner. This promotion did not affect Ms. Alcorn's billing rate, which is based on years of experience, not status as an associate or partner. Due to Ms. Alcorn's knowledge and understanding of the facts and issues surrounding the Study Areas 5-7 cases, her years of experience in the Special Master process, and the fact that the Firm does not have a less experienced attorney with sufficient knowledge of the case, it was most efficient for Ms. Alcorn to remain the attorney primarily responsible for the day-to-day work of monitoring implementation of the remedy.

18. Michelle Weaver graduated from Bowdoin College in 2003 and Columbia Law School in 2006, and joined the Firm as an associate that year. Ms. Weaver was an Articles Editor for the Columbia Journal of Environmental Law. Prior to joining the Firm, she held summer positions with the Natural Resources Defense Council and

11

New York Climate Rescue. She also participated in the Columbia University Environmental Law Clinic, where she helped draft briefs in support of a non-profit involved in civil litigation.  In September 2012, Ms. Weaver moved away from Washington, D.C., and, as a result, left her position as an associate with the Firm. Since September 2012, Ms. Weaver has remained in an Of Counsel position with the Firm and, during this time, has continued to perform discrete tasks on the Study Areas 5-7 cases, particularly the Study Area 7 case for which she has been responsible since 2008.  She has also assisted on other issues where she has the best knowledge, such as financial assurances and on issues that Ms. Alcorn was unable to address due to other demands on Ms. Alcorn's time.  As Ms. Weaver has lessened her hours, generally Ms. Alcorn has taken over responsibility for issues formerly handled by Ms. Weaver.  During this time, there was no duplication of work between Ms. Weaver and Ms. Alcorn.  If either of them had not done the work she did, someone else would have had to do it.

**UNDISPUTED 2012 FEES**

19.  On March 14, 2013, plaintiffs submitted their 2012 fee materials to Honeywell pursuant to the parties' informal fees procedures under the Consent Decrees.[5/]  On May 21, 2013, Honeywell responded by identifying proposed

---

[5/]The term "2012 Fees" refers to the fees informally submitted to Honeywell on March 14, 2013.

reductions and undisputed fees.    On June 20, 2013, plaintiffs responded to

Honeywell's arguments regarding proposed reductions and proposed a settlement

similar to the ones that the parties had entered with regard to the 2010 Second Half

Fees and the 2011 Fees.  Before Honeywell responded, the court of appeals issued its

decision on the 2009 Fees Application, the Outstanding Fees Application, and the

2010 First Half Fees Application (collectively, "the Remanded Fees").

20.  Following a decision on Honeywell's petition for rehearing, this Court sent

the Remanded Fees for mediation.  June 17, 2013 Letter, ECF No.1173.   During

preliminary discussions regarding the mediation, at Honeywell's suggestion, the

parties agreed to expand the mediation to include both the 2012 Fees and the fees-for-

fees from the litigation in the district court and the court of appeals.[6]  Honeywell also

informed plaintiffs and the mediator that it was reexamining the 2012 Fees and would

re-compute the undisputed fees.  Honeywell agreed to pay the undisputed fees before

the mediation session.   On October 10, 2013, Honeywell paid $543,465.09 in

undisputed fees for 2012.  March 31, 2014, Order, ECF No. 1228.

21.  When the mediation was unsuccessful, the district court appointed Special

Master Hughes to review the Remanded Fees and future fee applications.  November

---

[6]The fees-for-fees that were made part of the mediation included the litigation in the
district court and appeals court leading to the decisions in *ICO v. Honeywell,* 808 F.
Supp. 2d 744 (D.N.J. 2011)(hereafter "*ICO III*"), and *ICO v. Honeywell,*726 F.3d 403
(3d Cir. 2013)(hereafter "*ICO IV*").  The fee-for-fees also included work related to the
Remanded Fees.

13

15, 2013, Order,  ECF No. 1196, amended at ECF No. 1212.

22.  On January 28, 2014, Special Master Hughes held a scheduling conference during which a schedule was set that included the submission of the 2012 and 2013 Fees.  Scheduling Order No. 2, ECF No. 1210.  During the scheduling conference, it was agreed that the informal fees procedure would be waived for the 2013 Fees and that those fees would be presented in a fee application with the 2012 Fees.  Scheduling Order No. 2, ECF No. 1210.  It was also agreed that the waiver would be presented in a consent order for the district court's approval.  *See* March 31, 2014, Order, ECF No. 1228.

23.  As part of this application, plaintiffs do not seek payment of the amount of undisputed fees for 2012 paid by Honeywell on October 4, 2013.  However, because plaintiffs have no way of dividing disputed time records from undisputed time records, all time records are included with this application.  Therefore, after the reasonableness of the fees sought is decided pursuant to this application, the $543,465.09 paid by Honeywell for 2012 undisputed fees should be subtracted from the final award. Plaintiffs have identified this payment in their proposed order.

## ATTORNEYS' FEE RATES

24.  The fees requested in this application were computed using current hourly

14

rates from plaintiffs' update of the *Laffey* matrix.[7]    In the litigation of fees in the Study Area 7 case, as well as the more recent fees litigation in both cases, plaintiffs sought fees on the basis of hourly rates for Washington, D.C., as set forth in the *Laffey* matrix and updated using the Legal Services Index (hereafter "LSI").[8]    Plaintiffs' methodology has been adopted twice by this Court and affirmed twice by the court of appeals.  *ICO IV*, *supra*, 726 F.3d at 414-416; *ICO v. Honeywell,* 426 F.3d 694, 708-710 (3d Cir. 2005)(hereafter "*ICO II*"); *ICO III, supra*, 808 F. Supp.2d at 750-751; *ICO v. Honeywell,* 336 F. Supp. 2d  370, 383-388 (D.N.J. 2004)(hereafter "*ICO I*").

## GENERAL BACKGROUND

25.  As stated above, the 2003 Final Judgment and most of the Consent Decrees were assigned to Special Master Torricelli to ensure the proper implementation of the complex remedial and long-term protection requirements.  The Special Master retains technical experts and legal counsel.   Under the Consent Decrees, Honeywell is required to submit various documents, related to the development and implementation of the remedies, as well as their long-term protection, to plaintiffs and the Special

---

[7]In *Lanni v. New Jersey*, 259 F.3d 146, 149-150 (2001), the Third Circuit held:

> When attorney's fees are awarded, the current market rate must be used. The current market rate is the rate at the time of the fee petition, not the rate at the time the services were performed.

[8]The *Laffey* matrix was established on a calendar of June 1 to May 31 and is updated each year on the basis of the LSI maintained by the Bureau of Labor Statistics.   The *Laffey* matrix updated through 2014 is attached as Pl. Ex. 5.

15

Master for review and approval.[9] The Consent Decrees require that the review and approval process begin with plaintiffs and Honeywell prior to entering a formal review process with the Special Master. *E.g.*, Study Area 6 North Consent Decree, ECF No. 1141, para. 72(d)-(e); Study Area 6 South Consent Decree, ECF No. 1140, para. 86(d)-(f). Generally, Honeywell submits a document to plaintiffs and the Special Master, plaintiffs review and comment, and Honeywell submits a response. Once Honeywell submits a response, plaintiffs review it and either inform the Special Master that they agree, or, if disputes remain, plaintiffs continue to exchange additional comments and/or engage in negotiations with Honeywell. Once the parties inform Special Master Torricelli that they agree regarding a document, the Special Master either submits any comments of his own for a response from Honeywell and plaintiffs, or he approves the document. If Honeywell and plaintiffs inform Special Master Torricelli that they are unable to come to agreement regarding a document, the Special Master sets a schedule for the resolution of the dispute, which includes the submission of position papers by Honeywell and plaintiffs.

26. Other documents related to the remedies and/or the Special Master process that are filed with this Court, such as declarations regarding remedy implementation submitted by Honeywell and Consent Orders, are reviewed under the same process

---

[9] *See*, *e.g.*, Study Area 6 North Consent Decree, para. 72; Study Area 6 South Consent Decree, para. 86; Study Area 5 Groundwater Consent Decree, para. 78.

16

described in paragraph 25.

27. Honeywell is implementing a wide variety of different remedial actions to address contamination of the soil, groundwater and river sediments, at the various Study Area 5-7 properties. During 2012 to 2013, Honeywell was engaged in active remedial work primarily related to bedrock water, deep overburden groundwater, Hackensack River sediments, and the soil at Study Areas 6 North and South. The deep overburden groundwater and bedrock remedies consisted of pumping the contaminated water and treating it at a wastewater treatment plant prior to discharge to the Hackensack River, pursuant to limits set forth in a permit from the New Jersey Department of Environmental Protection (hereafter "NJDEP"). The sediment remedy involves dredging and capping contaminated sediments in the river. The Study Areas 6 North and South remedies for soil and shallow groundwater include soil excavation, capping contaminated soil materials in place, in-situ treatment of soils in select areas,[10] and containment and possible future treatment of contaminated shallow groundwater.

28. Before any remedial action can be implemented, Honeywell is required to submit a 100% Design for review and approval. *See*, *e.g.*, Sediment Consent Order,

---

[10]In-situ treatment is the process of permeating soils in place (*e.g.*, while the soils are still in the ground) with a chemical reductant solution that is expected to convert the extremely harmful hexavalent chromium into trivalent chromium which is less harmful. The soils are then tested after several years to ensure that the results remain the same and the chromium has not reverted to the more toxic hexavalent form.

ECF No. 1186, para. 62; Study Area 6 North Consent Decree, ECF No. 1141, para. 72; Study Area 6 South Consent Decree, ECF No. 1140, para. 86. The 100% Design generally includes a design report with a narrative description of the remedy; design drawings that are the blueprints the contractor will implement; technical specifications that act as the detailed regulations that govern the remedy work; and numerous attachments related to the design and its implementation and future protection, such as in-situ treatment work plans and the Open Space Design Standards (hereafter "OSDS"). *See* July 2013 Combined Study Areas 6 North and South 100% Design, ECF No. 1176.

