Plaintiffs'
Exhibit 2

## ENVIRONMENTAL, PRESERVATION, LAND-USE, AND ZONING MATTERS HANDLED BY TERRIS, PRAVLIK & MILLIAN, LLP

## RCRA HAZARDOUS WASTES

We have represented citizens in suits under the Resource Conversation and Recovery Act (RCRA) designed to require the remediation of properties contaminated with hazardous waste that presents an imminent and substantial endangerment to human health and/or the environment.

In *Interfaith Community Organization v. Honeywell International, Inc.*, 263 F. Supp. 2d 796 (D.N.J. 2003), affirmed, 399 F.3d 248 (3d Cir.), certiorari denied , 125 S.Ct. 2951 (2005), we represent the Interfaith Community Organization, the Hackensack Riverkeeper, and several individual plaintiffs in a citizen suit brought under RCR that is resulting in the excavation and removal of 1.5 million tons of toxic hexavalent chromium residue from a 34-acre site in Jersey City, New Jersey (know as the Roosevelt Drive-In Site or Study Area 7), and a clean-up of the deep ground water and sediments in the Hackensack River. The District Court for the District of New Jersey ordered the excavation after finding, among other things, that (1) the plaintiffs, some of whom live within a mile of the site, had standing to bring suit; (2) the site represents an "imminent and substantial endangerment to human health and the environment" under RCRA; and (3) the necessary permanent remedy for those endangerments is total excavation of the waste and remediation of contaminated sediment and deep groundwater.

The Court of Appeals for the Third Circuit affirmed the district court's injunction, noting that the citizen-plaintiffs had met a higher than necessary standard in proving Honeywell's liability and that "the time for a clean-up has come." The firm continues to represent the plaintiffs in proceedings before Special Master Robert G. Torricelli, appointed to oversee the implementation of the injunction. The excavation has been completed. Other remedial efforts will continue.

In January 2006, in an effort to expand the relief obtained with regard to Study Area 7, we brought another RCRA citizen suit against Honeywell, *Hackensack Riverkeeper v. Honeywell International, Inc.*, D.N.J., Civ. No. 06-022 (DMC), seeking remediation of chromium contamination to soils, groundwater, surface waters, and sediments associated with the properties adjoining Study Area 7. These properties are designated by the New Jersey Department of Environmental Protection (NJDEP) as Study Areas 5 and 6. The case is consolidated with *Jersey City Municipal Utilities Authority v. Honeywell International Inc.,* D.N.J., Civ. No. 05-5955 (DMC) and *Jersey City Incinerator Authority v. Honeywell International Inc.,* D.N.J., Civ. No. 05-5993 (DMC). In an effort to remediate and redevelop Study Areas 6 and 7, which together comprise 100 acres along the Hackensack River, Honeywell and the City of Jersey City have proposed a redevelopment plan that is designed to transform this contaminated area into a live-where-you-work neighborhood. Plaintiffs, Honeywell, and Jersey City have reached a settlement which provides for remediation protective of human health and the environment. The consent decrees include rigorous financial assurance requirements and multiple layers of institutional controls.

The remediation of Study Area 6 is being overseen by Special Master Torricelli in conjunction with the remediation of Study Area 7. The firm represents the Hackensack Riverkeeper in the proceedings before Special Master Torricelli.

Remediation of Study Area 5 is being undertaken pursuant to three consent decrees which address the soil and groundwater contamination. Like the decrees for Study Area 6, these decrees provide institutional controls and financial assurances. Under one of the decrees, an area used by Honeywell's predecessor, Mutual Chemical, for processing chromate ore will be remediated to become the Westside Campus of the New Jersey City University (NJCU).

In *Interfaith Community Organization v. Shinn* (D.N.J.), we represented the Interfaith Community Organization which sued the State of New Jersey under RCRA alleging that the soil at Liberty State Park is contaminated with chromium and various other chemicals. In November 1998, a federal judge entered a preliminary injunction against the State, ordering that it fence the areas in question or apply one foot of fill. This was the first time a court applied the State of New Jersey's risk remediation standard of 1 in 1,000,000 to arrive at an appropriate remediation solution. ICO also alleged Clean Water Act violations including an unpermitted discharge from the park and the illegal filling of a salt water marsh in violation of Section 404 of the Clean Water Act. After issuance of the preliminary injunction and a successful motion to enforce that injunction, the parties reached a settlement that imposes requirements to address the contaminated soils and other issues of restoration. The firm continues to monitor the State's implementation of and compliance with the agreement.

In *United States v. Hooker Chemicals & Plastics Corp.*, 101 F.R.D. 444 (W.D.N.Y. 1984), the court granted Ontario's motion to intervene to challenge a proposed settlement of an action involving a hazardous waste site next to the Niagara River. However, the court rejected Ontario's arguments that the settlement agreement violated public policy by not requiring a long-term, permanent remedy at the site. 607 F. Supp. 1052 (W.D.N.Y. 1985), affirmed, 776 F.2d 410 (2d Cir. 1985).

We represented the Province of Ontario in New York state proceedings regarding permits for two hazardous waste landfills near the Niagara River. At the SCA landfill in Model City, Ontario's participation led to an agreement to perform improved groundwater monitoring and studies regarding the appropriate cover for final closure. At the CECOS landfill in Niagara Falls, Ontario participated in a lengthy hearing before the New York Department of Environmental Conservation in which Ontario contended that the hydrogeological conditions at the site were inadequate. The DEC agreed and denied CECOS' application for a permit to expand its landfill operations.

In *United States v. Westinghouse Electrical Corp.* (N.D. Ind.), we represented the Indiana Public Interest Research Group, which sought to intervene to challenge a proposed settlement of a suit brought by the federal government under Section 7003 of the Resource Conservation and Recovery Act concerning Westinghouse's generation and improper disposal of polychlorinated

biphenols (PCB's) and other hazardous waste. The district court denied the motion on the ground that InPIRG had delayed too long in seeking to intervene.

We represented a citizens group in Buckingham County, Virginia, before the county Planning Board on issues concerning the continued operation and expansion of an existing toxic waste disposal facility and the potential construction of other such facilities in the county.

We have advised and represented the Province of Ontario on toxic waste issues involving the area near the Niagara River.

## WATER QUALITY

We have represented Friends of the Earth, Sierra Club, the American Canoe Association, the Public Interest Research Group of New Jersey, the North Carolina Conservation Council, the Professional Paddlesports Association, the South Carolina Coastal Conservation League, Florida Public Interest Research Group, Pennsylvania Public Interest Research Group, New York Public Interest Research Group, Trout Unlimited, the Foundation for Global Sustainability, the Atlantic States Legal Foundation, and other individuals and groups in over 100 citizen suits brought under the Clean Water Act to enforce discharge permits in Alabama, Kentucky, Louisiana, New Jersey, New York, North Carolina, South Carolina, Tennessee, Florida, Louisiana, Texas, and West Virginia. Under the Act, permittees must monitor and report their discharges on a regular basis and are strictly liable for any violations of discharge limits and monitoring and reporting requirements. The suits have requested civil penalties for past permit violations and injunctive relief to ensure future compliance. The defendants in the suits have been municipal treatment plants and industries, which discharge directly to navigable waters and which discharge indirectly to such waters through municipal treatment plants.

We succeeded in reversing the trend of barring citizens access to the federal courts through the concept of standing as a result of our victory before the Supreme Court in *Friends of the Earth v. Laidlaw Environmental Services, Inc. (TOC)*, 528 U.S. 167 (2000). The Court held that the citizens could sue to enforce the NPDES permit issued to Laidlaw without establishing harm to the waterway. They only needed to show harm to their interests in the waterway.

We have obtained court decisions on a number of issues of first impression in citizen suits under the Act, including: (1) the first decision awarding summary judgment on liability issues *(SPIRG v. Monsanto Co.*, 600 F. Supp. 1479 (D.N.J. 1985)); (2) the first decision upholding the constitutionality of the citizen suit provisions of the Act *(SPIRG v. Monsanto Co.*, 600 F. Supp. 1474 (D.N.J. 1985)); (3) the first decision holding that only judicial, not administrative, actions by government agencies can preclude a citizen suit for the same violations *(Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57 (2d Cir. 1985)); (4) the first decision granting a preliminary injunction against further permit violations *(PIRG v. Top Notch Metal Finishing Co.*, 26 ERC 2012 (D.N.J. 1987)); (5) the first decisions imposing the then statutory maximum civil penalty of $10,000 per violation *(SPIRG v. Monsanto Co.*, 29 ERC 1988 (D.N.J. 1988), *SPIRG v. Hercules, Inc.* , 29 ERC 1417 (D.N.J.

3

1989), *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158 (D.N.J. 1989), affirmed, 913 F.2d 64 (3d Cir. 1990), certiorari denied, 498 U.S. 1109 (1991); (6) the first decision imposing contempt penalties for violation of a consent decree ( *PIRG v. Ferro Merchandising Corp.*, 26 ERC 1362 (D.N.J. 1987)); (7) the first injunction obtained by citizens against a federal facility for violations of the Act (*PIRG v. Rice*, 774 F. Supp. 317 (D.N.J. 1991)); and (8) the first decision requiring a concentrated animal feeding operation (CAFO) to apply for an NPDES permit (*ACA v. Murphy Farms*, E.D.N.C., Nos. 7:98-CV-4-F(1); 7:98-CV-10-F(1); 5:98-CV-209-F(1), slip op., December 22, 1998.

