# EXHIBIT #1



**PRIVILEGED AND CONFIDENTIAL**

June 27, 2014

Michael D. Daneker
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
Tel.:  (202) 942-5000
Email:  michael.daneker@aporter.com

**RE:**  *Interfaith Community Organization v. Honeywell International, Inc.*, Civ. No. 95-2097
(consolidated with 05-5955); *Jersey City Municipal Utilities Authority v. Honeywell
International Inc.*, Civ. No. 05-5955

Dear Mr. Daneker:

Below please find my expert opinion with regard to Plaintiffs' 2012 -2013 Fee
Application in the above-referenced matters.

### INTRODUCTION AND SCOPE OF EXPERT REVIEW/ANALYSIS

I have been asked by counsel for Honeywell International, Inc. ("Honeywell") to provide
an independent analysis of legal fees associated with Plaintiffs' Application for and Brief in
Support of an Award of the 2012-2013 Attorneys' Fees and Expenses ("Plaintiffs' 2012-2013
Fee Application" or the "Fee Application").

I have reviewed these matters and the respective generated legal fees pursuant to
applicable principles regarding the reasonableness of legal fees and relevant case law, ethics,
custom, the practice of law, as well as my nearly forty years of experience as a litigator and in-
house attorney responsible for evaluating and assessing the reasonableness of fees and costs
billed by outside counsel and the supervision of complex environmental remedial projects
throughout the world.  In this report, I have described the fees that are unreasonable and/or
inappropriate, as well as highlighted categories of fees for which Plaintiffs have failed to carry
their burden of proving reasonableness.

### STATEMENT OF EXPERT COMPENSATION

My rate of compensation is $375 per hour.

Michael D. Daneker
June 27, 2014
Page 2

## MATERIALS REVIEWED TO ASSIST IN FORMING MY OPINIONS

My opinions are based on a review and analysis of the following information:

- Background materials pertinent to the above-captioned matter, including filings, legal briefings, correspondence and documents regarding same;

- Documents and materials pertaining to the environmental enforcement history of the sites and remedial activities at the sites involved in the above-captioned matter, including administrative orders, consent decrees, court orders and/or judgments;

- Documents pertaining to Terris Pravlik & Millian LLP's ("Terris Pravlik's") oversight/environmental review responsibilities or activities at the sites;

- Numerous letters/comment submissions by and between Terris Pravlik and its technical consultants, the Special Master, and Honeywell over the course of 2012-2013;

- Documents which purport to be Terris Pravlik's legal fees and expense billing records for the Plaintiffs' 2012 – 2013 Fee Application;

- The transcript of the April 9, 2014 oral argument on the Remanded Fees before Special Master Hughes;

- Special Master Hughes' May 19, 2014 Report and Recommendation on Remanded Fees ("Report and Recommendation"); and

- Terris Pravlik's June 13, 2014 Amended Fee Application, including the cover letter to the Court, the Amended Proposed Order, and the two Amended Exhibits in support of same (the "Amended Fee Application").

## LITIGATION AND EXPERT WITNESS BACKGROUND

I have spent my entire legal career handling or supervising major litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees. In accordance with Rule 26 of the Federal Rules of Civil Procedure, *see* my CV, a list of all cases in the last 4 years in which I have testified at trial or deposition – attached as Exhibit A.[1]

As Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous cases in state and federal court involving, *inter alia*, tort and contract

---

[1] My CV contains a list of presentations I have made in the past 10 years.

Michael D. Daneker
June 27, 2014
Page 3

claims brought against the State, election fraud, eminent domain and transportation issues, debarment of state contractors and environmental matters.

While a partner at Bayh Tabbert & Capehart; Donovan, Leisure, Newton & Irvine; and Willkie, Farr & Gallagher, I litigated several complex, multiple party environmental matters throughout the United States. I was national coordinating counsel for NL Industries in federal and state court proceedings associated with environmental and tort claims regarding NL's lead smelting operations. In addition, I served as national coordinating counsel for Chemical Leaman Tank Lines, a nationwide common carrier transporter, defending environmental and tort claims involving the transportation of hazardous materials and environmental remediation claims arising out of the operation of terminal facilities throughout the United States. I also served as liaison counsel in numerous multiple party actions brought by the United States Department of Justice throughout the country under the Comprehensive Environmental Response Compensation Liability Act (CERCLA) and the Resource Conservation Recovery Act (RCRA) on behalf of companies such as AT&T, Ashland Chemical, Arco, E. I. du Pont de Nemours, Texas Instruments and IBM.

While Vice President and Associate General Counsel at Wyeth and Senior Vice President at its pharmaceutical division, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation. One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history. In that litigation, 63,000 lawsuits were filed in virtually every state by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues. Wyeth had reserved over $20 billion dollars for these claims.

I have spent a considerable portion of my legal career supervising and/or handling matters pertaining to the investigation, design and remediation of complex environmental issues throughout the United States and internationally. These matters have involved litigation and administrative actions brought under virtually every federal and state statute dealing with environmental issues, including but not limited to CERCLA, RCRA, the Clean Water Act, the Clean Air Act, the state law equivalents of these statutes, as well as citizen's suits brought under the authority of these statutes.

Since 2009, I have been Co-Chief Executive Officer and Managing Director (and since mid-2013, Chief Executive Officer) of Wyatt Partners, LLC, a consulting firm which, among other things, provides expert analysis on the reasonableness of attorneys' fees and expenses in complex litigation. As a consultant on the issue of legal fees and expenses, I have advised companies and law firms with respect to billing guidelines used in complex litigation. I have also been retained by a number of national law firms to assist them in their analysis of legal fees and expenses in ongoing litigation. Examples of such companies include Chicago Title Insurance Company, Motorola Mobility, Inc., Plantronics, Inc., and GN Netcom, A/S.

As an expert in attorneys' fees cases, I have been involved in the trial, resolution and evaluation of legal fees and expenses in many jurisdictions throughout the United States, including California, Florida, New Jersey, New York, North Carolina, and Tennessee. These

Michael D. Daneker
June 27, 2014
Page 4

cases, several of which were class action lawsuits, have varied in nature, covering legal disciplines such as securities fraud, breach of contract/fiduciary duty, construction disputes (both defect and delay), environmental torts, employment disputes, and unfair business practices/false advertising.

## GENERAL OBSERVATIONS

Five attorneys (including three senior partners (billing at $772/hr)) and four paralegals (billing at $175/hr), generated $1,381,378.45 in fees and $512,951.22 in expenses for Plaintiffs' 2012-2013 Fee Application  That constitutes nine people (not including technical consultants) generating close to 2 million dollars in fees and expenses over only two years on monitoring work – not litigation.[2]

In contrast to the work performed by Terris Pravlik in the litigation filed on behalf of the Plaintiffs, Terris Pravlik's monitoring activities required a more discreet and narrow focus. Although the litigation involved the filing of numerous pleadings, extensive document review and discovery, depositions, briefings, and oral arguments, the monitoring work required a specific focus on technical issues pertaining to the remediation of the sites in question – an analysis that should have been provided, in substantial part, by technical consultants and not lawyers (as I will discuss in further detail in Section 4).  It is important to note that in addition to the consultants engaged by Terris Pravlik to perform this review and analysis, a substantial number of consultants were engaged by other entities to perform these tasks.  Specifically, this work was thoroughly reviewed and overseen by the New Jersey Department of Environmental Protection as well as by the United States District Court through Special Master Torricelli, who engaged an able team of technical consultants and counsel to add an additional layer of review to the technical issues at hand.

Based upon my experience supervising complex remedial matters throughout the world, it is unreasonable that, despite the fact that the overwhelming majority of issues requiring analysis were technical in nature, and that a vast array of technical expertise was brought to bear on the issues associated with the sites in question by all of the parties, that Terris Pravlik needed to spend the time it did engaged in what appears to be an excessive and, in some instances, unnecessarily duplicative review of every technical document and issue.

I conclude overall that Terris Pravlik has engaged in numerous unreasonable billing practices in this Fee Application.  Before engaging in my analysis, I first must raise three key general observations that place Terris Pravlik's fees and expenses for this Fee Application into the appropriate context.

---

[2] Since every entry Terris Pravlik billed in 2012-2013 occurred after the parties entered into the consent decrees under which Honeywell legally obligated itself to pay for Terris Pravlik's reasonable legal fees monitoring remedial work, Terris Pravlik was not at financial risk for any portion of this work.  Therefore, Terris Pravlik had the obligation to include in its fee submissions only time entries that were reasonable and to exclude any hours that were excessive, duplicative, and unnecessary.

Michael D. Daneker
June 27, 2014
Page 5

### 1. Terris Pravlik Has the Burden to Prove That Their Fees Were Reasonable.

The burden to demonstrate the reasonableness of all fees/expenses generated in these matters is on Terris Pravlik.  Our courts explicitly place the burden of establishing the reasonableness of attorneys' fees on the party seeking reimbursement, especially in light of the reasonableness factors contained both in *Johnson v. Georgia Highway Express*[3] and Rule 1.5 of the Model Rules of Professional Conduct.[4]  Therefore, <u>Terris Pravlik</u> has the burden to demonstrate the reasonableness of each and every time entry submitted for reimbursement.

Therefore, to the extent the firm has engaged in billing practices that call into question the reasonableness of the time and fees generated – be it because of excessive (and unexplained) intraoffice conferencing time and technical time, work that appears to overlap with tasks for which technical experts were retained, and a multitude of other unreasonable billing practices – the burden does not shift to Honeywell to disprove reasonableness.  And therefore, to the extent that Honeywell or this Court cannot determine the nature of certain work and the time/fees associated with same, Terris Pravlik has not met its burden of proving the reasonableness of its fees and expenses, and the fee award should be reduced accordingly.