29. Due to the voluminous size of the Study Area 6 North and South 100% Design, plaintiffs have not included it as an exhibit to this application. *See* ECF No. 1176. However, the very size of the 100% Design which, including attachments comprises approximately 4,326 pages, demonstrates why significant work on the part of plaintiffs' counsel was necessary for its review, comment, and approval. Aside from the size and complexity of the document, the importance of the 100% Design to ensuring the perpetual protection of the public health and environment at this 96-acre portion of Jersey City was the central reason that plaintiffs spent significant time on its review and final approval in 2012-2013.

30. The 100% Design has importance in the short term in that it sets forth the means to be followed in implementing the chromium remedy for approximately 96

18

acres of space comprising Study Areas 6 North and South.  Moreover, it is an important document that will govern actions at Study Areas 6 North and South in perpetuity. These requirements are set forth in the OSDS which govern the open space park land over the capped soil contamination.  A significant portion of the hexavalent chromium waste will be contained and left on site in perpetuity under land that will become a public park owned by the city of Jersey City.  The 100% Design will govern, in perpetuity, the actions that must be taken, and other actions that are prohibited, as the park becomes developed and is maintained in the future.  Plaintiffs' counsel had a responsibility to their clients, the plaintiffs, as well as to the public in general, to ensure that the 100% Design is as clear, detailed, and protective as possible.  This high level of clarity, detail, and protection is necessary to ensure as much as possible that there will be no harm to public health and safety, or to the environment, both in the short term as the remedy is implemented and in perpetuity when the public will be invited to use the park below which there is hexavalent chromium contamination.

31.  Much of the work related to the Study Area 6 North and South 100% Designs in 2012-2013 arose from various major changes to the 100% Design proposed by Honeywell.  For example, in late 2011, Honeywell proposed additional major

19

geotechnical work in the form of surcharging[11] in order to prepare the cap area to withstand the proposed future development over the cap. This change needed to be reviewed to determine whether the proposed work would be sufficient to allow for the proposed future development of the land or if additional design elements would be necessary. The bulk of this work regarding the geotechnical issues, the development that the cap design would withstand, and the related OSDS work was done in 2012. Similarly, in 2011, Honeywell proposed a major design change to include a gas venting layer in the cap. Again, this major addition to the design required additional work by plaintiffs, most of which was done in 2011, but some of which carried over into 2012. Likewise, in 2012, Honeywell made last minute major changes to the 100% Design, such as the changes related to in-situ soil treatment at Study Area 6 North (*see* para. 54(e)-(g) below).

32. The manner in which Honeywell produced revised documents for review caused plaintiffs to expend additional time. For example, during most of the negotiations of the revisions to the Study Area 6 North and South 100% Designs,

---

[11]Surcharging is a construction process by which an area is loaded with excess weight, generally, in the form of soil piles, in order to force the compression of the strata below. This process ensures that the area can withstand the weight of the future construction without causing differential settlement. Surcharging is important to the protection of the cap because differential settlement in the cap area could lead to a weakening of the cap or even its breach.

Honeywell did not adequately track the various revisions it was making.[12] Moreover, particularly early in the review process in 2010 and 2011, Honeywell did not always provide documentation showing that it had made the revisions to which it had agreed during negotiations.  Therefore, plaintiffs had to keep their own record of all of the agreed upon revisions so that, at the time of the final review of the 100% Design documents, we could be sure that all changes had been made.  At the time of the final review in April 2013, it became clear that all agreed upon revisions had not been made and many of plaintiffs' comments to Honeywell addressed these missing revisions.[13] Since all the agreed upon changes were not included, it was important to conduct a very close final review of the document.  This close review also revealed other problems that should have been identified by Honeywell, such as the fact that the Surcharge Monitoring Plan that was supposed to address surcharge at both Study Areas 6 North and South only addressed Study Area 6 North.  These mistakes meant

---

[12]In early 2013, plaintiffs informed Honeywell that our efforts to review for changes was made more burdensome because Honeywell was not tracking the revisions made to the design documents.  In response, Honeywell agreed to keep a log of the last round of revisions that were made to the design documents prior to submission to the parties for final review.  This log also included a listing of previous revisions that should have been made to the 100% Design based upon agreements between the parties during previous exchange of comments.  Therefore, at the time of final review in April 2013 plaintiffs had received a partial record of the revisions made by Honeywell.

[13]Even some of the revisions noted by Honeywell in its revisions log that was provided with the 100% Design were not actually made.

21

that plaintiffs necessarily expended substantially more time during the review process than would have been the case if the appropriate corrections has been made by Honeywell prior to submission to plaintiffs for review.

## EXPERTS

33. During the 2012-2013 time frame, a team of experts from different disciplines significantly supported plaintiffs' monitoring efforts. Dr. Bruce Bell advised plaintiffs on engineering and remediation issues. Dr. Benjamin Ross advised plaintiffs on groundwater and in-situ treatment issues. Dr. George Flowers advised plaintiffs on in-situ treatment, chemistry, and analytic issues. Dr. Kenneth O'Connell advised plaintiffs on geotechnical engineering issues, such as the ability of the capped area to withstand future roads and construction. Dr. Henry Bokuniewicz advised plaintiffs on sediment remedy issues. Dr. James Rogers advised plaintiffs on cap integrity issues. Dr. Michael Kavanaugh advised plaintiffs on financial assurance issues. James Wyse advised plaintiffs on New Jersey property law issues, including conservation restrictions and deed-based institutional controls.

34. Ms. Alcorn was responsible for oversight and coordination of the work conducted by the experts. Ms. Alcorn attended various technical meetings with the experts when the issues had direct bearing on understanding the remedy implementation, such as the sediment meeting, or where legal compliance issues were involved, such as the confirmation sampling meeting with NJDEP. As discussed in

22

paragraphs 52-53, 54(j)-(l) below, it is important for the attorneys to understand the technical issues because many of them are closely tied to the future protection of the cap. Any technical dispute that plaintiffs and Honeywell are unable to resolve must be presented to Special Master Torricelli for resolution. The work related to any such submission would have to be done by an attorney and would require that the attorney have a clear understanding of the issue, how it arose, the history of negotiations, and the basis for the expert's opinion.

35. Plaintiffs' experts assisted with oversight of the remedy and long-term-monitoring. This included review and comment on technical and design documents submitted to Special Master Torricelli and/or to plaintiffs under one of the Consent Decrees, participation in technical discussions and meetings with Honeywell, and advising plaintiffs' regarding technical issues. In addition, Drs. Bell and Ross attended regular technical conference calls conducted by Honeywell, which included the technical experts of the Special Master, and the monthly meetings held by Special Master Torricelli.

36. In general, Honeywell has between three and four engineers or other technical representatives attend the Special Master meetings. It is essential that plaintiffs' experts Drs. Ross and Bell attend the Special Master meetings in order to address technical issues and positions raised by Honeywell's engineers and technical representatives during the meetings. In addition, Special Master Torricelli frequently

23

seeks the position of plaintiffs' experts on various technical issues during the meetings.

37.  Plaintiffs also require the services of experts to advise them as to technical issues, so that plaintiffs have the ability to assess fully and independently the technical documents and opinions submitted by Honeywell.  While there are numerous other experts engaged by both Honeywell and Special Master Torricelli to assist them with technical issues, these experts are not retained by, nor do they work for, plaintiffs. Plaintiffs obviously cannot rely on the opinion of Honeywell's experts.  In nearly every exchange among plaintiffs' experts and Honeywell's technical representatives, the comments of plaintiffs' experts result in improvements to the design and implementation of the remedies.

38.  For example, the comments of plaintiffs' expert, Dr. O'Connell, resulted in the modification of the Study Areas 6 North and South 100% Design to increase the layer of soil separation between the top of the cap and future roadways above the cap. The Consent Decree required that there be a minimum of 12 inches of soil over the cap in future road areas and Honeywell's original design only included the minimum 12-inch separation.  However, after the assessment of Dr. O'Connell, Honeywell agreed that a 12-inch separation was insufficient to protect the integrity of the cap from the anticipated future loadings on the roads crossing the cap areas.  The design was changed and this change resulted in numerous more protective standards being

24

added to the OSDS.

39.  The qualifications of each of plaintiffs' experts and the general work that each performed in the case are set forth in their affidavits supporting this application. Those affidavit are Plaintiffs' Exhibits 14 through 21.

## WORK UNDERTAKEN

40.  This section describes the specific work undertaken by plaintiffs in the oversight and enforcement of the 2003 Final Judgment and the Consent Decrees, for which we seek compensation here.

41.  Much of the work covered by this application relates to plaintiffs' review of Honeywell's proposals concerning implementation of remedial work at the Study Areas and remediation documents, plaintiffs' submission of comments on such documents to Special Master Torricelli, and participation in the monthly status meetings held by Special Master Torricelli.   To the extent possible, plaintiffs keep their time and expenses separately for each of the Consent Decrees and the Study Area 7 case.  However, in some instances, issues overlap and the division of time and expenses between more than one decree is not efficient.  For example, for work related to all-parties meetings with Special Master Torricelli, instead of dividing time and expenses amongst each of the Consent Decrees and Study Area 7, plaintiffs created a separate billing account, called General Study Areas 5-7, to track their time and

25

expenses on overlapping issues, such as Special Master meetings.[14/]

42.  In identifying the time for which plaintiffs seek compensation, we have exercised billing judgment.  Plaintiffs are seeking compensation only for time that would have been billed to a fee-paying client.  In several instances, we are not seeking compensation for time that would have been billed to paying clients.  Plaintiffs are not seeking compensation for the time of any attorney who expended less than 25 hours total in the cases.  Any time expended by the individuals for whom we are seeking compensation that was determined should be excluded from the application has been designated as "No Charge" and included as Plaintiffs' Exhibit 11.