We have been successful in obtaining relief against federal, state, and municipal facilities as well as private facilities. In addition to obtaining an injunction requiring compliance with the Act at McGuire Air Force Base (*PIRG v. Rice*, *supra*), we have secured consent decrees ensuring permit compliance at two Army facilities and four state facilities. We have also litigated cases involving six additional government facilities, including three facilities at the federal government's massive nuclear research complex at Oak Ridge National Laboratories in Tennessee.

On behalf of the American Canoe Association, we entered into Consent Agreements with five municipalities in West Virginia and four in North Carolina which provided for injunctive relief to prevent further violations and civil penalties for violating their NPDES permits.

Judgments for civil penalties and settlement payments in our cases amount to over $40 million. These include the highest settlement in a citizen suit,     *PIRG v. Witco Chemical Corp.* ($10,000,000), and, at the time of imposition, the two highest civil penalties ever imposed by a court in citizen suits (*PIRG v. Powell Duffryn Terminals, Inc., supra* ($4,085,000 after remand); *SPIRG v. Hercules, Inc., supra* ($1,680,000)).

In *SPIRG v. AT&T Bell Laboratories*, 842 F.2d 1436 (3d Cir. 1988), the court held that the community market rate, rather than the firm's actual billing rate, was the proper measure of attorneys' fees in such citizen suits. The court found that the firm "performed excellent work," commended the "superb advocacy skills of plaintiffs' counsel, Mr. Terris" and found that the firm's billing rates fell "far short of what the Terris firm could command in the marketplace." *Id*. at 1442, 1445.

In *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000)(*en banc*), the Fourth Circuit found that the plaintiff environmental groups had standing to proceed with their suit under the Clean Water Act. On remand, the district court entered an judgment of liability in July 2003 concluding that the defendant was required to pay a civil penalty of $2.34 million. The case is currently awaiting a further decision regarding standing in the Fourth Circuit.

In *Chesapeake Bay Foundation v. United States*, we represented citizens organizations which challenged the granting of a state-issued NPDES permit for a refinery in the Hampton Roads area of Virginia. The grounds included the failure to prepare an environmental impact statement, to assure that water quality standards would be met, and to comply with procedural requirements of the Clean Water Act. The district court held that an environmental impact statement was not required (445 F.

Supp. 1349 (E.D. Va. 1978)) and that there was no cause of action in federal court (495 F. Supp. 1229 (1980); 501 F. Supp. 821 (1980)). However, the refinery was never built.

We have represented the Province of Ontario in judicial and administrative proceedings concerning the Clean Water Act discharge permit for the City of Niagara Falls wastewater treatment plant. The New York Department of Environmental Conservation first issued a renewal permit in 1982. We prepared comments on the draft permit and intervened on behalf of Ontario in New York state court when the permit was challenged by the City and industry groups. The permit was vacated by the court on procedural grounds. *Industrial Liaison Committee v. Flacke*, 479 N.Y.S.2d 696 (S.Ct. Albany Cty. 1984), affirmed, 485 N.Y.S.2d 662 (3d Dept. 1985). After the state issued a new draft permit in 1987, Ontario was granted party status by DEC to challenge this permit. We represented Ontario in negotiations with EPA concerning a new permit for the plant. We have also represented Ontario as an intervenor in related litigation brought by the City and other parties in New York state court challenging a DEC regulation which authorized technology-based permit limits for municipal treatment plants. *Buffalo Sewer Authority v. DEC*.

In 1998, we brought suit on behalf of the American Canoe Association, Inc., and other groups against a large hog farmer in North Carolina for operating a hog farm which for discharges of swine waste into a local waterway without a permit in violation of the Clean Water Act. In December 1998, the District Court for the Eastern District of North Carolina issued an Order finding that the facility in question was a CAFO and ordering it to apply for an NPDES permit from the State in order to be in compliance with the Clean Water Act. The Court also found that the hog farm had illegally discharged swine waste on at least two occasions. In 2001, the State of North Carolina issued its first NPDES permit to a CAFO as a result of this case. The district court also found that the plaintiffs had constitutional standing to sue and that the violations were ongoing at the time of the complaint as required by *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987). The district court's decisions were affirmed by the Court of Appeals for the Fourth Circuit. *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003), and 412 F.3d 536 (4th Cir. 2005).

In 1991, Bruce Terris testified before the Commissioner of the New Jersey Department of Environmental Protection and Energy concerning its new penalty regulations implementing the New Jersey Clean Water Enforcement Act of 1990. In addition, the firm has provided informal assistance to NJDEP in developing methods of incorporating into penalties the recovery of economic benefits enjoyed by polluters which delay implementing pollution control measures.

Bruce Terris and Carolyn Smith Pravlik have served as panelists at numerous conferences and seminars addressing Clean Water Act enforcement and citizen suits.

## WETLANDS

In *Alliance for Legal Action v. United States Army Corps of Engineers*, a homeowners group sued to stop the filling of wetlands for the expansion of the Greensboro, North Carolina, airport. The suit was based on the Section 404 Guidelines prohibiting the filling of wetlands unless there is no practicable alternative and on the adequacy of the mitigation measures. The district court found that no practicable alternatives existed and that the ratio of new wetlands to the destroyed wetlands was adequate. *Alliance for Legal Action v. United States Army Corps of Engineers*, 314 F. Supp. 2d 534 (M.D.N.C. 2004).

In 1996, we brought suit on behalf of a community organization challenging the construction of a Target Store in Burke, Virginia, where the construction would result in the filling of a wetland.

## WATER SUPPLY

We advised a Florida landowner on legal strategies for limiting growth and relieving pressure on Florida's limited water supply. Our analysis examined municipal water franchise agreements, state water regulations and statutes, the federal Safe Drinking Water Act relating to underground aquifers, and statutes affecting Everglades National Park.

## AIR QUALITY

In *Sierra Club v. Fri*, 344 F. Supp. 253 (D.D.C. 1972), affirmed, 4 ERC 1815 (D.C. Cir. 1972), affirmed by an equally divided Court, 412 U.S. 451 (1973), the Supreme Court held that the Clean Air Act requires that air quality in areas still having clean air must be protected from significant deterioration as well as that air quality must be improved in areas with heavily polluted air. The district court ordered the government to pay more than $50,000 in attorneys' fees to the plaintiffs. As a result of this case, EPA issued regulations for the prevention of significant deterioration (PSD) of air quality in clean air areas and subsequently Congress included specific PSD provisions, based on these regulations, into the Clean Air Act itself.

In *Sierra Club v. EPA*, 540 F.2d 1114 (D.C. Cir. 1976), remanded, 434 U.S. 809 (1977), we unsuccessfully challenged EPA's regulations on significant deterioration as not providing adequate protection for clean air. However, we were successful as intervenors in the related cases brought by industry challenging the power of EPA to issue regulations since the court of appeals upheld the regulations.

EPA determined that certain PSD provisions of the 1977 Clean Air Act Amendments would not apply to sources which obtained PSD permits before March 1, 1978, and which began construction before March 19, 1979. The most significant of these provisions was the requirement that new sources use the "best available control technology" determined on a case-by-case basis to limit emissions. Representing the Northern Cheyenne Tribe, Sierra Club, and Friends of the Earth, we petitioned the court to require EPA to implement the PSD Amendments as of their enactment,

August 7, 1977.  We also intervened to oppose industry's attempt to postpone the effective date even further than EPA wanted.  The court of appeals rejected both the environmental and industry attacks on EPA's implementation of the PSD provisions of the Amendments.  *Citizens to Save Spencer County v. EPA*, 600 F.2d 844 (D.C. Cir. 1979).  EPA agreed to pay a portion of our attorneys' fees.

In *State of New York v. Thomas*, 613 F. Supp. 1472 (D.D.C. 1985), reversed, 802 F.2d 1443 (D.C. Cir. 1986), certiorari denied, 482 U.S. 919 (1987), we represented the Province of Ontario, Canada, as an intervenor in a case brought by the northeastern states to force EPA to require states to revise their Clean Air Act implementation plans to eliminate pollution causing acid rain in Canada. The district court ordered EPA to issue notices to the polluting states, but the court of appeals reversed on the ground that the notices could not issue unless EPA first conducted a rulemaking proceeding on the issue of whether the states' pollution was endangering Canada.  We then petitioned EPA to conduct this rulemaking proceeding.  After EPA refused to do so, we petitioned the court of appeals to require EPA to begin the rulemaking process.  The court of appeals held that EPA was not required to make findings as to the endangerment to Canada and as to Canada having equivalent regulations as the United States until it had adequate information to issue notices to the states to remedy the situation. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1990).  The Court further held that, even though 10 years had elapsed since the first petition to EPA, EPA's failure to act on the petitions was not arbitrary and capricious.  However, the court suggested that EPA might have to act after issuance of the report of the Natural Acid Precipitation Assessment Program in late 1990.  Before that occurred, Congress enacted a comprehensive acid rain program in the Clean Air Act Amendments of 1990.