### 2. Terris Pravlik Has Inappropriately Staffed and Managed The Workload.

To date, the reviewed documents reflect that Terris Pravlik has proceeded with no apparent direction, guidance, supervision, or management by a client.  There has been little or no communication regarding the administration of the work by anyone outside of the law firm.  It is clear, and has been admitted by one of Terris Pravlik's clients (as I will discuss below), that this important supervisory/case management responsibility was not performed by a client supervising, monitoring or reviewing their work or their bills.  Instead, it is clear that the supervision, along with the conduct of the legal work itself, was performed solely and exclusively by Terris Pravlik.

The lack of client supervision was made abundantly clear in the deposition testimony of Captain William V. Sheehan.  In his March 10, 2011 deposition, Captain Sheehan, who is the Hackensack Riverkeeper, one of Terris Pravlik's clients in these matters, conceded four very important points that are key to understanding the dynamic of case supervision and oversight in this matter:

- He admitted that he did not review any of the Terris Pravlik billing records over the course of the entire history of these matters, noting that "[t]hat was not something that I asked to do." (*See* Condensed Transcript of Mar. 10, 2011 Deposition of William V. Sheehan ("Sheehan Dep."), at 90).

---

[3] *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974), cited by *Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983).  *See also Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (stating that the burden of proving that a request for attorneys' fees is reasonable falls on the party seeking the fees).
[4] Model Rules of Professional Conduct Rule 1.5.

Michael D. Daneker
June 27, 2014
Page 6

- He conceded that neither he nor any member of his Board of Directors was responsible for either the strategy or supervision of the litigation proceedings. (Sheehan Dep. at 16) and that he relied on counsel [Terris Pravlik] to make the right decisions (Sheehan Dep. at 100).

- He confirmed that, despite the fact that the Hackensack Riverkeeper had in-house counsel during the entire course of these proceedings, neither present in-house counsel nor counsel's predecessor served in any supervisory legal capacity in these matters (Sheehan Dep. at 9) and at no point in time did the in-house counsel communicate with anyone at Terris Pravlik with respect to this litigation. (Sheehan Dep. at 13).

- Finally, he flatly conceded that, since he was not paying for the services, he had no need to review the bills. He noted that "if I was paying for it, damn straight I would want to see them [the Terris Pravlik bills]." (Sheehan Dep. at 91).

This placed Terris Pravlik in the position of serving as *de facto* client and counsel, thus allowing the firm to operate in an essentially unsupervised and unfettered manner with no objective watchful eye monitoring their work or their bills. Out of the 2000+ time entries contained in Terris Pravlik's Exhibit 7, I noted that only approximately 60 time entries involved Terris Pravlik actually communicating with the client.

Such lack of supervision and oversight has enabled Terris Pravlik to generate a substantial amount of legal fees without objective case management. First, the firm employs an unreasonably top-heavy administration of the workload (including significant billing by senior partners performing work that can and should have been performed by associates at lower billing rates). The most junior attorney on these matters (Michelle Weaver) graduated from law school in 2006, and, as of August 2012, was the only non-partner performing legal work. In addition to the staffing issues, Terris Pravlik also generated unjustifiable and unnecessary intra-office conferencing time, an excessive amount of time on particular projects/issues where it simply was not warranted, and spent exorbitant amounts of time on what appears to be technical issues.

Many of the unreasonable billing practices I describe above cannot be analyzed and quantified as isolated practices. Instead, they overlap with one another in many instances. As such, there is no "cookie-cutter" way to determine how much of time and fees in certain categories were reasonable for purposes of determining and applying appropriate reductions. What I have done in my report is quantified each category as thoroughly and accurately as possible, and suggested what, in my opinion, is the most "reasonable" way to address the excessive fees associated with such unreasonable billing practices.

In my opinion, the usual best practice for corporate and governmental law departments supervising outside law firms working on litigation consists of the development, implementation and compliance with a set of guidelines which govern the overall management and conduct of litigation. Such guidelines set forth the requirements and expectations of the client and establish a clear set of "rules of the road" by which outside counsel is required to operate in the conduct of

Michael D. Daneker
June 27, 2014
Page 7

the litigation. The essential elements of such guidelines call for the performance of legal work in accordance with a specified set of requirements, including requirements regarding staffing and the conduct of the case and management of experts, budgets prepared in advance of performing any legal work, review and approval of the budgets by the client, the generation of legal bills that comply with the specified requirements and budgets, and review of the legal bills by the client to confirm compliance with the requirements.

Had Terris Pravlik followed these types of case management guidelines, they would have been required to manage the case appropriately, with budgets for specific sets of tasks, adherence to the budgets, and task-appropriate staffing, including an appropriate mix of attorneys and staff working on the matter. The overwhelming majority of the work in these matters was performed by the three senior named partners (Bruce J. Terris, Carolyn Smith Pravlik and Kathleen Millian, each at billing rates of $772 per hour). No corporate counsel or his or her counterpart in a federal or state governmental law department supervising such a matter would permit the total number of billers, the extraordinarily top-heavy concentration of billers in this matter, the excessive amount of intraoffice conferencing time, excessive attorney time on what appears to be "technical issues," and the excessive amount of time by all hands preparing for and being briefed *post hoc* on monthly meetings with the Special Master – meetings that often lasted an hour and that involved the evaluation of the same monitoring issues for which Terris Pravlik had been billing time over the course of each month.

## 3. Terris Pravlik's Time Records.

As both a litigator and in-house attorney, I have spent most of my legal career reviewing and approving payment of legal invoices. While in private practice, I was responsible for sending out clear, thorough, contemporaneous and timely invoices to my clients. As an in-house counsel for Wyeth, I was responsible for reviewing and approving these documents as the paying client. My ability to fulfill my roles under both circumstances depended upon the quality, accuracy, timeliness and thoroughness of the invoices. Based upon my background and experience, I conclude that the billing record documents provided by Terris Pravlik do not appear to reflect the kind of invoices appropriate for a paying client's review and approval.

In support of the Fee Application, Plaintiffs submitted a set of documents that appears to be a compilation of categories of work for "Client Sites/Categories" and specific projects undertaken in fulfillment of the post-monitoring judgment or post-decree monitoring work. As Judge Hughes recognized in his Report and Recommendation, "[a]gain, the time records . . . were not kept in the precise manner that would allow me to easily distinguish among the various activities that I feel are reasonable and those I find are not . . . [t]herefore, it is difficult to glean from Plaintiffs' time records the amount of time spent on intra-office conferencing versus preparing for meetings with the Special Master of whether a partner's review of an associate's work is, in fact, duplicative of another partner reviewing the same work." Report and Recommendation, pages 20-21.

Additionally, it is unclear to me whether the invoices submitted for this Fee Application accurately reflect the original documentation of time recorded by the firm's

Michael D. Daneker
June 27, 2014
Page 8

attorneys and staff in these matters. As a fee expert, I believe that the original and contemporaneous recordation of time is the most reliable source of information in evaluating legal fees and time entries. In my experience, preparation and submission of an invoice to a paying client should require printing out the recordation of attorney time from a master data base of contemporaneously recorded time, reviewing the time entries for accuracy and appropriateness and submission of an invoice to the client for payment. As I will describe in Section 6 of the Detailed Analysis of Attorneys' Fees, it appears that an intermediate and additional step was performed by certain individuals in the Terris Pravlik firm – specifically a review and reorganization of the time records prior to submission of the invoice to Honeywell. If that is so, I have questions about the accuracy and inherent reliability of the documents submitted to Honeywell in support of the Fee Application. In order to confirm their accuracy, I need to understand how and by whom this "additional step" was performed, how and whether the information contained in the invoices submitted in the Fee Application properly reflect the actual time recorded, any assumptions made by the individual(s) who reviewed and reorganized the invoices, and the assumptions made pertaining to the manner in which increments of time contained in the original invoices were transcribed into the existing set of billing records. Without that information, I cannot opine on the reliability of the information contained in the Fee Application.

Further, to the extent that Terris Pravlik has sought reimbursement for the time spent reviewing/reorganizing its time records for prior fee submissions (*see, e.g.*, Exhibit 7, Line Nos. 1962 to 2029), I believe that these fees are unreasonable (as I discuss below).

## DETAILED ANALYSIS OF ATTORNEYS' FEES

I will now describe the multiple unreasonable billing practices that appeared in Plaintiffs' 2012 – 2013 Fee Application. They were as follows:

### 1. Bruce Terris Oversight Time

Over the course of 2012 and 2013, Bruce Terris spent 79.1 hours and generated fees of $61,065.19.[5] Terris Pravlik maintains that Mr. Terris "reviews all of the written work and generally supervises the other attorneys working on the case. He does this to ensure that the Firm's written material is of the highest quality . . . Mr. Terris also reviews the Firm's written work to ensure that positions and arguments are consistent from case to case." Millian Affidavit, paragraph 13. It is my opinion that this extra layer of review by a senior partner of the firm at its highest billing rate was an unreasonable billing practice. First, given the credentials set forth in the Millian Affidavit for Mss. Pravlik, Millian, and Alcorn, Terris Pravlik's suggestion that these three highly experienced attorneys required additional supervision is unfounded. In his Report and Recommendation on Remanded Fees, Special Master Hughes agreed, finding that "it is not

---

[5] Attached as Exhibit B is a chart entitled "Bruce Terris," delineating all of Bruce Terris's time entries. The information and time entries contained in this Exhibit have been derived directly (copied and pasted) from Plaintiffs' Ex. 7 (Time Records). For easy reference, the chart is color-coded as follows: (a) time spent on "Oversight Work," as described herein, is coded RED; (b) time spent on Special Master meeting-related intraoffice conferencing is coded GREEN; and (c) time spent on other intraoffice conferencing is coded BLUE.

Michael D. Daneker
June 27, 2014
Page 9

appropriate or reasonable for Honeywell to pay for Mr. Terris to review another associate's work where another partner reviewed it or review another partner's work." Report and Recommendation, page 20. Second, with regard to the "consistency" argument, it is equally unfounded that Honeywell should be charged for any Terris Pravlik work relating to non-Honeywell matters, as Judge Hughes also emphasized.[6]

My review of the Fee Application confirms that Mr. Terris primarily served as a passive biller on these matters, spending the majority of his time either a) reviewing/editing letters (as opposed to major pleadings/motions) drafted by his colleagues (including his fellow senior named partners) or b) conferring with them. With few exceptions, Mr. Terris's participation consisted of activities such as "edit," "review," "confer," "revise," "read," and "talk." In essence, he served as a sounding board for other senior level partners within the firm.