43.  Plaintiffs have made additional reductions to their time in accordance with the fees decisions of this Court and court of appeals  (*ICO I*, *supra*; *ICO v. Honeywell*, 3d Cir., Nos. 03-2760, 03-3037 and 03-3585, Order, Feb. 3, 2006 (Pl. Ex. 13); *ICO III, supra*.  As discussed below in paragraph 85, plaintiffs have cut all non-working travel time by 50%.  *See* Pl. Ex. 6.  In addition, plaintiffs have cut all conferencing time between the Firm's attorneys by 10%.  However, time spent instructing paralegal and support staff is not conferencing time and therefore is not included in the 10% reduction.  *See* Pl. Ex. 12.  In order to make this reduction, after this Court's 2011 fee decision (*ICO III, supra,* 808 F. Supp. 744), plaintiffs' counsel instituted a policy that all time records that contain conferencing time shall contain the language "confer

---

[14/]Separate billing accounts are called clients in plaintiffs' timekeeping software.

with." We then sort out all time records that contain conferencing time and apply the 10% reduction to these timeslips.

44.     The contemporaneous time records maintained by the individuals performing work in the case show that we expended the time set forth in the "Summary of Time by Category" and the "Time Records by Category," which are Plaintiffs' Exhibits 6 and 7, respectively. Plaintiffs' Exhibit 6 shows the total amount of time expended in each category and subcategory by each individual.[15] Plaintiffs' Exhibit 7 sets forth the contemporaneous time records maintained for the work. The time records are organized by client, category, subcategory, individual, and date.[16] Within each category and subcategory, the time is divided by individual and then by date. Individuals are identified by their initials and the initials are presented in alphabetical order.[17]

45. There are 11 clients for the fees and expenses included in this application.[18]

_____

[15]Plaintiffs' Exhibit 6 also shows the requested hourly rate for the experience level of the individual at the time the work was performed.

[16]For ease of reference, each time record in Plaintiffs' Exhibit 7 is assigned a line number. The client is identified in the lower left corner of each page.

[17]Plaintiffs' Exhibit 8 sets forth the initials and full name of each individual performing work for which plaintiffs seek fees in this case. In Plaintiffs' Exhibit 8, the year of graduation refers to the year the attorney graduated from law school.

[18]This application does not includes 2012-2013 Fees incurred during 2012 and 2013 related to the fees litigation and mediation in the district court and the court of appeals with regard to Plaintiffs' Application for and Brief in Support of an Award of Disputed Fees and Expenses for their 2009 Post-Judgment and Post-Decree Work (hereafter
(continued...)

They are:

(a) Study Area 7;

(b) Study Area 6 North;

(c) Study Area 6 South;

(d) Colonial Concrete;

(e) New Jersey City University (abbreviated "NJCU CD");

(f) Study Area 5 Groundwater;

(g) Sites 79 and 153 South;

(h) Fisk Street Homes;

(i) Study Areas 5-7 Financial Assurances (abbreviated "SA 5-7 Fin. Assur.");

(j) General Study Areas 5-7 Matters (abbreviated "General SA 5-7 Matters"); and

---

18/(...continued)
"2009 Fees Application"), ECF No. 1005, Plaintiffs' Application for and Brief in Support of an Award of the "Outstanding Fees and Expenses" as Defined by the NJCU Consent Decree (hereafter "Outstanding Fees Application"), ECF No. 342 in Docket No. 05-5955, and Plaintiffs' Application for and Brief in Support of an Award of Disputed Fees and Expenses for Post-Judgment and Post-Decree Work for the First Half of 2010 (hereafter "the 2010 First Half Fees Application"), ECF No. 1047. Pursuant to Scheduling Order No. 2 (ECF No. 1210) those fees and expenses will be sought in a future application once the underlying matters giving rise to the Fees are resolved. Fees and expenses incurred in the litigation of the 2012-2013 Fees sought in this application will be sought in a supplemental application.

(k)  Study Areas 5-7 Fees (abbreviated "SA 5-7 Fees").[19]

46.  The time spent for each client is divided into categories and subcategories, each of which relates to particular work that was performed.  To the extent possible, the categories and subcategories follow the order in which the activities arose.  This breakdown is reflected in the organization of the time records in Plaintiffs' Exhibit 7 and in the Summary of Time by Category (Pl. Ex. 6), which show how much time was expended by attorneys and paralegals in each of the categories.  The work performed in each of these categories and most subcategories is described in paragraphs 47-85 below.

**Category: Deep Overburden Groundwater Remediation Monitoring.**

47.  This category involves the work related to the deep groundwater remedy. The work in this category falls into the following subcategories:

**Subcategory: Groundwater Issues**

(a) This time is for work regarding Honeywell's proposal in May 2012 to relocate one of the bedrock pumping wells to a location closer to the new wastewater treatment plant. Honeywell's proposal was evaluated by Dr. Ross, who provided technical comments in June 2012, including the suggestion that Honeywell

---

[19]The Study Areas 5-7 Fees client includes only the time expended on the informal fees process for 2011 and 2012 fees that is required under the Consent Decrees.  This informal process resulted in the negotiation and payment of undisputed fees for both 2011 and 2012.  This client does not include any time expended on an application for fees to this Court or related litigation.

conduct a pump test.  Honeywell agreed with the technical comments of Dr. Ross in a July 2012 Memorandum issued by their expert, Bill Soukup.  Honeywell provided the results of the pump test and additional information on other technical matters in October 2012 and in January 2013.  In January 2013, after consideration of the additional information by Dr. Ross, plaintiffs accepted Honeywell's bedrock well relocation proposal.

### Subcategory: WWTP Issues

(b)  This time is related to work regarding the new wastewater treatment plant (hereafter "WWTP")  proposed by Honeywell and the related changes in the treatment and discharge process.  Honeywell operates a WWTP to treat and discharge contaminated groundwater as part of the Study Areas 5-7 groundwater remedies.  As part of the on-going remedial work at Study Area 6 South, Honeywell needs to relocate the groundwater treatment operations to a new WWTP constructed on Study Area 6 North in 2013.  The old WWTP used by Honeywell through the end of 2013 is located on Study Area 6 South and, after treatment, the water is directly discharged to the Hackensack River pursuant to an NJPDES permit.  The new WWTP will treat the groundwater in a manner entirely different from the old WWTP, and will do so under a different type of permit.  The new WWTP will provide only partial treatment and will discharge to the Passaic Valley Sewerage Commissioners (hereafter "PVSC") publicly-owned treatment works system for full treatment at the PVSC WWTP.  These

30

operations will occur pursuant to a permit to discharge to PVSC, not an NJPDES permit. Plaintiffs had to review the new permit and consult with experts to ensure that the new WWTP would continue to protect the public and environment from the contaminated materials in the groundwater being pumped by Honeywell as part of the Study Areas 5-7 remedies.

### Subcategory: Monitoring

(c)  This time includes work regarding Honeywell's proposal to conduct the two-year review of the mass removal project earlier than is required by the Deep Overburden and Bedrock Groundwater Mass Removal Consent Decree (ECF No. 979, para. 5, amended at ECF. No. 1200) (hereafter "Mass Removal Consent Decree") and the impacts this would have on the other terms of the Consent Order.  The two-year report relates to a determination of whether the mass removal remedy is working and should continue.  The time was expended in discussing Honeywell's proposal with the experts and reviewing the Consent Order requirements.  Work in this subcategory also included consultation with Dr. Ross and preparing submissions to the Special Master on pumping rates for the groundwater system after the new wastewater treatment plant was installed and the annual groundwater monitoring report was issued.

### Subcategory: Regulatory Permits

(d)  This time involved the review of Honeywell's application for a permit that was required for the mass removal injection program.  The mass removal

31

injection program is the in-situ treatment of the extremely high levels of hexavalent chromium contamination in the deep overburden which lies approximately 80-100 feet below the surface. The Mass Removal Consent Decree provides that Honeywell must inject reductant in an amount sufficient to reduce 10 tons of hexavalent chromium per year. Mass Removal Consent Decree, ECF No. 979, para. 4(b).

**Subcategory: Deep GW Source Control**

(e) This time is related to work regarding oversight of the mass removal injection program requirements of the Mass Removal Consent Decree. This work included issues related to Honeywell's inability to install an injection well to the east of Route 440 as required by the Consent Decree, negotiations regarding the locations of the required injection wells and the order in which the agreed-upon locations would be injected, analysis of potential impact of mass removal injections on remedies at Study Areas 6 North and South, monitoring required by the Consent Decree that was not being conducted and/or reported, and concerns regarding the effectiveness of the mass removal injection program raised by plaintiffs' experts.

**Subcategory: Long-Term Monitoring Plan**

(f) This time is related to work regarding oversight of the monitoring of the deep groundwater remedy. This work includes the review and comment process for the annual reports and work related to the development of an Integrated Groundwater Monitoring Report for all of Study Areas 5 to 7. Under the Consent

32

Decrees, Honeywell is required to monitor various groundwater parameters and to report annually to plaintiffs and Special Master Torricelli to allow them the opportunity to review and comment on the report. The groundwater monitoring requirements are set forth, or will be set forth in the future, in various long-term monitoring plans developed under each of the Consent Decrees. However, in order to streamline the monitoring of all layers of groundwater and the review of the monitoring results, the parties and Special Master Torricelli agreed that an Integrated Monitoring Plan for groundwater covering all of SA 5-7 should be developed. During the 2012 to 2013 period, plaintiffs reviewed and responded to Honeywell's request for input as to the form and content of the Integrated Monitoring Plan.

**Subcategory: Consent Order**

(g) This time is related to work regarding the First Amended Deep Overburden and Bedrock Groundwater Mass Removal Consent Decree, which was entered by the Court on December 4, 2013, ECF No. 1200. It was necessary to amend the Mass Removal Consent Decree to address Honeywell's inability to comply with all of its requirements, such as the inclusion of an injection well to the east of Route 440. The time in this subcategory relates to the negotiation and drafting of the amended consent order.

**Category: Sediment Consent Order**

48. This category involves the work related to the oversight of the Sediment

33

Consent Order. The work in this category generally falls into the following subcategories:

### Subcategory: 100% Design

(a) This time is related to review and comment on the Sediment 100% Design which was entered as an Order of the Court on May 31, 2012. ECF No. 1132. Final permit approvals for the sediment remedy in the Hackensack River were received in March 2012. Following receipt of the permits, the Sediment Consent Order required the 100% Design to be entered as an Order of the Court. Work in this subcategory included consultations with our experts about Honeywell' proposed 100% Design, the preparation of technical comments by Dr. Ross, negotiations with Honeywell's counsel, and the drafting of a letter to the Special Master concerning plaintiffs' requests for modifications to Honeywell's proposed 100% Design. With the assistance of the Special Master, all outstanding issues were resolved, the 100% Design Order was entered by the Court, and the sediment remediation work began in July 2012.