We represented the Province of Ontario, Canada, by intervening in support of EPA's NOx SIP Call Rule which requires the Midwestern states and electrical utilities to reduce nitrogen oxide emissions which lead to ground-level ozone and smog in the Northeastern United States and in Ontario. The NOx SIP Call Rule was substantially upheld by the court. *State of Michigan v. United States Environmental Protection Agency*, 213 F.3d 633 (D.C. Cir. 2000).

We also represented the Province of Ontario before EPA in a proceeding under Section 126 of the Clean Air Act to consider claims by the States of New York, Pennsylvania, and Maine that midwestern pollution is being transported long distances and is causing acid rain in the northeast. The sources at issue in that proceeding are the same as those that are causing acid rain in Ontario. EPA denied the petition.  We advised the Province generally as to legislative, administrative, and litigation strategies to deal with the acid rain problem, including the acid rain regulations issued under the 1990 Clean Air Act amendments.

We advised the Northern Cheyenne Tribe throughout the proceedings it and EPA held to redesignate its reservation as a Class I air quality area under the significant deterioration regulations. After EPA approved the redesignation, various electric utilities and other parties challenged EPA's decision.  In *Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981), the court approved the redesignation.  We represented the Tribe as intervenors in this litigation.  The government agreed to pay a portion of the attorneys' fees in this case.

In *Montana Power Co. v. EPA*, several utilities brought suit seeking to invalidate the determination of EPA that the Colstrip power plant was subject to EPA's prevention of significant deterioration regulations. We represented the Northern Cheyenne Tribe and Northern Plains Resource Council as intervenors in support of EPA. The district court held that EPA's application of its PSD regulations to the plant was arbitrary and capricious. While the district court's decision was on appeal, the 1977 Amendments to the Clean Air Act were passed, and EPA concluded that, regardless of its previous regulations, the PSD requirements of the 1977 Amendments applied to the plant. The utilities then petitioned for review of EPA's new determination, and the Tribe and Council again intervened. The two cases were consolidated before the court of appeals, which held that the Colstrip power plant was subject to the PSD regulations. 429 F. Supp. 683 (D. Mont. 1977), reversed, 608 F.2d 334 (9th Cir. 1979).

We represented the Northern Cheyenne Tribe and the Northern Plains Resource Council in EPA's extensive proceedings concerning the Montana Power Company's application for a PSD permit under the Clean Air Act for the Colstrip power plant which the company claimed met the Class I increments of the PSD program. After EPA initially proposed to grant the permit, we persuaded EPA to reject it. The utilities petitioned for review in the Court of Appeals for the Ninth Circuit. *Puget Sound Power and Light Company v. EPA*. We represented the Northern Cheyenne Tribe and Northern Plains Resource Council which intervened. Subsequently, the company made a new application to EPA, which provided for substantially better air pollution controls, and this application was approved. The utilities dismissed their case after they entered into a settlement with the Tribe under which the Tribe received jobs, air-quality monitoring, and financial assistance to compensate for the impacts of the plant on the reservation.

We represented the Roosevelt Campobello International Park Commission in a petition to review EPA's approval of a PSD permit for an oil refinery in Eastport, Maine. The court retained jurisdiction of the petition until EPA promulgated new rules which would allow the refinery to be exempt from the 1977 Amendments to the Clean Air Act. *Roosevelt Campobello International Park Commission v. EPA*, 684 F.2d 1034 (1st Cir. 1982). We also represented the Commission in a petition to review the existing rules for grandfathering new sources under the pre-1977 Clean Air Act. *Roosevelt Campobello International Park Commission v. EPA*. The refinery has never been built.

We represented Citizens Against the Refinery's Effects and the Chesapeake Bay Foundation in opposing a refinery in the Hampton Roads area of Virginia. In one case, we challenged EPA's decision to approve a revision to Virginia's State Implementation Plan which established an asphalt substitution program to offset hydrocarbon emissions from the refinery, on the grounds that the offset was inconsistent with the Clean Air Act and with EPA's Emission Offset Interpretative Ruling under that Act. In the other case, we challenged EPA's decision to issue a PSD permit for the refinery on the ground that EPA violated the Clean Air Act and its own regulations when it analyzed the modeling and monitoring data to predict the air quality impact of the facility. The court of appeals held for EPA in both cases. *Citizens Against Refinery Effects v. EPA*, 643 F.2d 178, 183 (4th Cir. 1981). However, the refinery proposal was abandoned.

We advised a citizens group in Wilmington, North Carolina, which opposed construction of an oil refinery proposed by the Brunswick Energy Company. Our analysis related to the compatibility of the refinery with the North Carolina Coastal Area Management Act, the Clean Air Act, and NEPA. We recommended focusing on the lack of a demonstrated need for oil refineries in the face of current U.S. demand for oil. The project was abandoned by the company on the basis of the reduced demand for oil products through the year 2000.

In *Vavra v. EPA*, we filed a petition in the Supreme Court on behalf of citizens residing near Galveston Bay, Texas, seeking review of a decision by the court of appeals that EPA's conditional approval of the State of Texas' revisions to its state implementation plan and its resulting refusal to apply the Act's construction ban did not violate the Clean Air Act even though, according to EPA, the revisions did not fully comply with the Act. The Supreme Court denied the petition for certiorari. 459 U.S. 822 (1982).

In *Citizens' Ass'n of Georgetown v. Washington*, 370 F. Supp. 1101 (D.D.C. 1974), the court denied claims by a local citizens' organization that construction of an urban commercial development would result in increased traffic and thereby cause a violation of the Clean Air Act. While the district court subsequently ordered the District of Columbia government to pay one third of the attorneys' fees of plaintiffs (383 F. Supp. 136 (D.D.C. 1974)), the court of appeals ruled that the district court lacked jurisdiction to award fees to nonprevailing parties under the Clean Air Act (535 F.2d 1318 (D.C. Cir. 1976)).

On behalf of Group Against Smog and Pollution (GASP) in Pittsburgh, we submitted comments to EPA opposing the deferral of Jones & Laughlin Steel's obligation to meet coke oven gas emissions limitations at its Pittsburgh Works. Jones & Laughlin applied to EPA in November 1981 under the Steel Industry Compliance Extension Act of 1981 for an extension of the deadline stipulated in its consent decree for repairing its coke oven gas desulfurization system. EPA denied Jones & Laughlin's application and filed a contempt action against the company for its failure to comply with the consent decree. *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348 (6th Cir. 1986).

We achieved a favorable settlement for citizen groups challenging air emissions from a resource recovery facility in *Public Interest Research Group of New Jersey, Inc. v. Warren Energy Resource Co., L.P.*, D.N.J., Civ. No. 94-6380.

We represented residents in Frederick County, Maryland, in opposing the expansion of a fluoride-emitting aluminum reduction facility in that area in hearings before the state health department.

We prepared extensive legal analysis, comments, and draft documents for the State of New Jersey protesting the failure of the City of Philadelphia to regulate excessive emissions of sulfur dioxide.

We represented the National Coalition for Clean Air and the Northern Cheyenne Tribe in support of Congressional legislation which would effectively prevent significant deterioration of air quality in clean air areas. This work included Congressional testimony and the drafting of statutory language. In 1977, Congress adopted Clean Air Act Amendments embodying most of the provisions we supported.

We prepared a legal analysis of the air-quality implications of the use of refuse-derived fuels as a substitute for fossil fuels in utility and industry boilers for the Brookhaven National Laboratory and the Princeton Center for Environmental Studies.

Bruce Terris was co-chairman of the Air Quality Task Force of the National Coal Policy Project which was an effort to obtain the agreement of environmentalists and industry on issues relating to coal development. Other members of the office did much of the environmental staff work for the Task Force. The report was published as Where We Agree, Report of the National Coal Policy Project.

**WILDLIFE**

In *Wilderness Society v. Hathaway*, 5 ELR 10118 (D.D.C. 1975), the Wilderness Society challenged the transfer of three large western game ranges from joint Fish and Wildlife Service and Bureau of Land Management administration to the sole administration of BLM. The district court held that the Secretary of the Interior had no authority to transfer the game ranges from the jurisdiction of the Fish and Wildlife Service and that the lack of an environmental impact statement violated NEPA. Congress subsequently enacted a statute placing the ranges under the sole jurisdiction of the Fish and Wildlife Service.

*Sierra Club v. Hickel* involved an exchange of land between the Fish and Wildlife Service and a utility company for the construction of a nuclear power plant. The court of appeals held that the exchange did not violate various wildlife statutes (476 F.2d 1048 (6th Cir. 1972)) and the Supreme Court denied our petition for a writ of certiorari (411 U.S. 920 (1973)).