Additionally, the majority of Mr. Terris's time/fees were generated in the billing categories of Special Master Meeting Preparation and Follow Up. All of Mr. Terris's 49 hours and $37,828.00 in fees in these categories were generated by conferring, despite the fact that he did not attend any of the Special Master Meetings. Line Nos. 1459-1479, 1717-1738. Furthermore, as each of these entries indicate, Mr. Terris was one of at least four attorneys involved.[7] *Id.*

Therefore, for purposes of applying a reduction a) consistent with Judge Hughes's Report and Recommendation and b) commensurate with my opinion with regard to intraoffice conferencing and the Special Master Meetings (as I will discuss further in Section 2), I recommend applying a reduction of 18.87 hours and $14,567.64 in fees for Bruce Terris's oversight work only – all of the time he spent supervising fellow partners and editing their work.[8] His time spent on intraoffice conferencing shall be analyzed separately in Section 2 and reduced in accordance with my recommendation in that respective Section.

## 2. **Intraoffice Conferencing Time/Special Master Meeting Preparation/Follow-Up**

For the 2012-2013 Fee Application, Terris Pravlik purports to have generated $290,343.15 in fees for intraoffice conferencing.[9] Amended Ex. 12. In his Report and

---

[6] "I also find that it is not reasonable for Honeywell to pay for Mr. Terris's work reviewing consent decrees in this case and comparing them to a review of consent decrees in other unrelated cases for consistency." Report and Recommendation, page 20.

[7] In addition to the intraoffice conferencing time, Mr. Terris spent on the Special Master Meetings Preparation and Follow-Up, he also spent another 8.27 hours and $6,384.44 in fees on additional intraoffice conferencing. As previously indicated, such time he spent conferring regarding the Special Master Meetings appears in GREEN text in the Terris Exhibit, while his non-Special Master conferring time appears in the BLUE text in the Terris Exhibit.

[8] As previously indicated, such time appears in RED text in the Terris Exhibit.

[9] It is important to note that, upon careful review of Plaintiffs' Exhibit 7, I noted multiple time entries that involved intraoffice conferencing that were not included in Plaintiffs' Amended Exhibit 12. Such entries either a) were not included (*see, e.g.*, Line No. 745) or b) referenced words such as "meet" and/or "discuss" (*see, e.g.*, Line No. 839) or referenced a "call" with another Terris Pravlik attorney (*see, e.g.*, Line No. 396). Given that the difference in overall time was not significant enough to recalculate new numbers in this category, I have not done so. For purposes of analyzing Terris Pravlik's intraoffice conferencing time in the Special Master Meetings Preparation and

Michael D. Daneker
June 27, 2014
Page 10

Recommendation, Judge Hughes found the amount of intraoffice conferencing "excessive," reasoning that "the Terris firm did not need all lawyers at all conferences, especially as Plaintiffs argued in their efforts to be awarded Washington, D.C. billing rates because they have exceptional expertise in environmental litigation. I find that because of the Terris firm's professed expertise in this area, it should have developed streamlined means of communication that do not require multiple lawyers at multiple conferences." Report and Recommendation, page 24. Judge Hughes therefore recommended a 20% reduction in intraoffice conferencing fees for all Remanded Fees. *Id.* While Terris Pravlik originally proposed a 10% reduction in fees for such time in their Fee Application, since issuance of the Report and Recommendation, they have agreed to a 20% reduction. *See* Amended Ex. 12; Amended Ex. 4.

However, the extent to which "intraoffice conferencing" dominated and pervaded Terris Pravlik's fees in the 2012-2013 Fee Application was so excessive that I do not believe a 20% reduction to be sufficient – particularly given how much of Terris Pravlik's intraoffice conferencing fees were generated in preparation and follow-up for the monthly Special Master meetings, which lasted on average between 1 and 2 hours.[10] In his Report and Recommendation, Judge Hughes did not consider Honeywell's arguments to reduce the District Court's awarding of Special Master meeting preparation and follow-up fees to Plaintiffs because Honeywell did not appeal the District Court's ruling as to such fees, and did not recommend any reduction for such fees, "except as they may be duplicative in the intraoffice conferencing category." Report and Recommendation, page 29.

Including Bruce Terris's time, the attorneys spent over $170,000.00 (almost 60% of the $290,343.15 total on intraoffice conferencing) conferring in preparation for or in follow-up on the Special Master meetings.[11] Put another way, assuming the attorneys spent approximately 250 total hours conferring in preparation and follow-up for these meetings (*see* column D of the Exhibit), and the average meeting lasted 1.5 hours, it means that the attorneys generated over 10 hours of time in discussions pertaining to each meeting. In contrast to Terris Pravlik averaging over 10 hours per meeting of preparation and follow up time for the Special Master Meetings, Terris Pravlik's own technical consultants each averaged less than one hour of preparation and follow up time for each meeting.[12] Often as many as four to five lawyers at a time (at a

---

Follow-up categories, however, my Exhibit C factors in all of the time entries for which I observed some form of conferring among the Terris Pravlik attorneys, be it "confer," "discuss," "meet," "talk," etc.

[10] *See* Ex. 7, Line Nos. 1612-1658.

[11] Attached as Exhibit C is a chart entitled "IOC SM," delineating the time entries for the Special Master Preparation and Follow Up that involved Intraoffice Conferencing. The information and time entries contained in this Exhibit has been derived directly (copied and pasted) from Plaintiffs' Ex. 7 (Time Records). For easy reference, the chart is color-coded as follows: (a) Special Master meeting-related intraoffice conferencing that involved 4-5 attorneys is coded RED; and (b) Special Master-related intraoffice conferencing that provides no subject matter in the description of work is coded BOLD. As the Court will see, some entries may appear both RED and BOLD, indicating that 4-5 attorneys spent time conferencing with no subject matter provided in the description of work.

[12] Attached as Exhibit E is a chart entitled "SMM Prep/Follow-Up Time," delineating the time entries spent by the consultants preparing for and following up on the Special Master Meetings. This chart was created by examining the time entries of Bruce Bell and Benjamin Ross's firms, both of whom attended the Special Master Meetings with the attorneys from Terris Pravlik. See Plaintiffs' Exhibits 14 (Attachment B, pages Bell 199-245); and 15 (Attachment B, pages Ross 126-187). Based upon the information contained in their invoices, I added up the time they spent preparing for/following up on these meetings and averaged them. Those entries appear in this chart.

Michael D. Daneker
June 27, 2014
Page 11

combined rate of over $3,000/hr) were engaged in the conferencing.[13]   Further, many of the intra-office conferencing time entries are so vague that it is impossible to tell exactly what the attorneys were discussing.  For example, many narratives (notably generated by Bruce Terris) simply reference a conference/meeting with particular colleagues without any further explanation or indication as to the subject matter of the discussion.[14]   While Plaintiffs may argue that the use of categories/subcategories in the timekeeping records provides the requisite details for such subject matter, I do not find that argument sufficient for the Special Master meetings, given 1) the number of entries in which attorneys are simply listed as conferring with each other; 2) the number of attorneys involved in the conferring; and 3) the amount of fees that were generated on same.

As such, the extent of intraoffice conferencing in the preparation and follow-up process generated fees completely disproportionate to the purpose and content of these Special Master meetings.  Specifically, of the $181,688.34 Terris Pravlik spent on the category Special Master Meeting Preparation, $107,370.25 of those fees were intraoffice conferencing time.  That is approximately 60% of the time spent in this category, broken down as follows:

- All of Mr. Terris's 27.584 hours of time spent in the preparation category was intraoffice conferencing, and generated fees of $21,294.85;
- All of Ms. Pravlik's 28.901 hours of time spent in the preparation category was intraoffice conferencing, and generated fees of $22,311.57;
- Ms. Millian spent 38.78 hours intraoffice conferencing for Special Master Preparation, generating fees of $29,938.16;
- Ms. Alcorn spent 45.81 hours intraoffice conferencing for Special Master Preparation, generating fees of $26,020.08; and
- Ms. Weaver spent 17.88 hours intraoffice conferencing for Special Master Preparation, generating fees of $7,805.59.

While I acknowledge that a reasonable amount of preparation for these Special Master meetings was necessary, I believe that the amount of time spent conferring and the number of attorneys involved was excessive and unreasonable, particularly in light of the substantive work and review that naturally occurred while Terris Pravlik performed the Client/Site work between Special Master meetings.

Further, for Terris Pravlik to have generated $83,777.83 in fees following up on the Special Master meetings was unnecessary ($66,013.58 of which was intraoffice conferencing), broken down as follows:

- All of Mr. Terris, Ms. Pravlik's, and Ms. Weaver's time in this follow-up was spent on intra-office conferencing, generating fees of $36,675.10;

---

[13] As previously indicated, such entries involving four to five attorneys per conference appear in RED text in the IOC SM Exhibit.

[14] As previously indicated, such entries appear in BOLDED text in the IOC SM Exhibit.

Michael D. Daneker
June 27, 2014
Page 12

- All but .83 hours ($640.76) of Ms. Millian's 21.933 hours in this category was spent intra-office conferencing, generating fees of $16,291.52; and
- Ms. Alcorn spent 22.97 hours in this category intra-office conferencing, generating fees of $13,046.96.[15]

The amount of time discussing a recap of what occurred at the Special Master Meetings and determining follow-up steps was also unreasonable, particularly when a brief memorandum memorializing developments at the meeting would have achieved the same objective and been far more cost-efficient. It is also important to note that, on top of the excessive intraoffice conferencing fees Terris Pravlik generated for the Special Master Meetings, Terris Pravlik then generated an additional $39,245.50 in non-working travel time to attend these meetings. Line Nos. 1932-1961. In today's legal market, many clients will not pay for travel time, and, in the alternative, most attorneys work while in transit. Given that the Terris Pravlik attorneys who attended these Special Master Meetings all billed substantially for intraoffice conferencing during the preparation and follow up process, it seems entirely unreasonable to me that they billed additional non-working time on the train (otherwise perfectly suited to conduct necessary preparations).