### Subcategory: Work Plan

(b) This time is related to work regarding the review and comment process before Special Master Torricelli on the contractor work plans and the implementation of the work plan for the sediment remedy. This work was necessary to ensure compliance with the 100% Design, the 2003 Final Judgment, and the

Sediment Consent Order.

**Subcategory: Regulatory Permits**

(c) This time is related to work regarding the regulatory permits required to begin implementation of the sediment remedy. This work includes issues related to additional requirements sought by regulatory agencies that delayed the issuance of the required permits and review of the proposed permits.

**Subcategory: Monitoring**

(d) This time is related to work regarding monitoring the implementation of the sediment remedy beginning in mid-2012 and includes work related to delays in completion of the remedy, deferral of the remedy in area 28, review of Honeywell's assessment of the impact of Hurricane Sandy on the sediment remedy, and attending a meeting with Special Master Torricelli, Honeywell, and various technical representatives to discuss the implementation of the sediment remedy. Plaintiffs also reviewed reports and had conversations with their experts regarding on-site monitoring and periodic technical calls regarding the sediment remediation.

**Subcategory: Declaration**

(e) This time is related to work reviewing and commenting to Special Master Torricelli on the declarations prepared by Honeywell for the Court. The purpose of the declarations was to demonstrate Honeywell's satisfaction of the requirements of the Sediment Consent Order and the 100% Design in carrying out the

35

sediment remedy.

### Subcategory: Beneficial Environmental Projects

(f) This time is related to work on issues regarding the Droyers Cove project pursuant to the Sediment Consent Order. It included work to review and comment on the 50% Design for that project, negotiation with Honeywell regarding the lack of a walking bridge and skimmer elements in the 50% Design, and issues related to plaintiff Hackensack Riverkeeper's sponsorship of the beneficial environmental project. When the parties negotiated the beneficial environmental project provisions in the Sediment Consent Order, plaintiffs did so with the understanding that the project would include a bridge and skimmer system for Droyers Cove. When these elements were excluded from the 50% Design without any explanation as to why, plaintiffs had to expend additional time to address the issue.

### Subcategory: Supplemental Environmental Projects

(g) This time is related to work regarding the Jersey City affordable housing and Laurel Hill Park projects being implemented pursuant to paragraphs 42-46 of the Sediment Consent Order.

### Subcategory: Long-Term Monitoring Plan

(h) This time is related to work regarding assessment of the first-year monitoring requirements for the sediment remedy.

**Subcategory:  First Amended Consent Order**

(i)  This time is related to work regarding the amendment of the Sediment Consent Order.  The Sediment Consent Order required amendment because certain aspects of the agreed remedy – namely, tidal marsh restoration on the banks of the Hackensack River – were not permitted by the NJDEP.  Those provisions had to be eliminated and alternate provisions included for the Droyers' Cove beneficial environmental project.  The amendment also modified the recipient for the affordable housing contribution under paragraph 42 of the Sediment Consent Order and deleted paragraphs for obligations that had already been fulfilled.  Plaintiffs reviewed and commented upon Honeywell's draft amended order in consultation with their experts.

**Subcategory:  Negotiations with Defendants**

(j)  This time is for work regarding negotiations with Honeywell related to the amendments to the Sediment Consent Order.

**Subcategory:  Master Schedule**

(k)  This time is related to work regarding necessary revisions to the Master Schedule for the sediment remedy, as well as the drafting, review, and negotiation of a Consent Order entering the revised Master Schedule.  The Master Schedule is an order of the Court. Honeywell was unable to complete the implementation of the sediment remedy as required by the Master Schedule. Therefore, it was necessary to submit a Consent Order revising the Master Schedule

37

in order to prevent continuing violation of the court order.

**Subcategory: Public Meeting**

(l) This time is for work related to scheduling, preparing for, and attending a community meeting regarding the sediment remedy that was held by Honeywell at the request of the Special Master.

**Category: Plaintiffs' Rule 60 Motion Settlement**

49. This work is for the last steps associated with settlement of plaintiffs' Rule 60 Motion. This work related to the Amended Consent Motion Modifying the June 2003 Final Judgment to require that Honeywell is responsible for perpetually protecting Study Area 7 from re-contamination along its northern and southern boundaries.

**Category: 100% Design**

50. This category involves the work related to the review of the 100% Designs for Study Areas 6 North and South. During the 2012-2013 time frame, Honeywell submitted individual 100% Designs for Study Area 6 North and Study Area 6 South and later submitted a Combined Study Areas 6 North and South 100% Design. All work related to a 100% Design for an individual area was billed to that individual client. However, all work related to the Combined 100% Design is billed only to the Study Area 6 North client because the work could not readily be split between the Study Area 6 North and South clients.

51.  While the 100% Design and its numerous attachments all have a technical aspect and require review by an expert, each document also has legal significance and must be reviewed by an attorney.  First, in order to understand an expert's comments on a particular document and have a useful discussion with the expert regarding the comments, it is necessary for the attorney overseeing the expert's work to review the document.

52.  Second, the attorney must review all documents required by any of the Consent Decrees to ensure the document complies with the terms of the Consent Decree.  For example, in January 2012, the parties agreed to the Study Area 6 North in-situ treatment plan.  However, months later when Honeywell submitted the Contractor Work Plan for the Study Area 6 North in-situ treatment plan, it excluded one of the agreed upon treatment areas.  While the experts had to assess whether it was appropriate technically to remove the treatment area, Ms. Alcorn had to assess whether the technical change to the in-situ work plan violated the requirements of the Study Area 6 North Consent Decree and whether it was made in accordance with the procedures required in the Special Master process.

53.  Third, many of the attachments to the 100% Design are more legal than technical in nature, such as the OSDS.  An attorney must review reports and other technical documents in order to determine if the document has legal significance.  For example, during the final review of the Combined 100% Design, Ms. Alcorn noticed

39

in her review of the design drawings that a traffic circle had been included in the southeast corner of Study Area 6 South.  While this element did not have significance to the expert reviewers, Ms. Alcorn realized that this element indicated that future improvements to Route 440 might extend over the cap and violate the terms of the conservation restriction that has been recorded for the area.  As a result, the parties had to negotiate changes to the Consent Decrees, as well as develop additional provisions for the OSDS that would require the cap be protected during any future improvements to Route 440.

54.     The work in this category for each client falls into the following subcategories:

**Subcategory: Technical Issues**

(a) The time in this subcategory generally relates to the review and comment process before Special Master Torricelli.  Since this process involved multiple rounds of review, significant time was required.  First, there was an initial review and comment submission.  Then, Honeywell would issue a response that frequently required additional discussions and negotiations between the parties and a response from plaintiffs.  Then, once the plaintiffs and Honeywell had resolved their issues, Special Master Torricelli submitted his comments to Honeywell and plaintiffs for review and response.  During the review of the Study Area 6 North 100% Design, plaintiffs and Honeywell exchanged approximately four rounds of comments. During

the review of the Study Area 6 South 100% Design, plaintiffs and Honeywell exchanged approximately nine rounds of comments. During the review of the Combined Study Area 6 North and South 100% Design, plaintiffs and Honeywell exchanged approximately five rounds of comments.

(b) As changes to the design were agreed upon by the parties, the 100% Design document was not revised and reissued. Thus, it was necessary for plaintiffs to track the various issues and agreements made between the parties so that, once a revised design was finally issued, plaintiffs would be able to ensure all agreed upon changes had been made.

(c) As noted above, in 2012 and early 2013, the Study Areas 6 North and South 100% Designs were completely separate documents with separate attachments. This meant that each design went through an independent review and comment process. While the earlier review work on the Study Area 6 North 100% Design assisted in the initial review of the Study Area 6 South 100% Design, it did not eliminate the need to conduct a detailed review of this document. Plaintiffs' review of the Study Area 6 South 100% Design uncovered many instances where a change should have been made, based on agreed upon revisions to the Study Area 6 North 100% Design. The parties had agreed that the same changes would be made to the Study Area 6 South 100% Design.

**Subcategory: In-Situ Treatment**

(d)   The time in this subcategory is for work related to the in-situ treatment work plans and contractor plans for both Study Area 6 North and Study Area 6 South.   The work plans and contractor plans set forth the methods for implementing treatment.   Plaintiffs rely on these plans to determine whether Honeywell has met the requirements of the Study Area 6 North and South Consent Decrees.   The Study Area 6 North and South Consent Decrees require that, prior to the approval of in-situ treatment, Honeywell must demonstrate that treatment will result in a reduction of hexavalent chromium to 20 ppm or less and that no rebound will occur.   Study Area 6 North Consent Decree, ECF No. 1141, para. 55(d); Study Area 6 South Consent Decree, ECF No. 1140, para. 61(a)-(b).   The work plans and contractor plans are the documents that Honeywell submits in order to make the required demonstration.   Under the Consent Decrees, plaintiffs have the right to review and comment as part of the Special Master process.

(e)   In January and February 2012 plaintiffs reviewed and eventually approved a revised work plan for Study Area 6 North, which included three treatment areas.   However, the work plan did not include necessary provisions related to hydraulic performance,[20] so it was approved with the caveat that Honeywell had to

---

[20]Hydraulic performance is the means of determining that the required amount of reductant solution was injected and fully permeated the area for treatment without

(continued...)

42

provide the contractor plan that would include the hydraulic performance provisions for review and approval.  Review of the contractor plan showed  that it was not only inadequate concerning how the contractor planned to address hydraulic performance, but that it was also inconsistent with the approved work plan.  One of the three treatment areas was excluded from the contractor plan.  Honeywell's decision to exclude one of the treatment areas without prior consultation with or approval of the parties or the Special Master resulted in the expenditure of significant hours of work.