*Society for Animal Rights v. Schlesinger* involved the mass killing of millions of blackbirds in Kentucky and Tennessee by chemical spraying in alleged violation of NEPA, the Migratory Bird Act, and other statutes. After the court refused to transfer the case and a preliminary injunction was denied (512 F.2d 915 (D.C. Cir. 1975)), the Fish and Wildlife Service agreed to prepare a comprehensive environmental impact statement on the program and not to provide the chemical to kill blackbirds until the statement was finished. Congress subsequently passed a statute amending NEPA, partially nullifying the agreement, and allowing the chemical to be used prior to completion of the environmental statement.

We represented the Audubon Society at EPA meetings concerning the use of pesticides against blackbirds in Tennessee in violation of the federal pesticide laws.

10

In *Sierra Club v. Andrus*, 395 F. Supp. 1187 (D.D.C. 1975), the district court held that NEPA required preparation of an environmental impact statement on the annual budget of the National Wildlife Refuge System because budgetary decisions have a substantial effect on the management of the refuges. The court of appeals agreed that environmental statements must be prepared on budget proposals and ordered the Office of Management and Budget to issue regulations concerning the preparation of such environmental statements. 581 F.2d 895 (D.C. Cir. 1978). However, it required statements to be prepared on budget requests only when they make significant changes in the status quo and not on an annual basis. The Supreme Court reversed and held that NEPA does not require the preparation of environmental impact statements on the budgets of federal agencies. 442 U.S. 347 (1979). The Court also stated, however, that environmental statements are required on any programmatic decisions related to the budget. Other counsel represented the Sierra Club in the Supreme Court.

*Defenders of Wildlife v. Andrus*, 428 F. Supp. 167 (D.D.C. 1977), involved the validity of the shooting hours in the waterfowl hunting regulations of the Fish and Wildlife Service. The district court held that the shooting hours were invalid because they were not based on adequate studies showing that they protected migratory birds.

*National Rifle Ass'n of America, Inc. v. Kleppe*, 425 F. Supp. 1101 (D.D.C. 1976), affirmed, 571 F.2d 674 (D.C. Cir. 1978), involved the validity of the regulations issued by the Fish and Wildlife Service to reduce the use of lead shot in duck hunting. We represented Defenders of Wildlife as intervenors in support of the Service. The court upheld the regulations.

*Conner v. Andrus* involved a challenge in the District Court for the Western District of Texas to Fish and Wildlife Service regulations prohibiting all duck hunting in designated areas of New Mexico and Texas. We represented Defenders of Wildlife in an unsuccessful attempt to intervene in support of the validity of the regulations.

We represented the Roosevelt Campobello International Park Commission in adjudicatory proceedings before EPA regarding EPA's decision to disapprove an NPDES permit for a refinery in Eastport, Maine. The issues chiefly involved the navigational risks and the threat of oil spillage to the bald eagle and whales, which are endangered species. The Administrative Law Judge approved the permit. The court of appeals held that the ALJ did not have the best available scientific evidence concerning the risk of oil spills and required studies before a decision could properly be made to approve a permit. The court also held that these additional studies concerning risk would have to be addressed in a supplemental environmental impact statement. *Roosevelt Campobello International Park Commission v. EPA*, 684 F.2d 1041 (1st Cir. 1982).

We represented the Roosevelt Campobello International Park Commission as intervenors when the Pittston Company applied for an exemption from the Endangered Species Act to the Endangered Species Review Board relating to its proposed refinery. The case was dismissed when the court found that the company's application for an exemption was premature. *Pittston Co. v. Endangered Species Committee*, 14 ERC 1257 (D.D.C. 1980).

*North Slope Borough v. Andrus*, which is discussed elsewhere in this memorandum, involved the protection of endangered species of whales under the Endangered Species Act.

## HIGHWAYS

*Upper Pecos Ass'n v. Peterson*  involved a challenge to construction of a road through a national forest in New Mexico to be constructed with funds granted by the Department of Commerce, on the ground that the environmental impact statement required by NEPA was not prepared prior to the grant of funds.  We prepared the petition for a writ of certiorari, which was granted by the Supreme Court.  406 U.S. 944 (1972).  The government then agreed to preparation of a new environmental impact statement and reconsideration of the project on the basis of it.

*Smeltzer v. Adams* involved whether the proposed construction of a highway in north-central Iowa violated NEPA and Section 4(f) of the Department of Transportation Act.  The court held that the Department of Transportation was required to prepare an environmental statement before the highway could be built analyzing its cumulative impact and that the site-specific environmental statement for a 20-mile segment of the highway was inadequate.  11 ERC 1367 (N.D. Iowa 1978).  A new EIS was prepared which the district court held was adequate under NEPA.

*Farmland Preservation Ass'n v. Goldschmidt* involved whether the proposed construction of an interstate highway in east-central Iowa violated NEPA.  Plaintiffs, a coalition of farmers, asserted that the EIS inadequately considered alternatives, failed to consider the cumulative impact of constructing the entire interstate highway, and inadequately analyzed secondary impacts.  The district court held that the environmental statement was adequate and the court of appeals affirmed. 491 F. Supp. 601 (N.D. Iowa 1979), affirmed, 611 F.2d 233 (8th Cir. 1979).

In *National Wildlife Federation v. Adams*, we brought suit in the District of Columbia on behalf of national environmental groups and local landowners challenging the construction of a highway in Kitsap County, Washington, on the grounds that the President's Executive Order 11990 relating to wetlands, NEPA, and a military construction statute had been violated.  After the suit was transferred to the State of Washington, other counsel assumed responsibility for the case.  The district court denied plaintiffs' motion for a preliminary injunction and summary judgment and the decision was affirmed on appeal.  13 ERC 1343 (W.D. Wash. 1979), affirmed, 629 F.2d 587 (9th Cir. 1980).

*North Carolina Alliance for Transportation Reform v. United States Department of Transportation*, M.D.N.C., No. 1:99CV00134, involved a challenge to the construction of the western section of a proposed beltway around Winston Salem, on the ground that the environmental impact statement required by NEPA was inadequate and did not properly assess the environmental effects of the proposed highway.  The suit was brought in 1999 on behalf of the North Carolina Alliance for Transportation Reform and Friends of Forsyth.  Shortly after we filed the complaint and a motion for preliminary injunction and/or temporary restraining order, the Federal Highway Administration withdrew the Record of Decision due to the lawsuit and problems with Winston Salem's air compliance.  The Federal Highway Administration also determined that additional

12

environmental analysis would be considered before the Record of Decision is reissued. The parties voluntarily dismissed the case. The court then held that the citizen group were entitled to its attorneys' fees under the Equal Access to Justice Act because the government's position was in bad faith and not substantially justified. 151 F. Supp. 2d 661 (M.D.N.C. 2001).

We have advised the Sierra Club concerning its participation in highway litigation in the City of Baltimore, a citizens group concerning possible highway litigation in Baltimore County, an individual concerning highway litigation in northern Virginia, a group of farmers in Iowa regarding their rights to additional connector roads to a proposed freeway, and a citizen group in Virginia concerning a highway in the Blue Ridge, Mountains.

## AIRPORTS

In *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir.), certiorari denied, 112 S. Ct. 616 (1991), the firm represented a citizen group which challenged the approval of the Federal Aviation Administration of an Airport Layout Plan for a cargo hub in Toledo, Ohio. Petitioners claimed in the court of appeals that the approval is invalid because the environmental impact statement failed to analyze adequately alternative sites for this hub or the noise impact of its operations. The court of appeals held that the EIS was adequate because it discussed the alternatives of approving the expansion and not approving it and that the EIS did not have to discuss alternative locations in depth. The court also held that while the FAA violated the regulations governing environmental impact statements by publishing an EIS prepared largely by a contractor the FAA itself did not select, the violation did not warrant invalidating the EIS. We did not represent the petitioners in the Supreme Court.

In *State of Missouri v. Coleman*, we represented HUSTLE, a group of Illinois farmers and other concerned residents who intervened in order to oppose the construction of a new airport in the Columbia Waterloo area of Illinois to serve the St. Louis region. While the district court rejected our position (427 F. Supp. 1252 (D.D.C. 1977)), the Secretary of Transportation was persuaded to disapprove further federal funding for the new airport and it was not built.

In *Alliance for Legal Action v. FAA*, an organization of homeowners challenged the approval of plans to expand the Greensboro, North Carolina, airport for a FedEx facility. The challenge was based on the adequacy of the environmental impact statement, and particularly its treatment of alternative sites and the effects of noise. The Fourth Circuit held that the statement was "not perfect," but was adequate to support the agency decision. *Alliance for Legal Action v. Federal Aviation Administration*, 2003 U.S. App. LEXIS 13845 (4th Cir. 2003).

## RAILROADS

*Sierra Club v. ICC* involved the decision of the Interstate Commerce Commission to approve a 130-mile railroad to facilitate coal development in northeastern Wyoming. The court held that the ICC decision violated NEPA and remanded the case to the agency. 11 ERC 1241 (D.C. Cir. 1978).