In sum, Terris Pravlik's intraoffice conferencing time warrants more than a 20% reduction for several reasons, including, a) the extent to which the total amount of Terris Pravlik's $290,343.15 of intraoffice conferencing was spent on Special Master Meeting Preparation and Special Master Meeting Follow Up, particularly given the length of the Special Master meetings and the number of attorneys who conferred without actually attending the meetings; b) the vagueness of many of the time entries; and c) Terris Pravlik's decision to bill an additional $39,245.50 in non-working travel time that could have been productively utilized to prepare for meetings. Accordingly, I believe that a 50% reduction in Terris Pravlik's intraoffice conferencing fees for the 2012-2013 Fee Application more appropriately reflects the excessive amount of time/fees incurred in this category.

### 3. Clerical/Administrative Time

Administrative and clerical activities are generally considered part of a law firm's overhead expenses, and, as such, are already included within the law firm's pricing in the establishment of hourly rates for professional services. Clerical activities include tasks that do not require legal acumen and that should be effectively performed, at no charge to the client, by secretaries, file clerks and other non-professional staff of the law firm.

The client should also not be charged for items which are traditionally included in a law firm's overhead, such as secretary salaries, costs of maintaining a library, malpractice insurance, utilities and like kind expenses. Fees billed for office management/clerical work, and hence, attorney overhead, are, in my opinion, not separately compensable from the fees billed by the attorneys. The billing by attorneys and paralegals for the performance of clerical or secretarial

---

[15] *See* Exhibit C (summarizing intraoffice conferencing spent on Special Master meeting preparation and follow up).

Michael D. Daneker
June 27, 2014
Page 13

tasks is both unreasonable and inappropriate.  These tasks could and should be delegated to non-billing staff members or not charged to the client if performed by billing staff members.[16]

In these matters, I noted several types of such entries.

- Fees generated by paralegals to proofread (as opposed to cite check) documents. In Plaintiffs' 2012-2013 Fee Application, Terris Pravlik generated over 25 hours and $4,483.50 in paralegal proofreading charges.  Line  Nos. 3, 6, 22, 39, 58-59, 82-83, 142, 146, 222, 251, 327-328, 372, 774-777, 779, 864, 925, 1014, 1061, 1297, 1324, 1348, 1968-1971, 1995, 1999, 2023-2024, 2029.   The time entries demonstrate that these documents for which Terris Pravlik charged such fees were, with very few exceptions, letters – mostly to the Special Master as well as some unspecified "cover letters."  In addition to the fact that these documents had already been drafted and reviewed/revised by sometimes more than one attorney at a time, these were also not major motion papers or pleadings that required such efforts to finalize.  This proofreading was an activity that could and should have been performed at no cost by a secretary.  Furthermore, considering the number of attorneys who were already spending substantial amounts of time on these documents, to assign and charge for yet another person to review/edit the work is unreasonable and unnecessary.[17]

- Time spent by attorneys providing "clerical" related instructions to staff/other attorneys.  Line Nos. 63 and 755 (instructions re: proofreading), 769-771 (instructions re: "creating a file" and "checking figures and exhibits"), 854 (instructions re: submission of a letter), and 984 (instructions on providing documents to experts).  No paying client would agree to pay for charges such as these, and I conclude that they are unreasonable.  Not including block billed entries (for which an exact calculation cannot be made), the attorneys at Terris Pravlik spent at least 4.59 hours on these types of tasks, generating fees of $3,100.80.

- Miscellaneous clerical/administrative entries for which time should not be billed, such as Ms. Alcorn correcting a filing mistake (Line No. 1178)[18]; Ms. Alcorn spending 3 hours reviewing the record for instances of "filing problems" (Line No. 1912), paralegals discussing IT issues (Line No. 773); and paralegals comparing tables (Line No. 387).  Not including block billed entries (for which an

---

[16] *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989): "Of course purely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performs them."

[17] *See, e.g.*, Line Nos. 1-13, reflecting efforts by Mr. Terris (in oversight work), Ms. Millian, and Ms. Weaver drafting/editing a letter to Special Master Torricelli, and then assigning 2 paralegals to proofread it; and Line Nos. 1974-2007, reflecting efforts by Ms. Alcorn, Mr. Terris, and Ms. Pravlik to prepare the 2011 and 2012 Fee Submissions to Honeywell (which included reviewing/checking time records and calculations), and then assigning 2 paralegals to perform additional proofreading.

[18] Unless otherwise indicated, Line Numbers referenced in this Report refer to Line Numbers from Plaintiffs' Time Records at Exhibit 7.

Michael D. Daneker
June 27, 2014
Page 14

exact calculation cannot be made), the attorneys at Terris Pravlik spent at least 4.31 hours on these types of tasks, generating fees of $2,062.94.

I conclude that the **$9,647.24** in fees Terris Pravlik spent on this work was unreasonable.

## 4.   Excessive Time Spent in Technical Categories

In environmental matters such as the one at hand, there is a need for attorneys to engage technical consultants to provide advice on the array of technical and/or scientific-related issues which may arise. In support of its Fee Application, Plaintiffs have submitted Affidavits from 8 consultants who performed technical work over the course of 2012 and 2013. *See* Exs. 14-20, Corrected Ex. 21. These consultants presumably possessed experience and expertise in the technical disciplines required to assist in the review and analysis of the technical issues related to the monitoring work. In the aggregate, these consultants were paid $494,980.44 in 2012 and 2013 to provide such expertise to Terris Pravlik. *See* Ex. 9 (Summary of Expenses).

In my experience as an environmental attorney, I am well aware of the nature of the relationship between attorneys and consultants in remediation/monitoring processes such as this one. I appreciate (and have handled) situations in which the technical issues and the legal issues are connected and require attorney attention in order to ensure that the technical issues are handled appropriately and that any legal obligations of the parties are being satisfied as necessary. Given the "scientific" issues involved in environmental law, I also fully appreciate that, when it comes to certain technical issues there is, in fact, a need for attorneys to have, as Ms. Millian states, a "clear understanding of the issue, how it arose, the history of negotiations, and the basis for the expert's opinion." Millian Affidavit, paragraph 34.

However, the extent to which an attorney should be engaging in the technical realm has its limits and, in the end, the burden to demonstrate the reasonableness of any of such technical time spent is on that attorney – it does not shift to the party responsible for paying such fees to demonstrate unreasonableness. In this case, Terris Pravlik bears the burden to show that this time was reasonable.

In order to evaluate the Terris Pravlik technical time to confirm my preliminary assessment that the time incurred by Terris Pravlik was excessive, I carefully reviewed all of the Terris Pravlik and technical consultant time entries/invoices for 2012 and 2013 (Exhibit 7). The Client/Sites and respective fees I specifically examined for technical work were as follows:

|  | Total Terris Pravlik Fees | Total Consultant's Fees |
|---|---|---|
| Study Area 7 | $144,017.98 | $135,130.27 |
| Study Area 6 North | $540,959.40 | $167,981.72 |
| Study Area 6 South | $70,167.32 | $47,101.24 |
| Colonial Concrete | $28,516.44 | $1,350.00 |
| Sites 79 and 153 South | $21,074.75 | $7,343.96 |
| NJCU CD | $63,869.19 | $23,162.71 |
| Study Area 5 Groundwater | $18,350.91 | $4,744.00 |

Michael D. Daneker
June 27, 2014
Page 15

| | | |
|---|---|---|
| SA5-7 Financial Assurances | $10,834.63 | $294.00 |
| SA5-7 General Matters | $431,113.80 | $107,872.54 |
| **Total Fees:** | **$1,328,904.42** | **$494,980.44** |

I also carefully read the Millian Affidavit in order to understand the nature of and reasons for the workload Terris Pravlik performed for each of these Client Sites and Categories/Subcategories associated with same. Based on this review, I had several observations.

First, as shown above, for all of the Client Sites, Terris Pravlik outspent their consultants, oftentimes by two or three times the amount of fees. Second, many of Terris Pravlik's time entries within these particular Client Site Categories/Subcategories are true "hybrid" entries – in that they reflect both legal and technical work being performed in one entry or, in the alternative, the narrative in the time entry is not clear enough to make such a determination. Third, while the Millian Affidavit attempts to explain the work involved in each Client Site Category/Subcategory, it does not adequately articulate the reasons for the excessive staffing of certain Subcategories (sometimes up to four attorneys billing time (including three senior partners)), which is excessive and unreasonable. Fourth, the Millian Affidavit does not explain what I believe to be excessive amounts of time (sometimes up to 8 hours a day by Ms. Alcorn) on what appears to be the review of technical documents and/or correspondence with consultants. Based on these four observations (all of which shall be supported with examples below), it appears that a) Terris Pravlik has incurred unreasonable legal fees in duplication of and overlap with the very work for which their consultants were engaged to perform, and b) the overall time spent in several of the subcategories was excessive. The firm's time entries and correspondence memorializing their technical comments/review reflect what appears to have been an overblown and unnecessarily excessive review (often by multiple attorneys within the firm at its highest billing rates) of reports, documents, and other technical issues raised in the case.

I next attempted to identify any readily apparent overlap and duplication of technical issues/documents by comparing Terris Pravlik's time entries in the Client Site Categories/Subcategories with that of their consultants, particularly in the Category of 100% Design in Study Area 6 (both North and South). Unfortunately, this exercise did not provide any helpful indication of such overlap for several reasons. First, the descriptions of time in the consultants' invoices are generally not specific enough to allow for a thorough and accurate side-by-side comparison of time spent between the lawyers and the consultants. Second, the way in which many of the consultants billed and categorized their time did not provide a clear understanding to which Client Sites and Categories/Subcategories they were referring when describing their work (i.e., Bruce Bell, who billed to different categories such as "Roosevelt Drive-In" and "SA6 N-S Remediation") than Terris Pravlik did. Third, some of the consultants, namely O'Connell, did not even provide specific dates corresponding to each billing entry contained in his invoices, or even the identity of the billers involved. Therefore, I was still unable to evaluate thoroughly and accurately whether and to what extent Terris Pravlik's time on this technical work was excessive and duplicated that work performed by their consultants.