(f)  Plaintiffs had to assess whether the change in the in-situ work plan violated the requirements of the Study Area 6 North Consent Decree and whether it was made in accordance with the procedures of the Special Master process.  In addition, plaintiffs' counsel had to consult experts, who had to assess whether it was technically appropriate to remove the treatment area.

(g)  Plaintiffs also had to address this issue with the Special Master. Because plaintiffs and Honeywell were unable to resolve the dispute as to the excluded treatment area, the dispute was put to Special Master Torricelli for resolution.  Special Master Torricelli required plaintiffs and Honeywell to submit papers arguing their respective positions.  After reviewing the submissions of the parties, Special Master Torricelli issued a decision that Honeywell had to include the

[20]/(...continued)
dissipating from the treatment area too quickly.

excluded treatment area in the in-situ treatment plan. After Special Master Torricelli's decision, Honeywell revised the contractor plan so that it included all three treatment areas and resubmitted the revised plan for review.

(h)  In September 2012, Honeywell submitted the in-situ work plan for Study Area 6 South. Plaintiffs engaged in the Special Master review process that included reviewing the document, consulting with the experts regarding their comments, submitting comments, and reviewing and responding to Honeywell's response to plaintiffs' comments. However, similar to the Study Area 6 North in-situ treatment work plan, the Study Area 6 South work plan did not include necessary provisions related to hydraulic performance and injection monitoring, so the work plan was approved with the caveat that Honeywell had to provide a contractor plan that would include the missing provisions for review and approval. The contractor plan was not provided until September 2013, at which time plaintiffs engaged in the same review process described above and compared the September 2012 approved work plan to the September 2013 contractor plan.

**Subcategory: Methane Issues**

(i)  Both the Study Area 6 North and South Consent Decrees explicitly provided that the cap remedies would not include gas venting. *Compare* the original Study Area 6 North Consent Decree (ECF No. 202 in Docket No. 05-5955, para. 56), *with* the amended Study Area 6 North Consent Decree (ECF No. 1141, para. 56), and

44

*compare* the original Study Area 6 South Consent Decree (ECF No. 234 in Docket No. 05-5955, para. 65), *with* the amended Study Area 6 South Consent Decree (ECF No. 1140, para. 65). In 2011, Honeywell informed plaintiffs that they were concerned about the potential for methane gas to build up under the cap and, as a result, it proposed adding a gas venting component to the cap. The Consent Decrees were modified in 2012 to provide for gas venting. The work in this subcategory relates to Honeywell's proposal to modify the cap design in order to add a gas venting layer. Work with regard to this proposal started in 2011 and extended into 2012. The work conducted in 2012 included a discussion between Ms. Alcorn and Drs. Bell and Ross following a technical meeting that they had with Honeywell on the issue and a follow-up letter to the Special Master informing him of the parties' resolution of the issue.

**Subcategory: Open Space Design Standards**

(j) This time was for work related to the negotiation and drafting of the OSDS. The OSDS is the document that will govern all future development in the open-space park areas to be developed over the cap areas in both Study Areas 6 North and South. The OSDS provides standards for the development so that the integrity of the cap will be protected during and after development. The Study Areas 6 North and South Consent Decrees each require the OSDS. Study Area 6 North Consent Decree, ECF No. 1141, para. 72(c)(ix); Study Area 6 South Consent Decree, ECF No. 1140, para. 86(c)(xx). In addition, the portions of the OSDS that address roads and utilities

45

were required to be included as part of the 100% Design. Study Area 6 North Consent Decree, ECF No. 1141, para. 60(j)(v)(5); Study Area 6 South Consent Decree, ECF No. 1140, para. 74(j)(v)(5).

(k) The Study Areas 6 North and South Consent Decrees require the development of the OSDS because the remedies will leave large quantities of contaminated soils under the caps on Study Area 6 North and South, which will remain in place in perpetuity. As I have explained above in paragraph 30, plaintiffs' counsel had the responsibility, in reviewing and approving the 100% Design and, in particular, the OSDS, to ensure as much as possible the future protection of public health and the environment.

(l) The OSDS is intended to be a regulatory document that sets forth specific standards to govern the activities and development allowed over the cap. When the OSDS was first submitted to plaintiffs by Honeywell in mid-2010 with the Study Area 6 North 100% Design, it was not formatted or drafted as a set of standards. Rather, the OSDS was drafted more as a "Request For Proposal," like a wishlist and guidelines instead of clear enforceable standards. In addition, the initial OSDS included landscaping and planting, but failed to include roads and utilities as required for the 100% Design. Study Area 6 North Consent Decree, ECF No. 1141, para. 60(j)(v)(5); Study Area 6 South Consent Decree, ECF No. 1140, para. 74(j)(v)(5).

(m) In 2011, the parties focused their attention on reformulating the

46

OSDS document into a set of actual standards. They worked with Dr. Jason Grabosky, a professor and the John and Eleanor Kuser Faculty Scholar in Urban and Community Forestry at Rutgers University, as well as experts for the parties, to develop the OSDS into a thorough set of standards designed to protect the cap system. The OSDS include landscaping standards to protect the cap from the intrusion of plant roots and the maintenance of healthy landscaping above the cap. The standards agreed upon by the parties resulted in the addition of a root barrier layer to the 100% Design so that the roots of the trees planted as part of the landscaping will not penetrate the cap, which is intended to be impenetrable.

(n) In the 2012-2013 time frame, work on the OSDS shifted to the negotiation and drafting of the geotechnical, road, and utility standards. Geotechnical issues are implicated by any development feature that will exert downward pressure on the cap – examples include foundations, footers, utility fixtures such as light poles, and roads. The pressure of surface development and use can cause differential settlement of the cap. When pressures are greater in one area of the cap than in adjacent areas, the potential exists for differential settlement, which can weaken and even breach the cap. Thus, the OSDS standards are written to ensure that any development which will exert downward pressure is consistent with the design of the cap and its future protection.

(o) Pursuant to the terms of the Study Areas 6 North and South Consent

47

Decrees, the development that is allowed over the cap areas is limited to development that the cap is designed to withstand. Thus, the parties had to determine the types of development features that could be included in the future development. For development features with a geotechnical impact, such as roads, it was necessary to determine the loads that those features could transmit to the cap, and then assess whether the cap design is robust enough to handle them.

(p)   When the cap design was determined to be robust enough to withstand the development feature, standards had to be crafted to set forth clearly the rules governing the feature's construction and operation. For example, standards were crafted allowing for electric utility features such as light poles. However, in order to protect the integrity of the cap, it was necessary to set forth standards regarding the size and depth below ground surface of footers for electric utility features because these factors determine the downward force transmitted against the cap.

(q) When the cap design was not robust enough to withstand the future development, the design was modified to withstand the development. For example, the design was insufficient to withstand the estimated loads from the anticipated future traffic on the roads and, as a result, the design was modified to require an increased three-foot separation between road surfaces and the cap. The increased separation dissipated the expected loads from the anticipated future traffic to loads which the cap could withstand.

48

(r)   Also in the 2012-2013 time frame, the work on OSDS matters involved preparation of a submission for Special Master Torricelli regarding the disputed OSDS issues for resolution and the final review and approval process before him.  As discussed in paragraph 25, the Special Master review process requires that plaintiffs and Honeywell go through a review and negotiation process before Special Master review.

(s)   Over the course of 2012-2013, at least ten drafts, plus the final version of the OSDS, were exchanged between the parties.  There were four major meetings to negotiate issues in person and at least one Special Master meeting where the primary discussion related to the OSDS.  A submission by plaintiffs regarding disputed issues was prepared for Special Master Torricelli, but not submitted, due to an eventual agreement among the parties.  A comparison of the final OSDS, Pl. Ex. 23, with the original draft OSDS submitted by Honeywell, Pl. Ex. 24, demonstrates the significant work that was required to improve the OSDS so that they can perform the critical function of setting enforceable standards for development of the public park land over the capped hexavalent chromium contamination.

(t)   One of the reasons the OSDS required so much time is that it is a complex document that blends legal standards with technical matters.  The technical issues are the drivers of what standards are needed.  Extremely careful drafting was required so that the standards are understandable for future users who will not

49

necessarily have the same knowledge of the remedial work in Study Areas 6 North and South as the parties now do.

(u)  Due to the complexities of the OSDS, the volume of drafts and negotiations between plaintiffs and Honeywell, and the number of technical issues that had to be addressed through the standards, it was necessary to have two attorneys and two plaintiffs' experts work on this issue.  Ms. Pravlik conducted a majority of the negotiations with the assistance of Ms. Alcorn.  Dr. Bell and Dr. O'Connell participated in negotiations, meetings, and drafting of the OSDS.

**Subcategory: Geotechnical Issues**

(v) This time is for work related to geotechnical issues identified by Dr. O'Connell regarding the surcharge plan proposed by Honeywell in 2011.  The 100% Design for Study Area 6 North was originally submitted to the parties in 2010.  After the 100% Design was issued, plaintiffs pressed Honeywell to provide the geotechnical support for the level of stress the cap was designed to withstand.  This  would establish the maximum amount of future development that would be allowed under the Consent Decrees.  Study Area 6 North Consent Decree, ECF No. 1141, para. 60(j); Study Area 6 South Consent Decree, ECF No. 1140, para. 74(j).   In 2011, Honeywell informed the parties that, upon further review, their experts concluded that the cap area would need to be surcharged in order to support the proposed future redevelopment.

50

(w)  Plaintiffs had their geotechnical engineer,  Dr. O'Connell,  assess and comment on the surcharge plan, as well as assess whether the 100% Design complied with the Consent Decree requirement that the cap be designed to withstand future development.  Plaintiffs submitted Dr. O'Connell's comments regarding the geotechnical issues at the end of 2011.  In 2012, plaintiffs and Honeywell engaged in numerous negotiations and meetings to discuss and resolve the issues identified by Dr. O'Connell.  This resulted in significant revisions to the 100% Design, such as the changes to increase the separation between future road surfaces and the cap from a layer of 12 inches to a layer of 3 feet.