13

Subsequently, however, the court *en banc* withdrew its earlier decision and ordered the case to be heard before the entire court of appeals. In light of the construction that had already occurred on the rail line and the small probability that further litigation would prevent the completion of the line, the Sierra Club chose to dismiss the appeal.

We represented a Wyoming landowner and the WyoBraska Landowners Association, an organization of Wyoming and Nebraska farmers and ranchers, challenging the application of the Chicago and Northern Western Transportation Company to the Interstate Commerce Commission for authority to construct and operate a new 56-mile rail line in Wyoming and Nebraska. The Commission approved the line. The court of appeals upheld the Commission's approval, but stressed that the mitigating measures ordered by the ICC were to be taken seriously by the railroad and could be enforced by the landowners. *Mobil Oil Corp. v. ICC*, 685 F.2d 624 (D.C. Cir. 1982).

We represented the Northern Plains Resource Council in proceedings before the Interstate Commerce Commission challenging a proposed 89-mile rail line to the Powder River Basin in Montana. NPRC contended, in part, that the railroad proposal violated the Mineral Leasing Act because the railroad's backers planned to transport coal from their own federal coal leases on the rail line. The ICC first agreed with NPRC that the issue was a significant one requiring a hearing. After the hearing, an ICC administrative law judge accepted many of NPRC's contentions, but ultimately concluded there was no statutory violation.

## NUCLEAR POWER

In *Peshlakai v. Duncan* , we represented 89 Navajo Indians and Friends of the Earth in an action seeking to force six federal agencies to prepare national, regional and site-specific environmental impact statements on the mining and milling of uranium. The district court denied a temporary restraining order and preliminary injunction as to a small *in situ* mining project. 476 F. Supp. 1247 (D.D.C. 1979). The clients decided not to continue with the case.

We participated at EPA hearings on thermal standards to be used at the Calvert Cliffs' nuclear power plant.

We advised a local citizens group in the Staunton River area of Virginia concerning its opposition to the construction of a pump storage and nuclear power complex.

We prepared an extensive analysis for the Natural Resources Defense Council of the legal requirements for the supplemental environmental impact statement on the proposed Clinch River Liquid Metal Fast Breeder Reactor and concerning the inadequacy of the existing impact statement. The Nuclear Regulatory Commission determined that a supplemental impact statement was required.

## GEOTHERMAL ENERGY

We represented the Santa Clara Pueblo in hearings held by the Department of the Interior concerning an environmental impact statement on a proposed geothermal demonstration project in New Mexico. We also submitted comments for the Pueblo to the Department of the Interior which analyzed the Department's documents on the impact of the project on the Pueblo's religion. The state air board rejected an industry proposal which would have greatly relaxed state hydrogen sulfide emission standards and thereby allowed expanded geothermal development. We also prepared a legal memorandum for the Pueblo on geothermal leases entered into by the Department of Agriculture in a national forest. The proposed geothermal demonstration project was later abandoned.

## OTHER ELECTRIC POWER GENERATION AND TRANSMISSION

In *Concerned Citizens United v. Kansas Power and Light*, 215 Kan. 218, 523 P.2d 755 (1974), which was brought in Kansas state court, plaintiffs contended that, under Kansas law, an electric utility could not condemn land for a coal-burning power plant because it did not have proper zoning and could not show that it would be able to comply with various land, air and water quality laws. The Kansas Supreme Court rejected plaintiffs' position. However, as a result of this litigation, the Kansas legislature passed a new statute prohibiting condemnation of land until the condemnor has shown that it can comply with relevant laws.

In *Woida v. United States*, 446 F. Supp. 1377 (D. Minn. 1978), we brought suit under NEPA and the Rural Electrification Act on behalf of a coalition of citizens groups in Minnesota and North Dakota which opposed the construction of a large electric generating plant, an associated strip mine, and approximately 500 miles of extra-high voltage electric transmission lines. Plaintiffs sought an injunction against further construction of the unbuilt portions of the transmission lines and the microwave communications system associated with the project on the ground that the environmental impact statement was inadequate. The motion for a preliminary injunction was denied.

We analyzed for Friends of the Earth whether the Laramie River in Wyoming is a navigable river, requiring Army Corps of Engineers approval for the building of a power plant which would use its waters.

We advised a local citizens group in Utah which opposed construction of the Intermountain Power Project, a massive coal-fired generating plant. Our analysis focused on arguments under NEPA, the Federal Land Policy and Management Act, the Endangered Species Act, and the Clean Air Act.

Bruce Terris gave an address on public participation in energy-related decision-making sponsored by the National Science Foundation.

15

## LIQUID NATURAL GAS

We participated in extensive adjudicatory proceedings before the Federal Power Commission and Federal Energy Regulatory Commission concerning applications to import and store liquid natural gas (LNG) in a terminal on Staten Island on the ground that the transportation and storage of LNG in a highly populated area is too dangerous.  The facility has never been used for LNG.

We drafted bills concerning the appropriate location of LNG facilities and liability for any harm caused to persons or property due to accidents involving these facilities.

## SYNTHETIC FUELS

Bruce Terris was a member of the Advisory Panel on Synthetic Fuels to the House Science and Technology Committee in 1979-1980.  The Committee investigated the environmental and other problems concerning the development of synthetic fuels.  We wrote papers for the Panel on the effect of environmental regulations on the development of synthetic fuels and on fast-track legislation for speeding government consideration of projects affecting the environment which were then pending in Congress.

## COAL DEVELOPMENT

*Sierra Club v. Morton* was brought on behalf of the Sierra Club, National Wildlife Federation and rancher organizations in Montana and South Dakota to prevent the Department of the Interior and other federal agencies from issuing coal leases, entering into water options, or taking other actions related to coal development in the Northern Great Plains without preparing an environmental impact statement analyzing the impact of development on the entire region.  The district court rejected our contentions.  421 F. Supp. 638 (D.D.C. 1974).  The court of appeals held that, if the federal government continued with its huge coal development in the Northern Great Plains, a comprehensive environmental statement had to be prepared.  514 F.2d 856 (D.C. Cir. 1975).  The Department of the Interior then agreed to prepare a series of subregional environmental statements on coal development in various parts of the country.  The Supreme Court reversed the decision of the court of appeals and held that the subregional statements satisfied NEPA.  427 U.S. 390 (1976).  In doing so, it affirmed the requirements of NEPA as to comprehensive environmental statements when various governmental actions are interrelated.

*Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975), was brought by a number of Montana ranchers to challenge the Department of the Interior's approval of a mining plan for a strip mine in Montana.  The court held that NEPA required that an environmental impact statement be prepared on the entire 30,000 acres leased for a strip mine, rather than just on the first small portion of the mine, and ordered reconsideration of the lease on the basis of the new EIS.

In *NRDC v. Hughes*, we represented the Natural Resources Defense Council, the Environmental Defense Fund, and western environmental organizations in a suit which resulted in a

16

decision that the programmatic environmental impact statement prepared by the Department of the Interior on the entire federal coal leasing program was inadequate.  The court's order limited federal coal leasing pending the completion of an adequate programmatic statement.  437 F. Supp. 981 (D.D.C. 1977); 454 F. Supp. 148 (D.D.C. 1978).  The plaintiffs and the Department of the Interior then agreed to a settlement in which slightly more leasing was permitted and the government dismissed its appeal.  The case was appealed by industry intervenors.  While their appeal was pending, the Department of the Interior issued its new environmental impact statement on the federal coal leasing programs.  The appeal was then dismissed as moot.

In *NRDC v. Berklund*, 458 F. Supp. 925 (D.D.C. 1978), affirmed, 609 F.2d 553 (D.C. Cir. 1979), we represented the Natural Resources Defense Council and the Environmental Defense Fund in a suit challenging the position of the Department of the Interior that the Secretary has no discretion to deny a preference right lease even if the lease would result in severe environmental harm.  The district court held that environmental impact statements had to be prepared before the Department could enter into major leases and that it could consider environmental factors in deciding whether there were commercial quantities of coal to lease.  However, the court further held that, if there were commercial quantities of coal, the Secretary had no authority to refuse to lease on environmental or other grounds.

Bruce Terris wrote, with Eleanor Granger, a law review article on federal coal leasing.  Granger and Terris, The Leasing of Federal Land for Coal Production, 15 *Houston L. Rev.*  1175 (1978).

### OIL DEVELOPMENT

In *North Slope Borough v. Andrus*, we brought suit on behalf of Inupiat natives on the North Slope of Alaska against an oil and gas sale in the Beaufort Sea because of the threat to bowhead whales and other native subsistence resources.  Although the district court initially denied our request for a preliminary injunction (486 F. Supp. 326 (D.D.C. 1979)), the court later upheld several of our claims under the Endangered Species Act and NEPA and enjoined actions to consummate the sale or carry out pre-exploratory activities (486 F. Supp. 332 (1980)).  After all parties appealed, the court of appeals lifted the injunction and upheld the legality of the lease sale.  642 F.2d 589 (D.C. Cir. 1980).  In the meantime, however, the Department of the Interior issued a new biological opinion giving more protection to bowhead whales from oil development activities.  Subsequently, the district court ordered the government to pay the Borough's attorneys' fees.  515 F. Supp. 961 (D.D.C. 1981).  However, the order was vacated by the court of appeals.  689 F.2d 222 (D.C. Cir. 1982).