Michael D. Daneker
June 27, 2014
Page 16

For these reasons, a line-by-line analysis of each Terris Pravlik time entry would not have provided a thorough and accurate conclusion. Therefore, I chose to identify and analyze the time entries in several specific Categories/Subcategories for which the amount of time/fees generated by Terris Pravlik appeared excessive and disproportionate to what was necessary. This is appropriate given the time/fees generated by Terris Pravlik in the specific Category of 100% Design (and certain Subcategories within), and the fact that the billings for the expenditure of time by Terris Pravlik in this single Category exceeded the entire amount of monies paid to their own consultants for all categories of work for all of 2012 and 2013. *See* Ex. 9 (Summary of Expenses).

I have therefore conducted a detailed analysis of Terris Pravlik's technical time spent by its attorneys in six specific Subcategories within the 100% Design Category for Study Area 6 (both North and South). The time/fees and the performed work associated with these Subcategories were, in my opinion, so excessive and overstaffed that they were patently unreasonable and should be reduced accordingly. These Subcategories were as follows:

| Subcategory | Ex. 7 Line Nos. | Hours | Fees |
|---|---|---|---|
| Technical Issues, SA6North | (409-457) | 119.6 hours | $68,334.88 |
| In-Situ Treatment, SA6North[19] | (458-521) | 67.617 hours | $39,824.26 |
| Open Space Design Standards | (525-779) | 473.85 hours | $293,392.98 |
| Geotechnical Issues | (780-815) | 66.869 hours | $38,957.53 |
| Barrier Wall Issues | (836-883) | 63.902 hours | $38,310.29 |
| Technical Issues, SA6South | (967-1016) | 72.817 hours | $41,308.27 |

**Total Hours: 864.655          Total Fees: $520,128.21**

### *Technical Issues (Both Study Area 6 North and South)*

In the Subcategory of Technical Issues, five attorneys (including the three senior named partners) spent 119.6 hours and generated $68,334.88 in fees on Study Area 6 North work, and four attorneys (including the three senior named partners) spent 72.817 hours and generated $41,308.27 in fees on Study Area 6 South work. According to the Millian Affidavit, the time spent in the Technical Issues subcategory "generally relates to the review and comment process before Special Master Torricelli" and that, "[s]ince this process involved multiple rounds of review, significant time was required." Millian Affidavit, paragraph 54(a). The Affidavit then goes on to describe generally why the fees were so high, including the rounds of comments involved, the need to "track the various issues and agreements made between the parties," and plaintiffs dealing with "separate documents and separate attachments" for the design. Millian Affidavit, paragraph 54(a)-(c).

However, upon review of the time entries in this subcategory (Study Area 6 North - Line Nos. 409-457; Study Area 6 South – Line Nos. 967-1016), there is no satisfactory explanation for the excessive time incurred in this category. First, Terris Pravlik does not explain why five attorneys were needed to staff this subcategory in Study Area 6 North, particularly when four of

---

[19] For purposes of this Section, I have only chosen to highlight the In-Situ Treatment work for Study Area 6 North.

Michael D. Daneker
June 27, 2014
Page 17

them, including the three named senior partners, did little more than edit letters and confer amongst one another (*see* Line Nos. 450-457), and why four attorneys were needed to staff this subcategory in Study Area 6 South, particularly when three of them did little more than edit letters and confer amongst one another (*see* Line Nos. 1008-1112 and 1016).  Second, it is unreasonable that Ms. Alcorn combined <u>entire days</u> worth of tasks (between 6-8 hours at a time) into single time entries that reflected work performed on document review, conversations with consultants, and comment review without adequate breakdowns of her time and without appropriate explanations of <u>what legal and/or technical issues</u> she was reviewing/discussing. *See, e.g.*, Line Nos. 410-411, 436-437, 439.  Third, I noted additional block-billed entries for Ms. Alcorn that were similar in nature to the "full-day" entries (between 2-5 hours at a time) that also failed to provide adequate breakdowns/descriptions of issues.  *See, e.g.*, Line Nos. 412-418, 983, 987, 989, 990, and 997.   Finally, I observed entries for Ms. Alcorn that demonstrated general "review" of technical documents without further explanation as to whether this was a legal or a technical effort.  *See, e.g.*, Line Nos. 976, 981-982, and 985-986.

Examples of the text contained in such time entries for Ms. Alcorn are as follows:

- Review history of technical issues negotiations and reissued 100% design; review comments of B. Ross, K. Hosea and J. Rogers; phone calls w/ K. Hosea, B. Ross and J. Rogers re: comments on design; phone with J. Johnson re: review of design (8 hours), *see* Line No. 436;
- Review of design submission (7 hours), *see* Line No. 411;
- Phone calls with Ross and Hosea re: comments; review SA6N and S design submission re: same (4 hours), *see* Line No. 412;
- Phone calls with experts Ross, O'Connell and K. Hosea re: review of reissued design documents; Instruct paralegal re: documents to provide to experts; Organize and begin review of design submission (6 hours), *see* Line No. 410;
- Phone call with K. Hosea re: comments and changes consistant [sic] with SA6North; Phone call with J. Rogers re: same; review Ross comments; phone call with O'Connell re: comments (5 hours), see Line No. 983; and
- Review design and expert comments; discussions and correspondence with experts re: comments on design documents (5.03 hours), *see* Line No. 987.

*In-Situ Treatment*

In the Subcategory of <u>In-Situ Treatment</u>, four attorneys (including the three senior named partners) spent 67.617 hours and generated $39,824.26 in fees on this work.  According to Terris Pravlik, the time spent in this subcategory "is for work related to the in-situ treatment work plans and contractor plans for both Study Area 6 North and Study Area 6 South."  Millian Affidavit, paragraph 54(d).  The Affidavit then goes on to describe generally why the fees were so high, describing, among other things, tasks related to a revised work plan such as "reviewing the document, consulting with the experts regarding their comments, submitting comments, and reviewing and responding to Honeywell's response to plaintiffs' comments."  *Id*. at paragraph 54(h).

Michael D. Daneker
June 27, 2014
Page 18

However, upon review of the time entries in this subcategory (Line Nos. 458-521), there is no satisfactory explanation for the excessive time incurred in this category.  First, Terris Pravlik does not explain why four attorneys were needed to staff this subcategory, particularly when the three named senior partners involved primarily edited letters and conferred amongst one another (*see* Line Nos. 504-521).  Second, it is unreasonable that Ms. Alcorn combined multiple tasks (between 2-5 hours at a time) into single time entries that reflected work performed on document review, conversations with consultants, and comment review without adequate breakdowns of her time and without appropriate explanations of what legal and/or technical issues she was reviewing/discussing.  *See, e.g.*, Line Nos. 470, 474, 479-480, 486-487, and 501.  A careful review of the entries indicates that approximately half of Ms. Alcorn's 60.667 hours of time was contained in these types of block-billed and vague entries.

Examples of the text contained in such time entries for Ms. Alcorn are as follows:

- Review history of hydraulic performance issue; review Site 79 in-situ materials re:hydraulic performance issue; phone call with B. Ross re: same (2.08 hours), *see* Line No. 470;
- Phone call with B. Ross and G. Flowers re: Honeywell Response to comments about Contractor implementation plan; review plan and AMEC RTC; review draft comments (2.80 hours), *see* Line No. 474;
- Review contractor implementation plan and AMEC memo re: treatment area 8; review history of treatment area 8 issue (5 hours), *see* Line No. 480; and
- Review expert comments re: contractor plan; phone call with B. Ross re: comments; draft letter to Honeywell re: comments (3.02 hours), *see* Line No. 487.

*Open Space Design Standards*

In the Subcategory of Open Space Design Standards, five attorneys (including the three senior named partners) and two paralegals spent 473.85 hours and generated $293,392.98 in fees on this work.  According to the Terris Pravlik, the time spent in this subcategory "was for work related to the negotiation and drafting of the OSDS."  Millian Affidavit, paragraph 54(j).  I fully understand the purpose and importance of the document, the process by which the document was negotiated, as well as the fact that the OSDS is "a complex document that blends legal standards with technical matters."  *Id.*, paragraphs 54(k)-(t).

However, upon review of the time entries in this subcategory (Line Nos. 525-779), there is no satisfactory explanation for the excessive time incurred in this category.  First, the Millian Affidavit does not explain why five attorneys and two paralegals[20] were needed to staff this subcategory, particularly since three of the attorneys' participation was so minimal and involved editing letters and conferring amongst one another (*see* Line Nos. 574, 665-666, 681, and 721).  Second, Terris Pravlik also does not explain the extreme discrepancies in the amounts of time/fees devoted to the ten different OSDS drafts (as well as the final review) – for example,

---

[20] In fact, the Millian Affidavit does not accurately reflect such staffing, claiming that the firm only utilized the services of two attorneys in these efforts.  Millian Affidavit, paragraph 54(u).