(x) The technical issues identified by Dr. O'Connell were very important to plaintiffs' work regarding the development of the OSDS to ensure the integrity of the cap.  Therefore, close oversight by plaintiffs' counsel of these matters was essential.

**Subcategory:  Road Subgrade Issues**

(y)  This time is for work related to potential problems with the fill material to be used under roads and how this might negatively impact future performance of the cap.  This issue originally arose in 2011 when plaintiffs' submitted comments on the issue to Honeywell.  In 2012, most of the work on this issue involved review of Honeywell's response to plaintiffs comments, discussion between plaintiffs' counsel  and  Dr. O'Connell regarding his concerns, and discussions with

51

Honeywell's counsel regarding the issue. These negotiations led to a modification of the technical specifications in the 100% Design regarding the material that was authorized for use as road subgrade over the cap. These negotiations also informed the negotiations and drafting of the OSDS related to the road subgrades. *See* OSDS, Pl. Ex. 23, pp. 21-25.

### Subcategory: Confirmation Sampling Issues

(z) This time is for work related to the areas to be excavated as part of the soil remedy, namely the pre-excavation confirmation sampling for Study Areas 6 North and South. This issue arose in 2011, when plaintiffs and Honeywell exchanged comments and responses regarding Honeywell's proposed confirmation samples, and continued into 2012. Plaintiffs had commented that the confirmation samples relied upon by Honeywell were insufficient in quantity and location to meet the technical requirements for site remediation. In early 2012, correspondence on this issue was exchanged between plaintiffs, Honeywell, Special Master Torricelli, and NJDEP. In addition, NJDEP held a meeting with all the parties and the Special Master, which included experts and attorneys, to discuss the issue and hear the opinions of the parties. Following that meeting, NJDEP required that Honeywell include a greater number of sidewall and bottom confirmation samples.

### Subcategory: Barrier Wall Issues

(aa) This time is for work related to the revision of the 100% Design to

relocate the underground barrier wall, which will contain the contamination on a portion of Study Area 6 North, farther away from an underground 72-inch diameter force main pipeline owned and operated by the PVSC.

(bb)  In the spring of 2013, as the parties were getting ready for the final review of the Combined Study Areas 6 North and South 100% Design, Honeywell informed Special Master Torricelli and plaintiffs that PVSC and NJDEP had raised concerns about the proximity of the barrier wall to the 72-inch force main and the ability of the force main to withstand the stresses that the remediation might impose. Honeywell proposed that the easiest and fastest way to address the concerns raised would be to relocate the barrier wall.  However, relocation of the barrier wall raised numerous technical and legal issues, such as how the area outside of the wall would be remediated and what type of future use would be designated.

(cc)  The barrier walls basically create a four-sided box called the containment cell.  Under the terms of the Study Area 6 North Consent Decree (paras. 56 and 60), the area inside the containment cell would be capped and be designated as the Open Space Area, and the future use and development of this area would be highly restricted by the OSDS.  Under the terms of the Study Area 6 North Consent Decree (para. 55), the area outside the containment cell is designated as the Residential Area of Concern, in which the presumptive remedy would be excavation in order to allow for unlimited future use.  Plaintiffs' counsel assessed the legal

53

implications of the proposed change to the 100% Design under the terms of the Consent Decree and, in addition, assessed impacts to existing institutional controls like the conservation restriction for Study Area 6 North. Plaintiffs' counsel also consulted with their experts regarding whether Honeywell's proposal was appropriate from a technical perspective.

**Subcategory: Consent Order 100% Design Review**

(dd) This time is for work related to the final review and approval process for the 100% Design. The Study Area 6 North and Study Area 6 South Consent Decrees differed regarding the process for review and approval of documents. *Compare* Study Area 6 South Consent Decree, ECF No. 1140, para. 86(c)-(f), *with* Study Area 6 North Consent Decree, ECF No. 1141, para. 72(c)-(e). The Study Area 6 South Consent Decree requires that NJDEP be provided a review period prior to the review by the parties (ECF No. 1140, para. 86(d)), while the Study Area 6 North Consent Decree provided for NJDEP review contemporaneous to plaintiffs' review. (ECF No. 1141, para. 72(d)). Therefore, in order to remain in compliance with the terms of the Study Areas 6 North and South Consent Decrees, a consent order was filed to allow the Study Area 6 South review to follow the Study Area 6 North review. ECF No. 1167.

**Subcategory: Consent Order Entering 100% Design**

(ee) This time is for work related to the entry of the Combined Study

Area 6 North and South 100% Design by the Court. This Consent Order entered the 100% Design. It also designated areas where the chromium remedy would be deferred and set forth the process for future amendments related to relocation of the barrier wall in order to protect the 72-inch force main.

### Subcategory: Consent Order Barrier Wall

(ff) This time is for work related to the Consent Order regarding the amendments to the 100% Design due to the need to relocate the Study Area 6 North Barrier Wall in order to protect a 72-inch force main that is in close proximity to the remedy area.

### Subcategory: Scheduling

(gg) This time is for work related to communications with Honeywell and Special Master Torricelli regarding the schedule for review and comment on various documents.

### Subcategory: Document/Database Management

(hh) This is time expended by a paralegal to download and manage files and documents submitted via the Sharepoint site, which is an online depository for oversized submissions. While most documents are provided to plaintiffs via e-mail, some documents are provided through a file-sharing site set up by the Special Master's technical advisors, the Lewis Berger Group. When documents are provided in this manner, it is necessary to have a paralegal download and manage the

55

documents.

**Category: Soil Remedy**

55.    This category involves the work related to the oversight of the implementation of the remedy pursuant to the Consent Decrees.  The work in this category generally falls into the following subcategories:

**Subcategory: Monitoring Compliance**

(a)  This time is for work related to monitoring the excavation remedy being implemented at Study Area 6 South.  This includes reviewing documents submitted by Honeywell, discussing with the relevant experts their technical comments regarding the documents, and negotiating Honeywell's documentation of its implementation of the soil remedy.

**Subcategory: Regulatory Permits**

(b)  This time is for work to review permits related to de-watering.  In order to conduct the excavation work required for the remedy, Honeywell must de-water the excavation area.  Honeywell is required to obtain a permit to treat and discharge this water.

**Subcategory: Declaration**

(c)  This time is for work related to the review and comment on the excavation declaration for Study Area 6 South proposed by Honeywell.  Honeywell submitted a proposed declaration regarding the excavation at Study Area 6 South for

56

submission to the Court to document the excavation progress. Plaintiffs reviewed the proposed document and provided comments on it to Honeywell and the Special Master. In particular, plaintiffs stated that any such declaration should address all elements of the remedy, not just excavation.

**Subcategory: Site Monitoring**

(d) This time is for work related to the oversight of the on-site monitoring conducted by experts.

**Subcategory: Master Schedule**

(e) This time is for reviewing and commenting on multiple revised Master schedules for the remedies at Study Area 6 North and Study Area 6 South. When individual revised schedules were submitted, the time to review and comment was billed to the relevant client. However, it was decided that in 2013 the Study Areas 6 North and South remedy implementation should be combined. Thus, a Combined Study Areas 6 North and South Master Schedule was submitted for review and comment. The Combined Master Schedule was revised and issued for review at least three times in 2013. The work related to the Combined Master Schedule was billed only to the Study Area 6 North client.

**Subcategory: No Further Action Letter**

(f) The work in this subcategory related to the review of No Further Action letters regarding Site 79 and NJCU that were issued by NJDEP.

57

**Category: Groundwater Remedy**

56.    Under the Study Area 6 North client, this category involves the work related to review and comment on regulatory permits for the construction of the new Waste Water Treatment Plant on Study Area 6 North.    Under the Study Area 5 Groundwater client, this category involves the work related to the review and comment process for the Shallow Groundwater Report that is required by the Study Area 5 Groundwater Consent Decree (ECF No. 303 in Docket No. 05-5955, para. 78(c)).

57.    In 2012, Ms. Alcorn was responsible for the review and comment process for the Shallow Groundwater Report, which included both technical comments related to future monitoring and reporting and legal comments related to institutional controls necessary for the future protection of the public.    However, in 2013, due to other work demands on Ms. Alcorn, Ms. Weaver took over the work which was related to the determination and negotiation of appropriate institutional controls.    Plaintiffs have designated some work in this category as "No Charge" to avoid billing for any work that could be considered duplicative.

**Category: Consent Decree Modification**

58.    This category involves the work related to the negotiation, drafting, and filing of the First Amended Study Area 6 North Consent Decree and the First Amended Study Area 6 South Consent Decree.    The amendments to each of the Study

Areas 6 North and South Consent Decrees differed and the work was conducted and billed separately for each client. Similarly, the final review and filing of each amended Consent Decree was conducted and billed separately for each client.

**Category: Reports**

59. This category involves reviewing and analyzing specific reports such as a Remedial Action Report and a Remedial Action Work Plan.

60. Under the Colonial Concrete client, work in this category related to the review and analysis of the Remedial Investigation Report and Remedial Action Work Plan for the property known as Site 163, which is directly adjacent to the southern border of Study Area 6 South, in order to assess whether additional chromium remediation is necessary and whether legal action should be taken.

61. Under the Sites 79 and 153 South client, work in this category related to the review and comment on the Interim Remedial Action Report for Site 153.

62. Under the NJCU client, work in this category related to review and comment on the Remedial Action Report that documented the remedial action implemented at NJCU and is a long-term institutional control for the site.

63. Each of these reports had legal significance, requiring review by an attorney, and addressed technical matters, requiring review by an expert. An attorney must review all documents required by the Consent Decrees to ensure that the document complies with the terms of the decree. Moreover, in order to consult

59

effectively with our experts about the technical aspects of a report, the attorney must first review the report. Finally, an attorney must review reports and other technical documents in order to determine if the document has legal impact or significance. For example, the Remedial Investigation Report related to Site 163 required review by an attorney in order to determine if the new data related to hexavalent chromium were sufficient to support the initiation of a citizen suit.