In *North Slope Borough v. Hammond*, we brought suit against the state portion of the same Beaufort Sea oil and gas sale in Alaska Superior Court, raising claims under state law.  While that court and the Alaska Supreme Court denied a preliminary injunction, the Superior Court subsequently held that the state failed to explain adequately its reasoning as to why the sale would not harm the Alaskan natives and enjoined activities to develop the leases.  The injunction was stayed by the Alaska Supreme Court.  After the state issued a new decision document, the Superior Court again enjoined

17

lease activities, holding that the state lacked sufficient information to conclude that oil development outside the barrier islands would not harm the subsistence lifestyle of the Alaskan natives.    *North Slope Borough v. Hammond*, 17 ERC 1656 (1980).   The Alaska Supreme Court reversed the Superior Court's holding on this issue, but held that the state had failed to make adequate findings under its Coastal Zone Management Act and remanded the case for further administrative proceedings.  645 P.2d 750 (1982).  The state agreed to pay a portion of the attorneys' fees.

We filed a petition for review on behalf of the North Slope Borough challenging the Secretary of the Interior's five-year plan for offshore oil and gas development on the ground that it failed to carry out his trust responsibilities to Alaskan natives.  The court of appeals rejected the Borough's arguments, but held that the plan was invalid under the Outer Continental Shelf Lands Act on grounds raised by other challengers. *State of California v. Watt*, 668 F.2d 1290 (D.C. Cir. 1981). The court of appeals remanded the program to the Secretary of the Interior for revision.  After issuance of the revised program, the Borough joined five states, two local governments, and other environmental groups in filing new petitions for review.  Petitioners claimed that the revised program was in violation of the prior court of appeals' order and the Outer Continental Shelf Lands Act.  The court of appeals issued an order upholding the validity of the revised program.  712 F.2d 584 (D.C. Cir. 1983).

In *North Slope Borough v. Watt*, 20 ERC 1457 (D. Alas. 1984), we filed a suit challenging decisions by the Secretary of the Interior to reduce the seasonal restrictions on oil and gas drilling operations in the Beaufort Sea which were designed to protect the bowhead whale during its migration.  The Borough also challenged the adequacy of the biological opinions on these decisions issued by the National Oceanic and Atmospheric Administration under the Endangered Species Act. The claims were rejected by the district court.

In *North Slope Borough v. Hodel*, we filed a suit challenging decisions by the Secretary of Interior to authorize exploratory drilling operations in the Beaufort Sea during the fall bowhead whale migration.  The suit contended that noise from the drilling operations would constitute takings of bowhead whales by harassment, in violation of the Endangered Species and Marine Mammal Protection Acts.  The suit also raised claims under the Outer Continental Shelf Lands Act, the Coastal Zone Management Act, and the Alaska National Interest Lands Conservation Act.  The case was dismissed pursuant to a settlement agreement in which the drilling companies agreed to additional restrictions on drilling during the whale migration.

We intervened on behalf of the Alaska Eskimo Whaling Commission and the North Slope Borough in *Conoco Phillips v. Alaska, Inc. v. National Marine Fisheries Service*.  Conoco Phillips challenged conditions of its Incidental Harassment Authorization, which was issued by the National Marine Fisheries Service under the Marine Mammal Protection Act.   The conditions placed restrictions on the use of seismic exploration and were designed to prevent harassment of marine mammals, including bowhead whales.   The Alaska Whaling Commission and the North Slope Borough sought to uphold the conditions of the permit, arguing that they were required by the Marine Mammal Protection Act, the Endangered Species Act, and the National Environmental Policy Act.

Conoco Phillips's permit expired at the end of 2006 and in early 2007, it withdrew its application for a similar permit for work in 2007. The district court dismissed the case on mootness grounds.

We have provided advice to the North Slope Borough concerning federal oil and gas activities on the North Slope of Alaska, including on the adequacy of proposed operating orders, environmental impact statements, regulations affecting marine mammals, biological opinions on endangered whales, coastal zone management plans, and other measures to protect the environment during OCS exploration and development and on energy production proposals. We have also provided advice concerning oil and gas activities in the Norton Sound off the western coast of Alaska to native groups.

*State of Alaska v. Kleppe* challenged the validity under NEPA of the Gulf of Alaska OCS oil and gas sale. We represented the City of Yakutat, the Cordova District Fisheries Union and United Fisherman of Alaska. The district court dismissed the action. 404 F. Supp. 26 (D.D.C. 1975). The court of appeals affirmed except that it held that the Department of Interior was required to consider the inclusion of a termination clause in the lease. 580 F.2d 465 (D.C. Cir. 1978). After oil company intervenors petitioned for a writ of certiorari in the Supreme Court, the case was dismissed as moot because of the passage of the Outer Continental Shelf Lands Act Amendments. 439 U.S. 922 (1978).

*Southern California Ass'n of Governments v. Kleppe* and related cases were brought by 15 cities and counties in Southern California, the Consumer Federation of America, and a number of environmental organizations to challenge the validity of the accelerated leasing program for the Outer Continental Shelf and the Southern California oil and gas sale. A preliminary injunction was denied. 6 ELR 20115 (D.D.C. 1975). After transfer to the Central District of California, the cases brought by the cities and counties were dismissed on grounds of res judicata (413 F. Supp. 563 (1976)) and the private groups dismissed their suit voluntarily.

In *GOO v. Andrus*, we represented Get Oil Out and others seeking to require preparation of site-specific impact statements for several proposals to develop and produce oil and gas resources in the Santa Barbara Channel. The district court held that the environmental assessments were inadequate and enjoined construction of the oil platforms. 468 F. Supp. 82 (C.D. Cal. 1979). After the new environmental assessments were prepared, the district court held that an environmental impact statement was not required. 477 F. Supp. 40 (1979).

We represented the Sierra Club and other environmental groups in challenging the first sale of oil and gas leases in the Eastern Gulf of Mexico in 1973. Plaintiffs claimed that of the environmental impact statement prepared for the lease sale was inadequate under NEPA. The district court denied injunctive relief and the court of appeals affirmed. *Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975).

Bruce Terris was a consultant to the Ad Hoc Committee on the Outer Continental Shelf and to the Merchant Marine and Fisheries Committee of the House of Representatives concerning the Outer Continental Shelf Lands Act of 1978. Another attorney in the firm was a member of the

Committee on Assessment of Arctic Ocean Engineering Support Capability of the National Research Council.  This committee studied engineering and environmental obstacles to development of oil and gas resources in the Arctic Ocean off of Alaska.

## OCEAN RESOURCES

We assisted the Environmental Defense Fund in preparing comments opposing a proposal of the National Marine Fisheries to increase the maximum take permitted for important fishery resources in New England.  The comments emphasized that the proposal undermined the achievement of important long-range goals of the Fishery Conservation and Management Act.

We represented Get Oil Out in supporting designation of a marine sanctuary off of California.

We testified and submitted testimony on behalf of the New England Governors' Conference in matters relating to deep-water ports and double-bottom oil tankers.

## ENERGY CONSERVATION

We represented the Environmental Defense Fund in hearings before the Department of Transportation urging stronger economy standards for automobiles under the Motor Vehicle Information and Cost Savings Act.  This work consisted of finding expert witnesses and assisting in the preparation of their testimony.

We represented a coalition of environmental groups (Sierra Club, Friends of the Earth, Environmental Defense Fund, and Natural Resources Defense Council) in a Federal Trade Commission rulemaking proceeding involving the labeling and advertising of home insulation. Through the submission of written comments, presentation of witnesses, and cross-examination of witnesses presented by other interested parties, we urged promulgation of a rule which would enhance residential energy conservation efforts through the purchase of safe and effective insulation. The Commission promulgated a rule which was consistent with our position, requiring that consumers be informed of information about the effectiveness of insulation, expressed in R-values, through labeling, fact sheets, advertisements and other promotional material.

We prepared an analysis of energy conservation for the New England Governors' Conference.

## WATER PROJECTS

We represented the Deep River Citizens' Coalition, the Deep River Coalition, Inc., and the American Canoe Association, Inc., in a suit against the North Carolina Department of Environment and Natural Resources regarding its issuance of a 401 Certification under the Clean Water Act for a dam and reservoir.  The North Carolina Environmental Management Commission and Superior Court granted summary judgment upholding the certification.  On appeal, the North Carolina Court of Appeals held that the certification did not violate water quality standards and that the issue as to

preparation of an environmental impact statement after the approval of the project was moot since the statement was subsequently prepared. *Deep River Citizen's Coalition v. North Carolina Department of Environment and Natural Resources*, 598 S.E. 2d 565 (N.C. Ct. App. 2004).