Michael D. Daneker
June 27, 2014
Page 19

why the October 2012 Draft required four attorneys and over 50 hours time, yet the subsequent January 2013 Draft only required approximately 8 hours divided among two attorneys.  *See* Ex. 6 (Summary of Time).    Third, it is unreasonable that Mss. Alcorn and Pravlik combined <u>entire days</u> worth of one or more tasks (between 6-8 hours at a time) into single time entries.  Many of these entries reflected block-billed work performed on document review, conversations with consultants, analyzing unspecified OSDS issues/preparing for the meetings, and performing comment review without adequate breakdowns of their time and without appropriate explanations of <u>what legal and/or technical issues</u> they were reviewing/analyzing.  *See, e.g.*, Line Nos. 547, 549, 568, 577.  Other entries reflect that the attorneys spent their entire day drafting the OSDS documents.  *See, e.g.*, Line Nos. 568, 585, 587, 618.  Finally, it is patently unreasonable that Terris Pravlik outspent its two consultants, Drs. Bell and Ross, in this subcategory by, <u>at minimum</u>, over $130,000.00.[21]

Examples of the text contained in such time entries for Mss. Alcorn and Pravlik are as follows:

- Phone calls and e-mails with M. Daneker, S. Jackson and other parties re: scheduling Open Space Design Standards meeting; analysis of remaining Open Space Design Standards issues (8 hours), *see* Line No. 547 (Alicia Alcorn);
- Analysis of remaining Open Space Design Standards issues; prep for Open Space Design Standards meeting (6.5 hours), *see* Line No. 549 (Alicia Alcorn);
- Revise Open Space Design Standards; discuss Open Space Design Standards with experts Rogers, Bell and O'Connell (7 hours), *see* Line No. 568 (Alicia Alcorn);
- Draft revisions to standards (10.73 hours), *see* Line No. 573 (Carolyn Smith Pravlik);
- Prep for meeting with Honeywell and Special Master re:  latest draft -- Meeting with Honeywell and Special Master -- Revise draft (8.63 hours), *see* Line No. 588 (Carolyn Smith Pravlik); and
- Draft OSDS (7.25 hours), *see* Line No. 618 (Alicia Alcorn).

*Geotechnical Issues*

In the Subcategory of <u>Technical Issues</u>, five attorneys (including the three senior named partners) spent <u>66.869 hours</u> and generated <u>$38,957.33</u> in fees on this work.  According to Terris Pravlik, the time spent in this subcategory is for work "related to geotechnical issues identified by Dr. O'Connell regarding the surcharge plan proposed by Honeywell in 2011" (and that "close oversight by plaintiffs' counsel on [the technical issues] was essential."  Millian Affidavit, paragraphs 54(v) and (x).

However, upon review of the time entries in this subcategory (Line Nos. 780-815), there is no satisfactory explanation for the excessive time incurred in this category.  First, Terris

---

[21] Drs. Bell and Ross generated $163,309.58 in fees for work performed related to Study Area 6 (North and South).  Ex. 9 (Summary of Expenses).  Based on my review of the Bell and Ross invoices, I was unable to calculate with certainty how much of their time was devoted to the OSDS work.  However, even assuming (which I do not) that <u>all</u> of their work for these Study Areas related to OSDS, Terris Pravlik still outspent them by $130,000.00.

Michael D. Daneker
June 27, 2014
Page 20

Pravlik does not explain why three attorneys were needed to staff this subcategory, particularly when the two named senior partners involved, did little more than edit letters and confer amongst one another (*see* Line Nos. 809-810 and 813-815).  Second, it is unreasonable that Ms. Alcorn combined <u>multiple</u> tasks and/or entire days worth of work (between 2-6 hours at a time) into single time entries that reflected work performed on document review, preparing for meetings, conversations with consultants, and comment/response review without adequate breakdowns of her time and without appropriate explanations of <u>what legal and/or technical issues</u> she was reviewing/discussing.  *See, e.g.*, Line Nos. 785, 788-790, 796, and 808.

Examples of the text contained in such time entries for Ms. Alcorn are as follows:

- Phone calls with B. Ross and K. O'Connell re: geotechnical meeting; prepare for geotechnical meeting on 3/1/12 (2 hours), *see* Line No. 785;
- Review Honeywell geotechnical response and prepare for meeting with J. Johnson re: same; phone call with J. Johnson re: additional data provided by Honeywell; phone call with J. Karpatkin re: additional data requested from HW (4 hours), *see* Line No. 796;
- Review Honeywell response to geotechnical/road comments (6 hours), *see* Line Nos. 788-789; and
- Phone call with J. Johnson re: geotechnical meeting issues; prep for meeting (3.75 hours), *see* Line No. 805.

### *Barrier Wall Issues*

In the Subcategory of <u>Barrier Wall Issues</u>, four partners (including the three senior named partners) and two paralegals spent <u>63.902 hours</u> and generated <u>$38,310.29</u> in fees on this work.  According to Terris Pravlik, the time spent in this subcategory is for work "related to the revision of the 100% Design to relocate the underground barrier wall . . .," which "raised numerous technical and legal issues." Millian Affidavit, paragraph 54(aa) and bb).  "Plaintiffs' counsel assessed the legal implications of the proposed change to the 100% Design under the terms of the Consent Decree and, in addition, assessed impacts to existing institutional controls like the conservation restriction for Study Area 6 North.  Plaintiffs' counsel also consulted with their experts regarding whether Honeywell's proposal was appropriate from a technical perspective." *Id.*, paragraph 54(cc).

However, upon review of the time entries in this subcategory (Line Nos. 836-883), there is no satisfactory explanation for the excessive time incurred in this category.  First, Terris Pravlik does not explain why four partners (given that this work was performed in 2013 after Ms. Alcorn was promoted) and two paralegals were needed to staff this subcategory, particularly when two of the named senior partners involved did little more than edit letters and confer amongst one another (*see* Line Nos. 860-863 and 867-868).  Second, it is unreasonable that Ms. Alcorn combined <u>multiple</u> tasks (between 1.75 and 5.5 hours at a time) into single time entries that reflected work performed on document review, preparing for meetings, conversations with consultants, and comment/response review without adequate breakdowns of her time and without appropriate explanations of <u>what legal and/or technical issues</u> she was reviewing/discussing. *See, e.g.*, Line Nos. 837, 839, 843, 845, 846, 850, and 851.

Michael D. Daneker
June 27, 2014
Page 21

Examples of the text contained in such time entries for Ms. Alcorn are as follows:

- Review materials regarding the barrier walls and force main to prepare for meeting with Honeywell and DEP; phone calls with/ Hosea re: same (1.75 hours), *see* Line No. 837;
- Review design and CD docs related to barrier wall issue; analysis of issues that will need to be addressed if wall is moved; Phone calls with Ross, Bell and Hosea re: same; discuss with KLM; phone calls with J. Karpatkin re: 100% Design and open issues (5.5 hours), *see* Line No. 839;
- Prepare for and phone call with O'Connell re: barrier wall and force main geotechnical issues and  AMEC assessment; analyze additional questions for K. Hosea based on issues raised by O'Connell; provide additional materials and information to O'Connell (2.5 hours), *see* Line No. 845;
- Review additional material provided by Honeywell including MOU, Contingency Response Plan, figures and data (2.5 hours), *see* Line No. 846; and
- Review Honeywell supplemental assessment and confirmation letter from Hatch MottMacDonald; Review related design drawings and attachments; Review letter to DEP re: same; phone call with O'Connell re: same (3.4 hours), *see* Line No. 850.

In sum, based upon my experience supervising complex environmental remedial matters throughout the world, I have never seen this level of unreasonable, task-inappropriate, and excessive handling of this type of remediation/monitoring work that I observed in these subcategories.  I will also reiterate that <u>no paying client</u> would have approved this level of excessive technical review by the multiple Terris Pravlik attorneys in these subcategories, especially given the competent, skilled consultants also engaged in that very process, as well as the additional measure of technical oversight provided at the behest of the United States District Court through Special Master Torricelli (and his able team of technical consultants).

Based on my review, I have observed systematic issues with the fees and time entries in the subcategories described above, including excessive and disproportionate time spent in these subcategories, hybrid legal and technical entries, vague billing, and block billing.  It is my opinion that these fees and time entries do not adequately support the information contained in Plaintiffs' Fee Application, including the Millian Affidavit, justifying the reasonableness of these fees.  More specifically, 1) I cannot determine the nature of the majority of conversations these attorneys had with the consultants (and, as mentioned above, the consultants' invoices do not provide assistance in this area); 2) I cannot determine how much time was spent on which particular comments/design discussed in the Millian Affidavit (because the time entries do not specify); and 3) I cannot determine how the hybrid entries of legal/technical time were broken down in order to evaluate the reasonableness of the attorneys efforts in both areas.  Consequently, I conclude that the total amount of time/fees generated in these subcategories as well as the staffing was excessive on its face given Ms. Millian's description of the workload, and therefore, they were unreasonable.

For all the reasons described above, I conclude that Terris Pravlik has not met its burden of demonstrating that the excessive time/fees generated on technical issues in the respective

Michael D. Daneker
June 27, 2014
Page 22

Subcategories of the 100% Design Category for Study Area 6 (North and South) were reasonable. It is also important to note that these were by no means the only technical subcategories in which Terris Pravlik's excessive amounts of time spent in the subcategories generally, combined with their systematic hybrid legal and technical entries hampered my ability to evaluate the reasonableness of their fees. However, in my opinion, these six subcategories were the most egregious examples of such excessive and overblown technical work, and allowed me to highlight in the most productive way possible the multiple and overlapping unreasonable billing practices I observed for purposes of applying an appropriate reduction.

With regard to determining an appropriate reduction, I first must acknowledge three things: 1) I have already recommended reductions for portions of such time/fees described above in other Sections of this report, including time/fees for Bruce Terris Oversight Time, Intraoffice Conferencing, and Clerical/Administrative time; 2) despite my observation that the technical consultants' time entries were generally vague, I am not recommending reductions in their time for such reason[22]; and 3) due to the multiple and overlapping unreasonable billing practices I observed by Terris Pravlik in these particular subcategories, including excessive amounts of time, vague, and block-billed entries, and considerable amounts of time incurred on what appears to be technical work, the most fair and appropriate way to capture the extent of the unreasonable billing practices is to recommend a percentage reduction in fees for the subcategories described above.

Based on my experience as an environmental lawyer and litigator and my supervision of complex remedial projects throughout the world, and taking into account the other reductions I have already recommended for certain unreasonable billing practices in this category, I recommend applying a 30% reduction to the $520,128.21 in fees generated in the 100% Design Category, resulting in a reduction of **$156,038.46**.