## Category: Settlement

64. This category involves work under the Colonial Concrete client related to the settlement of potential claims regarding remediation of soils contaminated with hexavalent chromium on Site 163, directly to the south of the southern border of Study Area 6 South. The negotiations with Honeywell were ultimately successful and the parties settled. However, the time of plaintiffs' counsel was increased by Honeywell's vacillation on issues related to incorporating the Colonial Concrete Site 163 property into the Study Area 6 South Consent Decree and Honeywell's attempt to renegotiate issues.

## Category: Institutional Controls

65. This category involves work related to the development and implementation of institutional controls. In general, engineering controls are measures designed to isolate contamination in such a manner that there is no contact between the contaminants and the public or other parts of the environment.

60

Institutional controls are designed to protect the integrity of the engineering controls and limit human activities in the vicinity of the contamination.

66. Institutional controls should: (1) protect the engineering remedy; (2) reduce the threat of exposure to the contamination that remains in place; and (3) facilitate the reuse and redevelopment of contaminated properties. Thus, institutional controls must be designed to prevent existing and future land uses that are incompatible with levels of contamination remaining on site and to provide notice about the remaining contamination to current and future owners and users of the properties.

67. The work in this category falls into the following subcategories:

**Subcategory: Worker Training Manual**

(a) This time is for work related to discussions with Honeywell's counsel as to status of the development of the Worker Training Manual that is required by the Site 79 Consent Decree.

**Subcategory: Notices under Consent Decree**

(b) This time is for work related to notifying parties of their obligations to provide annual notices under the Consent Decrees.

**Subcategory: Annual Notice**

(c) This time is for work to review the annual notices to stakeholders required by the Site 79 Consent Decree and the NJCU Consent Decree.

61

**Subcategory: Annual Certification**

(d)  This time is for work to review the Annual Certification to the Court regarding compliance with the deed restrictions that is required by the Site 79 Consent Decree.

**Subcategory: Biennial Certification Report**

(e)  This time is for work related to the review of the Site 153 Biennial report and correspondence with counsel for Honeywell regarding the report.

**Subcategory: Deed Restrictions**

(f)  This time is for work related to the development and negotiation of the deed restriction for NJCU consistent with the NJCU Consent Decree and negotiation of Honeywell's proposed revisions to deed restrictions for Site 79 and Site 153, including review, comment, and negotiations.  The deed notices are vital to the long-term protection of the chromium remedy at each site.  The time expended in this subcategory was primarily related to language proposed by Honeywell that was inconsistent with the model deed restriction language that is required by the NJCU and Site 79 Consent Decrees.  Site 79 Consent Decree, ECF No. 301 in Docket No. 05-5955, para. 73; NJCU Consent Decree, ECF No. 302 in Docket No. 05-5955, para. 91.

**Subcategory: Long-Term Monitoring Plan**

(g)  This time is for work related to the development of the Long-Term Monitoring Plans for NJCU and Sites 79 and 153, review and comment on the plans,

62

and negotiation of specific issues with Honeywell, such as the appropriate trigger for requiring the use of the contingent groundwater system for NJCU. While some aspects of the review and comment process were technical and addressed by plaintiffs' experts, an attorney had to assess whether the plans complied with numerous legal requirements in the Consent Decrees.

**Category: Long-Term Monitoring**

68. This category involves work related to the long-term monitoring of implemented remedies that is conducted pursuant to the Consent Decrees and the required long-term monitoring plans related to each site. The work in this category falls into the following subcategories:

**Subcategory: Report**

(a) This time is for work related to the review of monitoring reports and quarterly logs submitted by Honeywell pursuant to the NJCU and Sites 79 and 153 Consent Decrees.

**Subcategory: Contingent System**

(b) This time is for work regarding issues related to the potential outward gradient for groundwater in the cap area of NJCU[21] and the need to operate the contingent groundwater pump and treat system. A containment cell, or cap area, for

---

[21]NJCU is located in Study Area 5, to the east of Study Areas 6 and 7. *See* Map of Study Areas 5-7, Pl. Ex. 22.

contaminated soil and groundwater should have an inward gradient so that it is not possible for the contaminated groundwater within the cell to flow out of the cell.

(c)  Pursuant to the terms of the NJCU Consent Decree, as well as the proposed Long-Term Monitoring Plan, if an outward gradient occurs, the contingent groundwater pump and treat system must be put into operation in order to prevent the release of contaminated groundwater from underneath the NJCU cap.  The annual groundwater report submitted in 2012 included data that indicated an outward gradient for groundwater in the NJCU cap area.

(d)  The work in this subcategory is related to reviewing and assessing Honeywell's position that there was not an outward gradient and the multiple investigations conducted by Honeywell regarding this issue.  While much of the work related to this issue was technical and done by plaintiffs' experts, it was necessary for plaintiffs' counsel  to consult with its experts to determine the legal consequences under the NJCU Consent Decree, to review the technical materials provided by Honeywell in order to engage in informed discussions with experts regarding their opinions, and to negotiate and draft correspondence with Honeywell.

**Subcategory: Cap Breach**

(e)  This time is for work related to the review and investigation of the breach of the NJCU cap in December 2013 and an assessment of additional legal controls that should be considered to prevent another breach in the future.  The NJCU

64

cap was in place for less than two years at the time of the breach.  This is indicative of a major breakdown in the institutional controls and monitoring systems that were developed in order to prevent any damage to the cap.

**Category: Financial Assurances**

69.  This category involves work related to the drafting, negotiation, review and filing of the Second Amended Consent Order Regarding Financial Assurances entered by the Court on May 24, 2012. ECF No. 1128.  Financial assurances are legal mechanisms, such as a letter of credit, designed to ensure that the funds required to complete Honeywell's remedial obligations will be available even if Honeywell goes bankrupt or ceases to exist.  Financial assurances are important to ensure that the remediations are completed regardless of Honeywell's future financial status.

**Category: Long-Term Financial Assurances**

70.  This category involves work in drafting a letter to the Special Master, dated March 26, 2012, in response to a letter from Honeywell, dated December 8, 2011, setting forth plaintiffs' position related to the development of the Long-Term Groundwater Financial Assurances.  Because both parties agreed that the amount of the existing Letters of Credit was more than sufficient to cover the amount required for long-term groundwater financial assurances, no further action on this subject took place in 2012-2013.

**Category: Compliance Monitoring**

71.  This category involves the work related to site visits conducted as part of the Special Master process.  In the spring of 2013, Special Master Torricelli invited the parties to participate in a site visit to Study Areas 6-7 with him in order to observe the status of the remedial work.

**Category: Special Master Meetings**

72.  This category involves work related to preparing for, attending, and follow up to the monthly meetings held by Special Master Torricelli.  In alternating months during 2012-2013, the meetings were conducted in person in Roseland, New Jersey, or via a telephone conference call.

73.  After the issuance of the 2003 Final Judgment in the Study Area 7 case, Special Master Torricelli convened monthly meetings to address the issues associated with the remediation of Study Area 7.  As additional matters were assigned to Special Master Torricelli by the Consent Decrees, those issues were added to the existing monthly meetings.

74.  In the 2012-2013 time frame, Ms. Alcorn and I represented plaintiffs at the Special Master meetings.

75.  The work in this category falls into the following subcategories:

**Subcategory: Special Master Meeting Preparation**

> (a)  Before each Special Master meeting, plaintiffs' counsel have an

internal meeting to prepare for the upcoming Special Master meeting.  At these meetings, we address the status and strategy of various issues.  We also address how a position or decision with respect to one study area may affect other study areas. Although Ms. Alcorn and I represent plaintiffs at the Special Master meetings, we are not able to perform all of the work required on behalf of plaintiffs in the Study Areas 5-7 cases.  These meetings allow us to have only two counsel at the meetings and therefore reduce the financial compensation plaintiffs seek.

(b)  Ms. Alcorn and I, as the attorneys representing the plaintiffs at the Special Master meetings, participate in every preparation session.  Ms. Weaver participated in most preparation sessions in 2012-2013 because she was the attorney responsible for the day-to-day work in the Study Area 7 case.  Ms. Pravlik periodically participates in the preparation sessions if issues arise that require her knowledge from the litigation of the Study Areas 5 and 6 case, such as institutional controls, the OSDS, or the intent of certain consent decree provisions.  Mr. Terris periodically participates in the preparation sessions in a supervisory capacity and in order to remain abreast of the current status of all issues in the Study Areas 5-7 cases. It would be inefficient, and costly to Honeywell, to have me and/or Ms. Alcorn attempt to acquire all of the knowledge that the other attorneys already have.

(c)   Based on my observations from attending the Special Master meetings since 2003, I understand that both Honeywell and the Special Master team

67

have preparation sessions before the Special Master meetings and that their sessions involve more than two individuals.  The team of attorneys and technical personnel who assist the Special Master at the meetings usually number at least six people.  On occasion, a member of the Special Master's team has stated at the beginning of a Special Master meeting that they have just come from a pre-meeting session.  The Honeywell participants in the Special Master meeting often remain after the meeting for a session among themselves.

**Subcategory: Special Master Meeting Attendance**

(d) Since 2003, I have represented plaintiffs at the Special Master meetings, along with a more junior attorney who works on the Study Areas 5-7 cases. Currently, Ms. Alcorn attends the Special Master meetings with me.

(e) Honeywell is typically represented at Special Master meetings by two attorneys. Honeywell typically also has three to four engineers or other technical contractors or consultants present at the meetings.  Plaintiffs' attorney staffing at Special Master meetings is generally equal to Honeywell's.  Plaintiffs bring two experts, Dr. Ross (a hydrogeologic expert) and Dr. Bell or Kim Hosea (environmental engineers).  Thus, plaintiffs' overall staffing of the meetings is lower than Honeywell's.

**Subcategory: Special Master Meeting Follow Up**

(f) Following the Special Master meetings, the other attorneys and I meet

to discuss issues addressed at the Special Master meetings that require further action. As with the preparation sessions, the follow up sessions require the participation of the attorneys who will be doing the follow up work.