*National Audubon Society v. Kleppe* involved the Garrison Diversion project in North Dakota. The suit claimed that the environmental impact statement and wildlife mitigation plan were inadequate. The district court rejected the government's motions to transfer the case to North Dakota. 6 ELR 10179, 65371 (D.D.C. 1976). Plaintiff and the Department of the Interior agreed to the halting of almost all construction pending preparation of a comprehensive environmental statement and a new wildlife mitigation plan and reauthorization of the project by Congress. When the Department violated its agreement, we obtained an order from the court of appeals that the agreement was valid. As a result, the district court issued an injunction against further acquisition of land or construction. 17 ERC 1401 (D.D.C. 1981). The court of appeals lifted the injunction and reversed on the ground that the agreement had expired. 678 F.2d 299 (D.C. Cir. 1982). A settlement was then arranged which allowed a part of the project to be built, but significantly reduced the environmental harm.

We represented American and Canadian intervenors in a case challenging the approval by the Federal Energy Regulatory Commission of a proposal to raise Ross Dam in the State of Washington. The issues involved NEPA, the Administrative Procedure Act, the Federal Power Act, and the Wild and Scenic Rivers Act, including whether an environmental impact statement must consider environmental damage caused in a foreign country. The court of appeals upheld approval of the dam, in part because several of the critical issues would be considered in proceedings before the Federal Energy Regulatory Commission. *Swinomish Tribal Community v. FERC*, 627 F.2d 499 (D.C. Cir. 1980). A settlement was reached with Canada under which the project was not built.

We represented the National Wildlife Federation, other national environmental groups, and several Colorado environmental groups in an action seeking to prevent the Denver Water Board from constructing large water treatment and supply facilities in the Rocky Mountains which could cause substantial environmental damage and would be unnecessary if reasonable water conservation measures were adopted. *National Wildlife Federation v. Andrus* (D.D.C.). The case involved claims that the EIS inadequately considered cumulative impacts, alternatives, and secondary impacts; that the EIS contained grossly inaccurate data; and that the proposal was approved in violation of the Federal Lands Policy Management Act and Section 404 of the Federal Water Pollution Control Act. The case was settled when the Denver Water Board agreed to adopt conservation measures, to establish a continuing advisory Board which would include members of environmental groups, to review and comment upon the Board's development plans, to take other actions to provide more public participation in its decisionmaking process, and to pay the attorneys' fees of plaintiffs.

In *Oudes v. Block*, a landowner in West Virginia sued to enjoin construction of a small dam on the ground that the United States Department of Agriculture and Soil Conservation Service failed to prepare an environmental impact statement adequately assessing the impact of the project. The

21

district court transferred the case to West Virginia.  516 F. Supp. 13 (D.D.C. 1981).  The West Virginia court denied the injunction and granted summary judgment for the defendant.

## FORESTS AND PARKS

*West Virginia Division of Izaak Walton League v. Butz*  was brought by the Izaak Walton League, Sierra Club, Natural Resources Defense Council, and others to enjoin the "clear-cutting" practices of the Forest Service in the Monongahela National Forest.  The district court and the court of appeals held, under the Organic Act of 1897, that the Forest Service could allow only the cutting of mature timber in national forests, not young growing trees, and that each tree must be individually marked prior to sale.  367 F. Supp. 422 (D. W.Va. 1973), affirmed, 522 F.2d 945 (4th Cir. 1975). Congress passed the National Forest Management Act of 1976 as a result of this decision, which modified the decision, but included forestry requirements providing substantially more environmental protection than previously existed.

Bruce Terris was chairman of a committee created by Senator Jennings Randolph to draft legislation governing silvi-cultural practices in the national forests in order to minimize environmental damage from timber cutting.  This bill was introduced by Senator Randolph and Congressman Brown. Mr. Terris testified in support of the bill and we represented the Coalition to Save Our National Forests in its efforts in the Congress to have the bill adopted.  Elements of that bill were included in the National Forest Management Act of 1976.

In *Sierra Club v. Butz* , 3 ELR 20071 (N.D. Cal. 1973), the Sierra Club challenged the decision of the Forest Service to permit timber cutting in undeveloped, roadless areas within the national forests without preparation of environmental impact statements.  The court issued a preliminary injunction against further timber sales covering 50 million acres of land.  The Forest Service then agreed to prepare environmental impact statements pursuant to NEPA before allowing development of the roadless areas.

*Sierra Club v. Butz* was brought under NEPA, the Organic Act of 1897, and a variety of other federal statutes to prevent the largest timber sale in the United States in Tongass National Forest in Alaska.  We participated in the briefing of this case in the Court of Appeals for the Ninth Circuit, which remanded the case to the district court for further consideration.  At the request of the company, the Forest Service then canceled the contract.

*United States v. Parker* involved a decision by the Court of Appeals for the Tenth Circuit holding, under the Wilderness Act, that an area in a national forest in Colorado could not be subject to timber cutting until it had been studied for designation as a wilderness area.  The government petitioned the Supreme Court for a writ of certiorari and we wrote the brief opposing that petition. The government's petition was denied.  405 U.S. 989 (1972).

*Sierra Club v. Morton*, 405 U.S. 727 (1972), involved the Sierra Club's standing to sue to prevent the construction of a large resort and connecting highways and electrical transmission lines

by the Disney Company in the Mineral King area of Sequoia National Park.  We submitted an amicus curiae brief in the Supreme Court on behalf of The Wilderness Society, Izaak Walton League of America, and Friends of the Earth.  Although the Supreme Court held that standing had not been shown, it remanded the case to the district court to allow evidence on this issue as our brief had requested.  On remand, standing was upheld and the project was not built.

We represented Natural Resources Defense Council, the Sierra Club, and other environmental organizations which intervened in *Alaska v. Carter* in the District Court of Alaska.  See 462 F. Supp. 1155 (D. Alas. 1978).  The case involved the efforts of the State of Alaska to invalidate the actions of the President, the Secretary of the Interior, and the Secretary of Agriculture in 1978 to protect over 100 million acres of public lands in Alaska pending Congressional action to place the lands in the federal land management system.  Following the district court's decision in *Anaconda Copper Co. v. Andrus* (discussed below) and the enactment by Congress in 1980 of the Alaska National Interest Lands Conservation Act, the case was settled on terms that preserved all the lands placed in 1979 by the President and the Secretaries of Interior and Agriculture in the federal land management system.

We represented many of these same groups as intervenors in *Anaconda Copper Co. v. Andrus and Bristol Bay Native Corp. v. Carter*  which also involved industry challenges to the President's efforts to protect Alaska lands.  In *Anaconda Copper Co. v. Andrus*, the district court held that the President's actions under the Antiquities Act to establish national monuments were lawful.  14 ERC 1853 (D. Alas. 1980).  In light of this decision and the enactment of the Alaska Lands Act, the plaintiffs in *Bristol Bay* dismissed their case.

We were members of the Alaska Law Council which was formed for the purpose of providing legal resources to protect the Alaska environment. We prepared a background memorandum for the Council describing the major environmental issues facing Alaska.  We also assisted the Alaska Coalition in relation to legislation and regulations concerning disposition and management of federal lands in Alaska.

We prepared an analysis for the National Parks and Conservation Association concerning the legal issues raised by proposed dam reconstruction in the Grand Teton National Park.  In particular, we considered the statutory prohibitions against mining for borrow material within the park's boundaries.

## HISTORIC PRESERVATION

*Ely v. Velde* involved litigation by local citizens under NEPA and the National Historic Preservation Act to challenge the grant of federal funds under the Law Enforcement Assistance Act for construction of a prison in a historic area of Virginia.  We participated in the litigation in the court of appeals, which held that the grant was illegal without preparation of an environmental impact statement.  451 F.2d 1130 (4th Cir. 1971).  After more litigation, the project was abandoned by the State of Virginia.

In *Patrons of the Adams House v. Washington*, we represented a local citizens group which sought injunctive relief to stop the demolition of a house under consideration for designation as a historic landmark.  The Superior Court of the District of Columbia granted injunctive relief pending the determination by the Joint Committee on Landmarks on the historic status of the house.  The house was subsequently saved.

In *Crosby v. Young*, 512 F. Supp. 1363 (E.D. Mich. 1981), we represented the plaintiffs in an effort to prevent the City of Detroit from demolishing a historic, ethnic neighborhood, Poletown, in order to build a GM Cadillac assembly plant.  The claims brought under NEPA, National Historic Preservation Act, and the Clean Air Act were rejected by the district court.