## 5. Special Master Meeting Attendance

Terris Pravlik reported to have spent $96,005.32 in fees attending the Special Master Meetings. However, Terris Pravlik's breakdown of fees in this category was not entirely accurate or complete. My review of the billing records revealed that additional preparation and/or follow up time was improperly categorized within the "Attendance" category. At least **$6,859.81** of additional preparation and/or follow-up time was charged in February (Line Nos. 1614/1637), March (Line Nos. 1616/1639), April (Line Nos. 1619/1642), June (Line Nos. 1622/1646), and July (Line Nos. 1623/1647) of 2012 and September (Line Nos. 1626/1651), October (Line Nos. 1628/1653), and December (Line Nos. 1632/1657) of 2013 by Ms. Millian and/or Ms. Alcorn under the category "Attendance," which does not properly reflect the task performed in this category. Specifically, for these months, I noted that one attorney attendee billed for the attendance at the meeting only, while the second attorney attendee block billed her attendance with additional tasks such as preparing and/or conferring with the experts. I therefore recommend reimbursing the block biller in those particular months for time spent attending the meeting only, especially given a) the fact that the attorney billed time to the wrong category and

---

[22] *But see* Section 8, in which I recommend reductions in the technical consultants' fees for other reasons.

Michael D. Daneker
June 27, 2014
Page 23

b) the excessive amount of fees Terris Pravlik already generated for the preparation and follow up process.[23]

Additionally, as much as **$53,848.00** of attendance time was charged in January, May and November of 2012 (Line Nos. 1612/1635, 1620/1643, and 1631/1656), and in January, March, May, July, and November of 2013 (Line Nos. 1613/1634, 1617/1636, 1621/1644, 1624/1648, and 1630/1655), but cannot be parsed out because of block-billed entries by all of the meeting's attendees. This is problematic because a) the attorneys were billing time to the wrong category; b) I cannot tell exactly how much time was spent actually meeting with the Special Master and how much time was incorrectly billed; and c) Terris Pravlik already generated what I believe to be excessive amounts of fees in the categories of Special Master Meeting Preparation and Special Master Meeting Follow Up. Therefore, to the extent that Honeywell or this Court cannot determine the breakdown of the time/fees associated with the block-billed entries, Terris Pravlik has not met its burden of proving the reasonableness of its fees and expenses, and the fee award should be reduced accordingly.

### 6. <u>Preparation of Fee Submissions</u>

In the Category of SA 5-7 Fees, Terris Pravlik incurred $52,474.04 in fees (*see* Plaintiffs' Exhibit 6 (Summary of Time)), which included the preparation of informal Fee Submissions for the Second Half of 2010, 2011 and 2012, according to Ms. Millian's Affidavit at pages 71-72. A portion of this work involved Terris Pravlik's attorneys reviewing their own time records as well as those of their consultants in support of these submissions. Line Nos. 1962-2029. This work involved four attorneys (including three senior partners) and four paralegals reviewing time/expense records, making calculations, creating exhibits that selectively presented Terris Pravlik's time and fees, proofreading, and conferring with one another about same.

In addition to the excessive time and fees spent on these tasks, the majority of the work in this Category was performed by Ms. Pravlik at her senior partner rate of $772/hr, totaling $42,577.36 – <u>over 80%</u> of the fees incurred in this category. Line Nos. 1972-1994, 2000-2004, 2011-2022, and 2026-2028. Additionally, Ms. Pravlik spent approximately 33 of her 55.152 hours (almost 60% of her time) reviewing Terris Pravlik's (and its consultants') time and expense records (including checking calculations), which is not only task-inappropriate, but arguably clerical and should have been performed at no cost by a secretary. *See generally* Line Nos. 1972-1993, and 2002-2003.

Furthermore, many of the time entries in this fee category involved intra-office conferencing (Line Nos. 1978, 1980, 1996, 2007, 2009-2010, 2016, 2018, 2020, 2025), attorneys providing instructions to support staff about the relevant time records (Line Nos. 1964-1965, 1982, 1984, 1986, 1991, 1994), proofreading (Line Nos. 1967-1971, 1995, 1999, 2023-2024),

---

[23] For purposes of clarifying my recommended reduction of $6,859.81: for each month listed above in 2012 and 2013, I calculated the difference between 1) the block-biller's total time for that month and 2) the non-block-biller's total time for that month. I then multiplied that difference by the block biller's rate. I then added the total fees for each month where this issue occurred to arrive at the sum of $6,859.81.

Michael D. Daneker
June 27, 2014
Page 24

and were block-billed with other tasks, making a precise calculation of the time breakdown difficult.[24]

Moreover, Ms. Millian stated in her Affidavit that the time records Terris Pravlik submitted are contemporaneous.[25]  Assuming this is true, it is my opinion that the amount of time Ms. Pravlik and others billed to construct the fees and expenses portion of these prior fee submission should have been unnecessary and therefore was unreasonable.   If these contemporaneous records already existed, there was no reason for four attorneys and four paralegals to spend the amount of time they did performing the work described in the submitted time entries.

For these reasons, I recommend an additional reduction (not including time already reduced for Bruce Terris Oversight Time and Clerical Proofreading) of **$25,000.00** – the approximate amount of time/fees (33 hours times her rate of $772/hr) spent by Ms. Pravlik unnecessarily reviewing Terris Pravlik's time/expense records and/or calculations.

### 7.  Non-Working Travel Time

In Plaintiffs' 2012-2013 Fee Application, Terris Pravlik generated **$55,220.33** in non-working travel time.  Ex. 7, Line Nos. 407-408, 960-966, 1932-1961.  Such fees should be eliminated as inappropriate, as it is my opinion that traveling attorneys should not charge for non-working travel time.  Moreover, many paying clients will not reimburse for non-working travel time, and thus Honeywell should not be required to do so, even if Honeywell is paying at a half rate for such time.  It is also important to note, as I discussed in Section 2, that the majority of the fees generated for non-working travel time resulted from the travel time to and from the Special Master Meetings.  Given the excessive amount of time Terris Pravlik already spent on the preparation/follow up for these meetings (*see* Section 2), I conclude that any additional charges generated for time spent on a train was even more superfluous and unnecessary under the circumstances.

### 8.  Consultant Time and Expenses

The Technical Consultants retained by Terris Pravlik incurred $494,980.44 in fees and expenses in 2012 and 2013.  A portion of such fees/expenses were excessive and unreasonable and should not be reimbursed as detailed below.

---

[24] Terris Pravlik also incurred charges in this category for Bruce Terris Oversight Time editing letters (Line Nos. 1966-1967 and 2006-2010) as well as proofreading charges incurred by paralegals (Line Nos. 1968-1971, 1995, 1999, 2023-2024, and 2029).  For purposes of calculations, those charges have already been addressed in separate sections of my report and therefore do not factor into my recommended reductions for purposes of the Preparation of Fee Submissions Work.

[25] *See* Millian Affidavit, paragraph 44.

Michael D. Daneker
June 27, 2014
Page 25

### A.  Bell/Ross Travel Expenses to Attend Special Master Meetings

Three of Terris Pravlik's consultants invoiced a total of $**62,796.50** in fees and **$10,069.74** in expenses to travel to 13 Special Master Meetings for a total of **$72,866.24**.[26] There were a total of 24 Special Master Meetings, 11 in which the consultants participated over the telephone (and which averaged .86 hours).[27]  The remaining 13 meetings took place in Roseland, NJ, to which Terris Pravlik and their consultants traveled (these 13 meetings averaged 2.1 hours).  As discussed above in Section 2, I note that Terris Pravlik timekeepers also spent nearly $40,000 on top of their consultants' fees and expenses to travel to these meeting (sending multiple billers from the firm on all but one occasion), for a total of over $100,000.00 in non-working travel time to travel to and from these 13 meetings in Roseland.

Bruce Bell of Carpenter Environmental Associates attended 9 of the in-person meetings and invoiced an average of 11.73 hours of travel time to and from each meeting (for a total of 105.5 hours of non-working travel time) at a rate of $320 - $330 per hour.  Mr. Bell's colleague at Carpenter, Kim Hosea, invoiced an average of 3.175 hours of travel time when she attended the meetings in Roseland, at her substantially lower rate of $230 per hour (for a total of 12.7 hours of non-working travel time). Mr. Bell participated in exactly half of the total 24 meetings, and Ms. Hosea participated in the other half.  Carpenter Environmental Associates billed in total $37,281.50 in non-working travel time for attending the Special Master Meetings in Roseland.[28] In addition, Carpenter billed $4,901.49 in Special Master Meeting expenses, all of which is undocumented and unsupported.[29]

Similarly, Benjamin Ross, of Disposal Safety, attended all 13 meetings in Roseland traveling to and from his office in Washington, D.C. Mr. Ross invoiced an average of 7.269 hours of non-working travel time for each trip (for a total of 94.5 hours and $25,515.00 in non-working travel time billed).[30]  Mr. Ross also seeks $5,168.25 in expenses for traveling to and

---

[26] Attached as Exhibit D is a chart entitled "Consultant Time/Expenses Totals," delineating a breakdown of all of consultant time and expenses incurred in 2012 and 2013 for which I am recommending reductions.

[27] See Exhibit F, entitled "SMM Conference Calls," delineating a breakdown of all time spent by Plaintiffs' consultants Bell and Ross on Special Master Meetings held by conference call.  The data for this chart was taken directly from Plaintiffs' Exhibits 14 (Attachment B, pages Bell 199-245) and 15 (Attachment B, pages Ross 126-187).

[28] All of the time/fees referenced thus far in this paragraph are reflected in Exhibit G, a chart entitled "Carpenter SMM Travel," delineating a breakdown of all time spent by Plaintiffs' consultants from Carpenter Environmental Associates traveling to and/or attending the Special Master meetings that were held in-person.  The data for this chart was taken directly from Plaintiffs' Exhibit 14 (Attachment B, pages Bell 199-245).