(g) Many of the issues discussed by counsel during their Special Master meeting preparation and follow-up conferences are issues that are complex and have long-term effects. For example, during 2012 and 2013, significant time was spent in follow up conferences between counsel related to issues surrounding the OSDS that are required by the Study Areas 6 North and South Consent Decrees and are a part of the 100% Design. As I have explained above in paragraphs 54(j)-(l), the establishment of the Open Space Design Standards is of paramount importance for the protection of plaintiffs and the public.

**Category: Case Administration**

76. This category primarily involves work under the subcategory "ECF Management." This is work engaged in by a paralegal related to the monitoring of the court docket and management of all filings made in the Study Areas 5-7 cases.

**Category: Communications with Government**

77. This category involves communications and meetings in 2013 with Jersey City government entities regarding the remediations being implemented pursuant to the 2003 Final Judgment and the Consent Decrees. These communications were engaged in at the request of Special Master Torricelli in order to assist a newly elected

69

Jersey City Mayoral administration in understanding the remedial work at Study Areas 5-7, the Special Master process, and the obligations of Jersey City under the various Consent Decrees.

**Category: Communications with Third Parties**

78. This category involves work in 2013 related to a community meeting held at the request of Special Master Torricelli regarding the Study Area 6 North and South remedial work that was set to begin in mid-2013.

**Category: Plaintiffs' Motion to Consolidate**

79. This category involves the work on the motion to amend the September 8, 2011, Order Consolidating the Study Area 7 and Study Areas 5 and 6 cases for filing purposes. This Court's 2011 Order was not given effect by the Clerk's office. Having been informed by the Clerk's office that changes to the 2011 Order were necessary to give effect to the consolidation, plaintiffs began to draft a motion to amend the 2011 Order. At the same time, plaintiffs engaged in negotiations with Honeywell's counsel seeking a consent motion regarding consolidation. Plaintiffs' motion was never filed because counsel to Special Master Torricelli offered to work with the Clerk's office to attempt to have the 2011 Order effectuated. The category is divided into subcategories that relate to the drafting of plaintiffs' motion and related negotiations with Honeywell's counsel.

**Category: 2010 Second Half Fee Submission**

80.  This category involves work related to correspondence with Honeywell's counsel regarding the fees incurred in the second half of 2010.  The parties settled most of these fees and agreed to set aside certain fees called the Appeal Overlap Fees, which were to be resolved pursuant to the rules established in conjunction with the Remanded Fees.

**Category: 2011 Fees Submission**

81.  This category involves the work related to plaintiffs' informal submission of 2011 fee materials to Honeywell pursuant to the requirements of the Consent Decrees.  This involved the work to review and prepare the materials to provide to Honeywell, reviewing and responding to any objections raised by Honeywell, negotiating the disputed and undisputed fees amount, and developing a consent order to document the fees that remain in dispute and the payment of the undisputed amount.

82.  The time expended on the submission to Honeywell relates to the review of the time and expense records to determine the fees and expenses to be sought and whether the time is properly categorized.  The work also relates to reviewing the time records encompassed within the inter-office conferencing reduction.  *See* para. 43. This work also involves review of Honeywell's response to plaintiffs' fees request and preparation of a reply letter that presented a compromise on the fees.  This exchange

of correspondence resulted in settlement of these fees.

**Category: 2012 Fees Submission**

83.  This category involves the work related to plaintiffs' informal submission of 2012 fee materials to Honeywell pursuant to the requirements of the Consent Decrees.   This involved reviewing and preparing the materials to provide to Honeywell, reviewing and responding to any objections raised by Honeywell, and negotiating the disputed and undisputed fees amount.

84.  The time expended on the submission to Honeywell relates to the review of the time and expense records to determine the fees and expenses to be sought and whether the time is properly categorized.  The work also relates to reviewing the time records encompassed within the inter-office conferencing reduction.  *See* para. 43. This work also involves review of Honeywell's response to plaintiffs' fees request and preparation of a reply letter that presented a compromise on the fees.

**Category:Travel (Non-Working)**

85. This category involves the time billed for travel when no work on the case or any other billable matter was undertaken during the travel.  In the fee litigation in the Study Area 7 case, the court of appeals reversed this Court's award of 100% compensation of travel time and remanded the issue for determination of "whether attorneys in Washington are typically compensated for their travel time at their full billing rate."  *ICO II, supra,* 426 F.3d at 711.  However, the court of appeals also

72

made clear that, to the extent that plaintiffs worked while traveling, that time should be fully compensated as substantive time rather than travel time. *Id.* at 711, n.15. Before the issue was decided on remand, the same issue arose in the fee application for the fees incurred for the appeal of the merits decision. In the briefing for that application, plaintiffs informed the court of appeals that plaintiffs were unable to obtain evidence demonstrating how Washington attorneys are typically compensated for travel time and therefore acquiesced in the 50% reduction urged by Honeywell. Appellee Interfaith Community Organization's Supplemental Brief in Support of Its Application for Attorneys' Fees and Expenses, January 13, 2006, *ICO v. Honeywell*, 3d Cir., Nos. 03-2760, 03-3037 and 03-3585, pp. 4-5. Since that time, plaintiffs have reduced the hourly rate for non-working travel time by 50%. In order to distinguish the non-working travel time, we bill it to a separate category and cut the hourly rates by 50%. The time in this category is divided into subcategories that relate to the purpose of the travel involved.

## EXPENSES

86. In plaintiffs' application, we have also requested reimbursement of the expenses incurred in 2012-2013. These are the type of expenses which we normally bill to our paying clients. The total amount of expenses we seek are $512,951.22. Pl. Ex. 9.

87.    We have divided the expenses into multiple categories.[22]    The computerized records of the expenses incurred during the course of the case organized by these categories are attached as Plaintiffs' Exhibit 10.  The computerized records describe each expense, the amount associated with it and the date incurred.  A summary of the total expenses in each category is set forth in Plaintiffs' Exhibit 9.  The categories are set forth in alphabetical order as they appear in Plaintiffs' Exhibits 9 and 10.  In paragraphs 88-96 below, I describe the expenses in each of these categories.

88. **Conference Calls.** This amount represents the costs incurred for conference calls.

89.    **Document Production.**  This amount represents the printing and copying costs incurred for the copying of court papers, technical documents, expert comments, documents submitted in the Special Master Process, and correspondence.  We charge 15 cents per page for black and white document production in this case.[23]

---

[22] The client for the expenses is identified in the lower left corner of each page in this exhibit.

[23] 15 cents per page reflects a reduction in the per page rates sought in previous applications.  The 19.2 cents per page rate sought in previous applications was based upon the decision of the court of appeals that 19.2 cents per page was reasonable. *ICO v. Honeywell*, 3d Cir., Nos. 03-2760, 03-3037 and 03-3585, Order, Feb. 3, 2006. Plaintiffs have reduced the per page rate sought based upon a recent decision of the District Court for the District of Columbia.  *Salazar v. District of Columbia*, 2014 WL 342084, pp.14-15(D.D.C. Jan. 30, 2014)(Pl. Ex. 25).

90. **Expert Witness Fees.** This amount represents the fees incurred for the services of plaintiffs' expert witnesses. The work of these experts is described in paragraphs 33-39 and in their respective affidavits (Pl. Exs. 14-21). In Plaintiffs' Exhibits 9 and 10, the expert witness fees are shown by expert.

91. **Overnight Delivery Charges.** This amount represents the overnight delivery costs incurred for sending court papers and other materials to the Court, Honeywell, or plaintiffs' experts. Overnight delivery was used only when it was requested, when necessary due to court-ordered deadlines, and/or due to the importance or time-sensitive nature of the materials, and/or when the item could not be sent via e-mail or other electronic means.

92. **PACER Court Docket System**. This amount represents the fees charged for use of the Court's PACER docket system in conjunction with this case. Plaintiffs use PACER services for two purposes. First, we check the docket as a back up to the ECF system. Under a decision of the Court of Appeals for the District of Columbia Circuit regarding attorney conduct, counsel have an ethical obligation to satisfy litigation deadlines and other requirements regardless of whether the ECF system has functioned properly in terms of providing notification. *Fox v. American Airlines, Inc.*, 389 F.3d 1291, 1294 (D.C. Cir. 2004) (an attorney has an obligation to monitor the docket independently of receipt of CM/ECF e-mail notices). Therefore, we periodically check the docket in each case that we litigate. Second, we use PACER

75

to research filings from other cases and to download filings from other cases that we intend to use as exhibits. These research costs are compensable. *Adolph Coors Co. v. Truck Insurance Exchange*, 383 F. Supp. 2d 93, 97 (D.D.C. 2005) (computerized databases lower attorney hours spent doing research). PACER charges that fall into the first category are billed to the SA 5-7 General Matters billing client. Those that fall into the second category are billed to the client associated with the research. In this application, all of the PACER charges fall into the first category and have been billed to the SA 5-7 General Matters.

93. **Printing - Color.** This amount represents the copying costs incurred for copying materials that needed to be copied in color. We charge 25 cents per page for a color copy.[24]

94. **Postage**. This amount represents the postage costs incurred for mailing court papers and correspondence.

95. **Travel Expenses.** This amount represents travel expenses for meetings and site visits.

96. **Westlaw**. This represents the cost incurred by the Firm for Westlaw computerized legal research.

---

[24]Plaintiffs have set their per page rate based upon a recent decision of the District Court for the District of Columbia. *Salazar v. District of Columbia, supra*, 2014 WL 342084 at 15 (Pl. Ex. 25).

## MISCELLANEOUS

97.  The Firm bills paralegal time to its paying clients in the same manner as attorney time.  As a result, paralegal time is included in Plaintiffs' Exhibits 6 and 7. *See Missouri v. Jenkins*, 491 U.S. 274, 284-288 (1989).

98.  The Firm has received no compensation from plaintiffs or any other source for the fees and expenses sought in this application.

99.  Plaintiffs have never had the financial resources to pay any attorneys' fees to my Firm in this case or the Study Area 7 case or even to reimburse it for the out-of-pocket costs incurred.  The Firm has always represented plaintiffs in this case on an entirely contingent basis for all our fees and expenses.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 1, 2014.

KATHLEEN L. MILLIAN