We represented the Natural Resources Defense Council, Save Our Broadway Committee, Actors Equity, and seven other theater unions in challenging the destruction of two historic theaters in New York City, the Helen Hayes and the Morosco, for construction of a hotel.  Suit was brought in both federal and state court under NEPA, the New York State Environmental Quality Review Act, the National Historic Preservation Act, and the Housing and Community Development Act.  As a result of the suit, the Department of the Interior agreed to consider the administrative appeal to have the Morosco declared eligible for the National Register of Historic Places and the theater was found eligible.  We then participated in proceedings before the Advisory Council on Historic Preservation, which approved a Memorandum of Agreement allowing the destruction of the theater.  Subsequently, the district court denied a preliminary injunction (*Natural Resources Defense Council v. City of New York*, 528 F. Supp. 1245 (S.D.N.Y. 1981)), the court of appeals reversed that decision and remanded for a partial trial on the merits (12 ELR 20182 (2d Cir. 1982)), the district court again ruled for the City (534 F. Supp. 279 (S.D.N.Y. 1982)), the court of appeals affirmed (672 F.2d 292 (2d Cir. 1982), and the Supreme Court first issued and then lifted an injunction (456 U.S. 920 (1982)).  In the state courts, after receiving several temporary injunctions, we lost in the New York Supreme Court, the Appellate Division, and the Court of Appeals. *Natural Resources Defense Council v. City of New York*, 112 Misc.2d 106 (Sup. Ct., N.Y. Co. 1982), affirmed without opinion, 86 A.D. 2d 818 (1st Dept. 1982), leave to appeal denied, 46 N.Y.2d 501 (1982).  As a result, the theaters were destroyed.  However, the case spurred successful efforts to confer landmark status on other New York theaters.

## LAND USE AND ZONING

*Coalition Against Lincoln West v. City of New York* was brought in New York state court on behalf of residents of the upper West Side of Manhattan, challenging the City's approval of a massive residential/commercial development in that area.  The suit was based on violations of the New York State Environmental Quality Review Act (SEQRA) and the New York City Charter requirements for public participation in land use decisions.  The trial court held that the City's environmental impact statement violated SEQRA because it failed to consider reasonable alternatives to the project. The Appellate Division reversed and the reversal was upheld by the Court of Appeals. 94 A.D.2d 483 (1st Dept. 1983), affirmed, 60 N.Y.2d 805 (1983).

*Sierra Club v. Lynn*, 364 F. Supp. 834 (W.D. Tex. 1973), was brought on behalf of the Sierra Club and a number of local organizations challenging a grant by the Department of Housing and Urban Development for a new town which threatened San Antonio's water supply. The suit contended that the environmental impact statement was inadequate. The case was settled when the government agreed to do additional studies prior to disbursing funds and an new environmental statement was prepared.

*Arlington v. Board of Supervisors of Fauquier County* was brought in the Circuit Court for Fauquier County, Virginia, challenging the county's approval of a subdivision in a rural area. The plaintiffs contended that the county violated its subdivision ordinance because the plan was inconsistent with the county's comprehensive plan and other provisions of the ordinance relating to septic tanks, roads, and the like. The circuit court rejected these claims and the Virginia Supreme Court refused to hear the case.

*Citizens Ass'n of Georgetown v. Zoning Commission* challenged as illegal the rezoning of the Georgetown waterfront to allow mixed-use development because it was inconsistent with the comprehensive plan for the District of Columbia and was adopted after illegal *ex parte* communications between the D.C. government and waterfront developers. The Superior Court rejected our contentions. We appealed to the District of Columbia Court of Appeals which *en banc* rejected both claims. 392 A.2d 1027 (1978).

We represented three Colorado environmental organizations -- Western Colorado Resource Council, Colorado Open Space Council and High Country Citizens Alliance -- and two national environmental organizations -- Friends of the Earth and the Wilderness Society -- in a challenge to a land-use plan prepared by the Bureau of Land Management for part of the North Fork Valley in western Colorado. The issues involved the right of affected citizens to raise such a challenge and the duties of the BLM under NEPA, the Federal Land Policy and Management Act, and the Mineral Leasing Act with regard to land-use planning. This challenge was rejected at the agency level.

We represented a group of citizens in Charles County, Maryland, who opposed a proposed outdoor shooting range which was to be located within one mile of the site of the largest Great Blue Heron rookery on the Atlantic Coast. As a result of this opposition, the proposal was withdrawn.

We represented the Community Planning Association of Catonsville, Maryland, at hearings of the Planning Board of Baltimore County on a proposed large subdivision.

We advised a citizens group in King George County, Virginia, concerning its opposition to proposed sand and gravel mining operations on prime agricultural farm land. We analyzed whether the developers had procured valid permits under federal, state and local law.

We represented a group of citizens in McLean, Virginia, who sought to persuade the County of Fairfax to require a developer to revise his construction plans to make the development more compatible with the surrounding environment.

25

**NOISE**

We served as technical consultants to an EPA project which was preparing a manual on noise enforcement litigation by state and local prosecutors.

**ENVIRONMENTAL TORT LITIGATION**

We represented a group of citizens who had brought tort suits against Koppers Industries for harm to them from breathing air pollution and from a plume of polluted groundwater near their homes due to the creosote manufactured by Koppers.  Our clients were initially represented by another firm and the case was settled.  Our clients decided the settlement was unfair and refused to sign the settlement papers.  Koppers was able to obtain an order enforcing the agreement in Arkansas Circuit Court.

We advised residents in Maryland concerning possible environmental tort litigation relating to fluids emitted by an aluminum reduction plant.

Bruce Terris advised the Canadian St. Regis Band of Mohawk Indians concerning the appropriateness of a proposed settlement of environmental tort litigation brought by the Band against a large aluminum company relating to the emission of fluorides.  Mr. Terris recommended that the settlement be approved.  The Band approved the settlement.

In June 1980, Bruce Terris spoke at a conference in Berlin, concerning the environmental law of Germany and the United States, on the American law of nuisance.  He subsequently gave talks in three other German cities on behalf of the United States government on American environmental law.

In March 1989, Bruce Terris participated in the Thirteenth Annual United States District Court Judicial Conference for the District of New Jersey on a panel with judges and leading attorneys chaired by Fred Friendly discussing a hypothetical environmental tort case.

**MISCELLANEOUS LITIGATION**

We represented a number of environmental and other citizens groups in *Natural Resources Defense Council v. SEC*.  The court reversed the district court's order that the SEC conduct further rulemaking proceedings as to whether it should require additional disclosures from corporations concerning the impact of their activities on the environment and their compliance with equal employment opportunity statutes.  606 F.2d 1031 (D.C. Cir. 1979).  However, the court based its decision in part on the commitment of the SEC to consider further actions in these areas.

In *Prince George's County v. Holloway*, we represented a group of employees of the Naval Oceanographic Office which was being transferred from Maryland to Mississippi.  The district court

issued a preliminary injunction against that transfer on the ground that the environmental impact statement was inadequate under NEPA.  404 F. Supp. 1181 (D.D.C. 1975).

## MISCELLANEOUS ACTIVITIES

We advised the environmental ministry of the State of Israel concerning American laws and regulations requiring an examination of the environmental impact on Israel of U.S.-funded projects in neighboring countries and on mechanisms that have been used to resolve environmental disputes between such countries.

Bruce Terris spoke in 1989 and 1993 at international conferences in Israel on the subject of citizen litigation in the United States.  As a result, interest was raised in legislation in Israel to encourage citizen environmental suits.  Terris assisted an Israeli lawyer in preparing a bill which would expand citizen standing in environmental suits, provide for the payment of attorneys' fees to citizen plaintiffs, and give other rights to citizens bringing all types of environmental litigation.  The standing provisions were adopted.

Bruce Terris spoke on environmental citizen litigation at the Fifteenth Annual Conference on the Environment sponsored by the Standing Committee on Environmental Law of the American Bar Association.

Bruce Terris has spoken on air quality and NEPA litigation at several environmental law seminars sponsored by the American Law Institute and the American Bar Association.

Carolyn Smith Pravlik served on the Advisory Panel to the United States Sentencing Committee for review of the United States Sentencing Guidelines on environmental crimes.

Ms. Pravlik has written two articles on compliance with NPDES permits under the Clean Water Act and she is frequently asked to speak about citizen suits at legal conferences and seminars. She has repeatedly made presentations at the Public Interest Environmental Law conference at the University of Oregon.

Kathleen L. Millian spoke on environmental citizen suits in February 1993 at the American Law Institute/American Bar Association's annual course on Environmental Law.  Ms. Millian also testified on behalf of environmental groups in November 1996 at a public hearing concerning EPA's method for calculating the economic benefit resulting from a firm's failure to comply with pollution control laws.

We have appeared at numerous Congressional hearings, administrative hearings, meetings, and seminars concerning NEPA, the Clean Air Act, the Clean Water Act, and the recovery of attorneys' fees under environmental and other statutes.

We have prepared comments on numerous draft environmental impact statements and environmental assessments including on coal development and related railroad construction in eastern Wyoming, a coal strip mine in Montana, the national coal-leasing program, oil and gas leasing in the Beaufort Sea, oil platforms in California, phosphate mining in Idaho, a dam in Washington, an LNG facility in New York, a geothermal project in New Mexico, and the Channel Island Marine Sanctuary in the Santa Barbara Channel off California.

Bruce Terris has served on the legal advisory committees of Friends of the Earth and the Environmental Defense Fund.

### HONORS

The firm received the Law Conservationist of the Year Award from the National Wildlife Federation for 1982.

The firm was awarded the 1999 J. Henry Rushton Award for the Advancement of Paddlesports by the American Canoe Association for the firm's litigation on behalf of the Association to protect waterways in West Virginia and North Carolina used by the Association's members.

Bruce Terris received the Lifetime Achievement Award from the Hackensack Riverkeeper in October 2005.