[29] Attached as Exhibit H is a chart entitled "Carpenter SMM Expenses," delineating a breakdown of all expenses incurred by Plaintiffs' consultants from Carpenter Environmental Associates relating to their travel to and/or participation in the Special Master meetings.  The data for this chart was taken directly from Plaintiffs' Exhibit 14 (Attachment B, pages Bell 199-245).

[30] Attached as Exhibit I is a chart entitled "Ross SMM Travel," delineating a breakdown of all time spent by Plaintiffs' consultant, Benjamin Ross, traveling to and/or attending the Special Master meetings that were held in-person.  The data for this chart was taken directly from Plaintiffs' Exhibit 15 (Attachment B, pages Ross 126-187).

Michael D. Daneker
June 27, 2014
Page 26

from Roseland. Unlike Carpenter, Mr. Ross did provide documentation for all but two (9/17/13 and 11/19/13) of the meetings (the expenses for those two meetings total $675.60).[31]

It is my opinion that all $62,796.50 in non-working traveling fees both Carpenter Environmental Associates and Mr. Ross billed should be eliminated as inappropriate. It is my opinion that neither lawyers nor their experts should be billing for non-working travel time, and in my experience most fee paying clients do not permit billing such time.

I also recommend a reduction in the expenses for both experts. In my experience, an expert's expenses should only be reimbursed upon provision of adequate documentation to ensure the legitimacy and accuracy of the charges. Carpenter Environmental did not provide documentation for any of their $4,901.49 in expenses for the meetings. In contrast, Mr. Ross did provide documentation for all but two (9/17/13 and 11/19/13) of the meetings (the expenses for those two meetings total $675.60). I therefore recommend reducing the claimed expenses by $5,577.09, the total of undocumented expenses for both expert firms. *See* Exhibit D.

I recommend a total reduction of **$68,553.59** for the experts' Special Master Meeting Attendance, broken down as follows: $62,976.50 in non-working travel time and $5,577.09 in undocumented expenses. *See* Exhibit D.

### B. Bruce Bell Clerical/Administrative Time

Certain of the time entries incurred by four members of the Carpenter Environmental firm appeared clerical or administrative in nature and as such are not properly billable. These categories included Document Management, Project Management/Budget or Job Files and amounted to $12,416.10.[32] Almost every month, Mr. Bell spent time on a category entitled Project Management/Budget for which there is no further explanation of the time incurred but was presumably spent evaluating the projected time that would be spent by his staff during the upcoming month. That time appears to be administrative/clerical in nature and should not be billed. Three individuals, Kelly Wood, Louis Matthews, Jr. and Kevin Dragonchuk spent a substantial amount of time performing Document Management, which appears to be a clerical/administrative function and not properly reimbursable.

I therefore conclude that the $12,416.10 performing clerical and administrative time was unreasonable.

---

[31] Attached as Exhibit J is a chart entitled "Ross SMM Expenses," delineating a breakdown of all expenses incurred by Plaintiffs' consultant, Benjamin Ross, relating to his travel to and/or participation Special Master meetings. The data for this chart was taken directly from Plaintiffs' Exhibit 15 (Attachment B, pages Ross 126-187).

[32] Attached as Exhibit K is a chart entitled "Bell Clerical" delineating all non-reimbursable clerical/administrative time generated by Carpenter Environmental Associates. The data from this chart was taken directly from Plaintiffs' Exhibit 14 (Attachment B, pages Bell 1-245).

Michael D. Daneker
June 27, 2014
Page 27

### C.  O'Connell Clerical/Administrative Time

Certain of the time charged by O'Connell employees was categorized as secretarial and should not have been charged.  The majority of these time entries were performed by Elizabeth Slick, for secretarial time including printing, typing up questions, preparing and reviewing documents, organizing binders, and assembling documents.  This time amounted to $1,800.00 – all of which I conclude was unreasonable.[33]

### D.  Bruce Bell Expenses

Carpenter Environmental incurred two expenses that appear to be overhead and should not be reimbursed.  The first was a $3,150.80 charge for computers and a $35.00 charge for equipment.  I also noted an additional $2,305.72 in undocumented expenses (Reproduction, Shipping/Supplies, and Non-Special Master Meeting Travel), which should not be reimbursed.[34] I consider each of these items as overhead of the firm and not properly reimbursable.

### E.  O'Connell Expenses

The O'Connell firm incurred an expense for a book in the amount of $64.00 purchased on April 7, 2012.  Exhibit 17 (Affidavit of Kenneth O'Connell) of Plaintiffs' Fee Application, Attachment B, Page "O'Connell 6."   I consider this item as overhead and not properly reimbursable.  In addition to the $64.00 book charge, O'Connell billed $746.73 in expenses, all of which are undocumented and should not be reimbursed.  *Id.*, at 3 ($22.20), 4 (15.44), 5 ($24.00), 17 ($30.09), and 23 ($655.00).

In sum, I conclude that **$89,071.84** of consultant fees/expenses were unreasonable and therefore should not be reimbursed.

### 9.  Terris Pravlik Expenses

Terris Pravlik generated $512,951.22 in expenses in their 2012-2013 Fee Application.  The majority of these expenses have already been discussed in the section above entitled "Expert Time and Expenses."  However, I noted some additional expenses that appeared unreasonable, either because they 1) should be considered overhead; 2) supplement my arguments that this matter was overstaffed and overworked (which lends to superfluous charges in categories such as printing); and 3) are so vaguely described in the billing narratives and have not been supplemented with backup invoices, and therefore it is impossible for me to determine what work was being performed and whether it was reasonable.  Such charges (as set forth in Exhibit 10 of the Fee Application) were as follows:

---

[33] Attached as Exhibit L is a chart entitled "O'Connell Clerical" delineating all non-reimbursable clerical/administrative time generated by O'Connell and his employees.  The data from this chart was taken directly from Plaintiffs' Exhibit 17 (Attachment B, pages O'Connell 1-40).

[34] Attached as Exhibit M is a chart entitled "Bell Other Expenses" delineating all non-reimbursable overhead and undocumented expenses.  The data from this chart was taken directly from Plaintiffs' Exhibit 14 (Attachment B, pages Bell 1-245).

Michael D. Daneker
June 27, 2014
Page 28

- Conference Calls: $181.19 (generated in Client/Sites SA7 (Line Nos. 1-2), SA6-North (Ex. 10, Line Nos. 254-255), and SA5-7 General Matters (Ex. 10, Line Nos. 874-878). Beyond providing a corresponding invoice number for these calls, Terris Pravlik has not provided supporting documentation with regard to these charges, nor have they indicated any details as to the conference calls to which these charges apply (*i.e.*, dates, times, participants, etc.).

- Document Production 3rd Circuit ($777.45) and Printing – Color ($400) (generated in all of the Client/Site Categories for the Fee Application): Terris Pravlik generated over $1,000 in printing charges over the course of 2012 and 2013. Based on my review of Exhibit 10, the firm is charging Honeywell for every instance of an attorney/staff member printing anything, including Word/PDF Documents, emails, receipts/reservations/expense reports, envelopes, resumes, and miscellaneous documents that are so vaguely described that it is too difficult to discern their nature (*see, e.g.,* Ex. 10, Line Items 111, 121, 150, 270, 271 - "Microsoft Outlook – Memo Style"). Additionally, in several instances, it appears that a) attorneys were printing documents more than once (*see, e.g.*, Ex. 10, Line Nos. 376-377, 451-453, 470-472, 618-619, 713-714, 719-720) and b) multiple attorneys/staff members were printing the same document (*see, e.g.*, Line Nos. 591-597, 846-847, and 1222-1223). Further, I noted several staff members who incurred printing charges whose participation in this matter has not been described/explained by the firm (*i.e.*, RAP, FLB, and CT), and who were printing mostly clerical documents such as the envelopes described above and PACER printing charges (for which, incidentally, Terris Pravlik incurred additional charges of $29.92 in a separate category entitled "PACER – Court Docket System" – *see* Exhibit 9).[35]

Without further information and amplification from Terris Pravlik regarding these categories of expenses, I cannot thoroughly and accurately evaluate them for reasonableness. I will therefore take the position that all such undocumented/unexplained expenses are unreasonable and should not be reimbursed.

---

[35] Terris Pravlik also incurred $58.78 in Westlaw charges for Client/Sites 79 and 153 South, SA5-7 General Matters, and SA5-7 Fees (*see* Exhibit 9). The time entries for Document Production in these categories (as set forth in Exhibit 10) are not specific enough for me to determine whether Terris Pravlik also may have incurred additional printing charges originating from this Westlaw research.

Michael D. Daneker
June 27, 2014
Page 29

## CONCLUSION

I conclude that Terris Pravlik has not met its burden of demonstrating the reasonableness of the fees/expenses it has incurred for the 2012-2013 Fee Application.  For this reason, and all of the other reasons set forth above, I conclude that the following reductions should be applied to the Terris Pravlik fees and expenses as follows:

1. Bruce Terris Oversight Time:  $14,567.64
2. Intraoffice Conferencing Time:  $145,171.58
3. Clerical/Administrative Time: $9,647.24
4. Excessive Time Spent in Technical Categories:  $156,038.46
5. Special Master Meeting Time
   a. Special Master Attendance: $6,859.81
   b. Special Master Block-Billed time:  $53,848.00
6. Preparation of Fee Submission:  $25,000.00
7. Terris Pravlik Non-Working Travel Time: $55,220.33
8. Consultant Time/Expenses: $89,071.84
9. Terris Pravlik Expenses:  $1,358.64 (Conference Calls, Document Production, and Printing – Color Charges)

Total Recommended Reductions in Fees:  $466,353.06

Total Recommended Reductions in Terris Pravlik Expenses and Terris Pravlik's Consultant Time/Expenses: $90,430.48

**Total Recommended Reductions in Fees/Expenses:  $556,783.54**

Respectfully Submitted,

Steven A. Tasher, Esq.
CEO and Managing Director
Wyatt Partners, LLC
P.O. Box 358
Berkeley Heights, New Jersey 07922
Email:  stasher@wyattpartners.com
Telephone:  (908) 561-7483